UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| THE NATIONAL SECURITY ARCHIVE,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT,<br>　　et al.,<br><br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　　Civ. No. 07-1577 (HHK)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## PLAINTIFF'S MOTION FOR LEAVE TO SERVE EXPEDITED DISCOVERY REQUESTS AND TO COMPEL RULE 26(f) CONFERENCE

Pursuant to Rules 26(d) and 33(a) and 34 (b) of the Federal Rules of Civil Procedure, Plaintiff the National Security Archive (the "Archive") hereby moves for entry of an order expediting the commencement of discovery and compelling the parties to meet pursuant to Rule 26(f) as soon as possible. Defendants have not responded to the Archive's request pursuant to LCvR 7(m) for their views on this motion. A memorandum of points and authorities in support of this motion and a proposed order is attached.

Respectfully submitted,

DATED: October 26, 2007　　　　_____

JOHN B. WILLIAMS (D.C. Bar No. 257667)
SHEILA L. SHADMAND (D.C. Bar No. 465842)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
202.879.3939

MEREDITH FUCHS (D.C. Bar No. 450325)
THE NATIONAL SECURITY ARCHIVE
The Gelman Library

2130 H Street, N.W., Suite 701
Washington, D.C., 20037
202.994.7059
***Attorneys for Plaintiff The National
Security Archive***

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL SECURITY ARCHIVE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civ. No. 07-1577 (HHK) |
| | ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR LEAVE TO SERVE EXPEDITED DISCOVERY REQUESTS AND
## TO COMPEL RULE 26(f) CONFERENCE[1]

### BACKGROUND

This lawsuit seeks to save important historical records of the United States.  The

records at issue are not being preserved as required by the Federal Records Act and are in

danger of being lost forever.  According to at least two news media reports in April 2007,

several million email messages sent from and received within the Executive Office of the

President ("EOP") over at least a two-year period have been deleted from White House

servers administered by the White House Office of Administration.

The National Security Archive (the "Archive") is no stranger to such

controversies as it was one of the plaintiffs in *Armstrong v. EOP*, 810 F. Supp. 335

---

[1]       The Archive understands that on this same date Citizens for Responsibility and Ethics in
Washington (CREW) has also filed a motion to compel a Rule 26(f) conference and for leave to conduct
expedited discovery in a lawsuit virtually identical to this one. *Citizens for Responsibility and Ethics in
Washington v. Executive Office of the President, et al.*, Civil No. 07-1577 (HHK) ("*CREW v. EOP*").  The
discovery that CREW seeks is identical to the discovery the National Security Archive is seeking here.
Given the pending unopposed motion to consolidate *CREW v. EOP* with this case, the Archive requests that
the Court consider the two motions together and grant both the National Security Archive's and CREW's
motion.

(D.D.C. 1993), which led to the issuance of a series of court orders that required the preservation and recovery of millions of email records from the Reagan, Bush and Clinton White Houses.  In the *Armstrong* series of cases, the federal courts in the District of Columbia recognized the pressing need to preserve the emails in question while the legal issues in the case were being resolved.  Despite settled legal obligations flowing from Federal Records Act and the *Armstrong* cases requiring that federal record emails be preserved, the Executive Office of the President is not preserving such records.

The White House acknowledged in two April 2007 press conferences that as many as 5 million emails may be missing.[2]  With just over a year left in the current administration, and a great deal of uncertainty as to the status of the millions of missing email records within the EOP, the Archive requires expedited commencement of discovery while there is still time to take action to ensure that the greatest number of federal records are preserved.

On September 5, 2007, the Archive filed this case seeking injunctive relief against the Executive Office of the President (EOP), the Office of Administration, Executive Office of the President (OA), Alan Swendiman, the Head of the Office of Administration, Executive Office of the President, the Archivist of the United States, and the National Archives and Records Administration (NARA).  The suit includes eight counts related to the improper deletion of federal records within the Executive Office of the President. The complaint alleges illegal conduct due to the knowing failure of the defendants to

---

[2]    Press Release, White House Office of the Press Secretary, Press Gaggle by Dana Perino and Dr. Ali Al-Dabbagh, Spokesman for the Government of Iraq (April 13, 2007) (White House spokesperson quoted as saying, "I wouldn't rule out that there were a potential 5 million emails lost"); Press Release, White House Office of the Press Secretary, Press Briefing by Dana Perino (April 16, 2007) (White House spokesperson quoted as saying, "we are aware that there could have been some emails that were not automatically archived because of a technical issue").

recover, restore and preserve millions of email records created and/or received within the Executive Office of the President and the failure of the Archivist and head of OA to take enforcement action to ensure adequate preservation of all federal records.  Complaint, ¶ 1. Plaintiff also seeks an order compelling the defendants to implement an adequate electronic records management system in compliance with federal law.  *Id*. at ¶ 2.

On September 25, 2007, Citizens for Responsibility and Ethics in Washington (CREW) filed a virtually identical complaint in *Citizens for Responsibility and Ethics in Washington v. Executive Office of the President, et al.,* Civil No. 07-1707 (HHK/JMF) ("*CREW v. EOP*") against the same defendants and designated it as related to this case. On October 11, 2007, CREW filed a motion for a temporary restraining order against the White House defendants seeking an order requiring preservation of all the records that are the subject of their suit.  A hearing on that motion was held before Magistrate Judge Facciola on October 17, 2007.  Magistrate Judge Facciola issued a report on October 19, 2007, which recommended that the Court grant a temporary restraining order against defendants requiring them to preserve existing back-ups in any medium that are in the possession, custody or control of any of the defendants.  (Exhibit 1)  Judge Facciola concluded that absent this relief, CREW will suffer irreparable harm; as he noted, the threat that back-up media would be destroyed "is a text book example of irreparable harm." *CREW v. EOP,* Report and Recommendation, October 19, 2007, at 2.  He further found that the public interest favored preservation "since the emails at issue may have historical and public importance." *Id*.  Finally, Judge Facciola weighed the irreparable harm to CREW, the absence of harm to the defendants and the "substantiality of the legal questions presented" to conclude that the TRO should be issued.  *Id*. at 4-5. In particular

– on the merits of the defendants' claim that the OA is not an agency and therefore not subject to the requirements of the Federal Records Act – Judge Facciola found that: "I certainly cannot say that CREW has no likelihood of prevailing on that issue." *Id*. at 4.

On October 18, 2007, after first requesting adequate assurances of document preservation from the government and in light of the government's statements at the October 17, 2007 hearing in *CREW v. EOP*, the Archive requested a meeting with the defendants to discuss discovery pursuant to Rule 26(f) of the Federal Rules of Civil Procedure. Letter from Sheila L. Shadmand to Helen H. Hong dated October 18, 2007 (Exhibit 2). Although the defendants have not formally appeared yet in this lawsuit, counsel for the defendants has identified herself to the Archive. (Exhibit 5) Further, although this lawsuit was filed first, it is virtually identical to the suit filed by CREW three weeks later. Accordingly the government's filings and representations in *CREW v. EOP* have significance to the plaintiff in this case as well.

CREW also sent a letter on October 18, 2007, requesting a meeting pursuant to Rule 26(f). Letter from Anne L. Weissman to Helen H. Hong dated October 18, 2007 (Exhibit 3). Both the Archive and CREW requested that the discovery conference take place "as soon as practicable" as mandated by Rule 26(f). Both the Archive and CREW expressed a willingness to meet at any time during the week of October 22, 2007. In light of the short time remaining for the current White House administration, and the irreparable harm that will occur to plaintiff – indeed to the entire American public – if the passage of time permits the deletion of additional email records, the Archive had hoped to develop a plan to promptly commence discovery in conjunction with the defendants. Counsel for the defendant sent an email response to the Archive on Monday October 22,

2007, stating that it would consider the request during the week of October 22, 2007. E-mail from Helen H. Hong to Meredith Fuchs dated October 22, 2007 (Exhibit 4). Counsel for the Archive again contacted counsel for the defendant by telephone voicemail message on Friday, October 26, 2007 seeking a response to the request for a Rule 26(f) conference. The defendants have not responded to the Archive's request for their views on this motion or request to schedule a Rule 26(f) conference. Thus, the Archive is forced to bring this motion to request an order from the Court compelling the parties to meet pursuant to Rule 26(f) as soon as possible or to order expedited discovery seeking critical information about the email records deleted from the Executive Office of the President's servers and the existing back-ups from which those emails can be restored.

## ARGUMENT

As with any civil litigation, the Court has broad discretion as to whether and what discovery the Archive should be granted. *See, e.g., SafeCard Servs., Inc. v. Securities and Exchange Commission*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Rule 26(d) authorizes the Court, in its sound discretion, to order expedited discovery for good cause. *See* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 2046.1; *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996).

While the courts apply varying standards to guide them in the exercise of this discretion,[3] the facts in this case demonstrate that there is good cause for the

---

[3]    Some courts apply the same standard as that required to obtain a preliminary injunction, *see, e.g., Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982), while other courts apply a "reasonableness" or "good cause" standard. *See Special Situations Cayman Fund v. Dot Com Entertainment Group, Inc.*, 2003 U.S. Dist. LEXIS 25083 *5 (W.D.N.Y. 2003).

commencement of discovery, there is a great risk of irreparable harm if the commencement of discovery is delayed, and the discovery will serve to expedite resolution of plaintiff's injunctive claims on a matter of national importance. *See, e.g., Ellsworth Associates, Inc.*, 917 F. Supp. at 844 (granting expedited discovery where the discovery would expedite resolution of plaintiff's injunctive claims and the defendants failed to establish "good cause" for a protective order). A party's need for timely information constitutes good cause for such expedited discovery. *See Optic-Electronic Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987) (granting motion for expedited discovery where "[i]t is in the best interest of all parties to have this case resolved as soon as possible"); *Whitkop v. Baldwin*, 1 F.R.D. 169 (D. Mass. 1939). Moreover, where, as here, "one party has an effective monopoly on the relevant information," the need for discovery is especially acute. *Founding Church of Scientology v. National Security Agency*, 610 F.2d 824, 833 (D.C. Cir. 1979).

In this case, time is a critical factor in protecting extremely important federal records that are—by the White House's own admission—missing. The records at issue include over 5 million email records generated between 2003 and 2005 (and possibly later) in the Executive Office of the President. The EOP includes among its agency components: the Office of Administration (OA), the Office of Management and Budget (OMB), the United States Trade Representative (USTR), the Office of National Drug Control Policy (ONDCP), the Council on Environmental Quality (CEQ), and the Office of Science and Technology Policy (OSTP). These agencies have long been recognized as subject to the Federal Records Act and records disclosure laws such as the Freedom of Information Act.

The missing records at issue span critical events in U.S. policy, including the invasion of Iraq in March 2003, the Abu Ghraib scandal, release of a congressional report detailing the flawed intelligence that was relied upon concerning weapons of mass destruction in Iraq, and the handling of Hurricane Katrina.  If the deletions go beyond 2005, they may also involve records concerning the renewal of the highly controversial U.S.A. Patriot Act, a major administration initiative concerning immigration policy, and the White House role in the firing of a number of U.S. Attorneys.  These are the kinds of records that the Federal Records Act seeks to preserve because they document our history and facilitate an informed American public.

The White House has acknowledged the deletion of the records but has not detailed the scope of the deletions, the number of missing emails or the time period during which emails have been deleted.  *See supra* note 1.

Critically, this Administration is entering its last 14 months.  On January 20, 2009, a new President will enter the White House and an entirely new staff will take over the computers that received and transmitted the emails at issue.  At that time, any effort to recover missing email records will be significantly compromised.

Although this court may enter an order pursuant to Magistrate Judge Facciola's recommendation that would bar defendants from destroying any of the existing back-ups in their possession, custody or control, there remains a pressing need for the immediate commencement of discovery.  In order to ensure that plaintiffs' rights to ultimate relief will be preserved, questions regarding what back-ups of EOP emails still exist and how their preservation is ensured must be answered.

Most fundamentally, the defendants refuse to provide any details about the still-existing body of back-up copies, including what time period they cover, the extent to which they contain any of the missing emails, and whether there are multiple copies beyond what the defendants have variously referred to as "disaster recovery tapes – tapes formatted to focus on restoring systems and point in time data in the event of an emergency – that were in the Office of Administration's possession as of September 5, 2007," Letter of Helen H. Hong to Sheila L. Shadmand dated October 8, 2007 (Exhibit 5) and "[d]isaster recovery tapes relating to the official, unclassified Executive Office of the President email system."[4]  Defendants' papers in *CREW v. EOP* do not explain what the coverage of the "official, unclassified" system is.  Nor is it clear whether the various back-ups referred to concern email records currently on the system or back-ups of file server files in which the emails were stored after being extracted from the email system. There is significant confusion on these issues because, although the defendants have made representations about back-ups held by OA, counsel for the defendants stated at the October 17, 2007 hearing before Magistrate Judge Facciola in *CREW v. EOP*, "[T]here are additional back-up tapes in addition to the ones that were in the Office of Administration's possession on September 25th." Statement of Helen H. Hong, Counsel for Defendants, Transcript of Hearing in *CREW v. EOP* on October 17, 2007, Page 5, Lines 15-17 (Exhibit 7).  Resolving these ambiguities is crucial in determining the extent to which additional steps must be taken immediately to protect plaintiff's right to full and effective relief.

---

[4]      *CREW v. EOP*, Defendants' Local Rule 72.3(b) Objections to Report and Recommendations on Plaintiff's Motion for a Temporary Restraining Order, p. 2 n. 1 (Exhibit 6).

Plaintiffs also seek to discover whether deleted emails are missing from the existing back-up media.  The likelihood that such destruction has already occurred may be inferred from the defendants' opposition to CREW's motion for a TRO in which they attach a single exhibit: a November 5, 1995 schedule authorizing the destruction of back-up tapes which contain "records that are duplicated elsewhere for preservation and disposition." *CREW v. EOP*, Defendants' Opposition to CREW's Motion for a Temporary Restraining Order., Exhibit 1, p. 4, ¶ 8.  (Exhibit 8.)  From this, the White House defendants argue that the OA "was permitted under the FRA [Federal Records Act] to recycle, or delete, back-up tapes 'when 90 days old.'" *CREW v. EOP*, Defendants' Opposition to CREW's Motion for a Temporary Restraining Order at 11. (Exhibit 9.)  Further, at the hearing before Magistrate Judge Facciola in *CREW v. EOP*, although Ms. Hong repeated three times that the back-up tapes for emails generated by EOP components after September 25, 2007, are not being recycled, *this* lawsuit was filed on September 5, 2007.  Statement of Helen H. Hong, Counsel for Defendants, Transcript of Hearing in *CREW v. EOP* on October 17, 2007, Page 5, Lines 18-22, Page 6, Lines 10-11, Page 7, Lines 9-13.  (Exhibit 7).  Thus, Ms. Hong's representations raise serious concerns with the National Security Archive.

If back-ups were deleted prior to September 5, 2007, when this case was filed, or records were not preserved properly on back-ups from 2003-2005, then an order requiring preservation of the back-ups presently in the defendants hands will not be sufficient to provide the ultimate relief that is sought.  It may be necessary, instead, to recover the missing records from other sources, including individual workstations, or through other forensic means.  Expedited discovery should quickly establish what back-

ups have been destroyed and what records are missing so that plaintiffs can (1) take steps

to protect other sources of missing federal records and (2) focus their claims on what

actually can be recovered so as not to enmesh the Court in deciding unnecessary issues.

Thus, it is critical to ascertain what time period is covered by the presently existing back-

up copies and, in particular, the "disaster recovery tapes relating to the official,

unclassified [EOP] system"

      To wait several months before beginning to discover the answers to the questions

raised by plaintiffs would virtually guarantee that the answers will no longer be readily

available.  A transition in the White House is a major event.  The administration wraps up

its activities, virtually all of the people involved in policy depart, and the hardware and

software systems are cleared.[5]  Even if the Court, at that time, were to issue a

preservation order that included all of the individual work stations, servers, and

associated technology once the systems are no longer live operating systems, it may be

far more difficult to recover the emails, thus making it less likely the plaintiffs could

obtain complete relief.  The ability to reconstruct missing emails many months from now

will be severely compromised.  It is critical to pinpoint what back-up copies are presently

available and what back-up copies have been destroyed to explore, in the short time that

remains, alternative methods of restoring the millions of deleted email records.

---

[5]    *See, e.g.*, Stephen Labaton, "Judge Sees Plan by White House to Defy Orders and Purge Data," The New York Times at A1 (Jan. 15, 1993) (describing the reaction of United States District Judge Richey in the *Armstrong* litigation to documents of the outgoing Bush Administration indicating the intent to "write over user data at each work station on all personal computer systems in order to create clean user space for the incoming Administration N.S.C. staff."); Andrew Miga, "Clinton team trying to get up to speed; Phones, traffic still tied up – and the media are complaining already," Boston Globe at 6 (Feb. 1, 1993) (describing transition from Bush Administration to Clinton Administration); Sonya Ross (AP), "Confusion, last minute touch ups welcome new Washington regime," (Jan. 22, 2001) (Describing transition from Clinton Administration to Bush Administration).

In addition, documents about the architecture of the email storage system that the EOP used between March 2003 and October 2005, the period during which the millions of emails were deleted, and the email storage system currently in use by the EOP would be enormously useful in sharpening the focus of this litigation, especially as the Court grapples with questions about what preservation obligations it should impose on the defendants.  The defendants have made it clear that absent discovery, they will not provide answers to even the most basic questions.  *See*, *e.g.*, *CREW v. EOP*, Defendants' Opposition to Plaintiff's Motion for a Temporary Restraining Order, p. 17.  Yet, basic information about how the email storage system works will go a long way towards understanding what must currently be preserved and why.

In this case, the relevant factors weigh in favor of expedited discovery regardless of whether the Court grants a temporary restraining order to CREW in *CREW v. EOP*. Expedited discovery is appropriate where, as here, delay may result in irreparable harm, and the discovery may preserve a state of affairs in which the Court may provide effective, final relief. *See, e.g., Express One Int'l, Inc. v. U.S. Postal Service*, 814 F. Supp. 87, 92 (D.D.C. 1992) (enjoining contract and granting expedited discovery in order to expedite resolution of the case so as to avoid harm to parties and greater costs of enjoining contract at a later date after the transition to a new contract).

The Archive is suffering irreparable harm from the deletion of Executive Office of the President emails that constitute federal records, but the full extent of the irreparable harm is presently unknown.  Accordingly, the Archive needs to discover which emails have been preserved and which emails are missing to ensure measures are taken to

preserve all the records subject to this suit.[6]  In short, given the limited time available, the complex issues to be presented by the Court, and the severity of the impact of the records being lost forever, this Court should order discovery to commence immediately.  The Archive is entitled to learn details about what records may exist for future restoration without waiting for the traditional discovery mileposts.

Expedited discovery is also appropriate to "better enable the court to 'judge the parties' interests and respective chances for success on the merits." *Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn.) (granting expedited discovery), *aff'd in part and rev'd in part on other grounds*, 746 F.2d 429 (8th Cir. 1984).  Here, that includes the possibility of narrowing or focusing the issues in dispute.  Plaintiff's lawsuit arises under the Federal Records Act and the judicially enforceable obligations that statute imposes on the defendants.  This Court clearly has jurisdiction to enforce the obligations that the Federal Records Act imposes on the defendants with respect to the federal records included among the deleted emails.  *See, e.g., Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991).  While it is possible that the defendants may argue that some of their components are not subject to the Federal Records Act, because all of the records of the EOP are commingled, it is irrelevant whether one of the components is or is not subject to the Federal Records Act.[7]  Therefore, granting expedited discovery

---

[6]     Thus, this case differs from the circumstances in a case such as *Armstrong v. Bush*, 807 F. Supp. 816 (D.D.C. 1992), where forward-looking preliminary relief was ordered while the legal issues were resolved.  Here, in contrast, the potential disappearance or destruction of emails is not tied to a definite event *in the future*, but instead to a course of conduct that took place in the past and may be continuing.

[7]     The White House has argued in an unrelated suit, despite the fact that the OA has long processed FOIA requests and been identified as subject to FOIA by the White House, that the OA is not an "agency" subject to the FOIA.  *Citizens for Responsibility and Ethics in Washington v. White House Office of Administration*, Civil No. 07-0964 (CKK) (D.D.C.).  It has signaled in its opposition papers to CREW's motion for a temporary restraining order in *CREW v. EOP* that it intends to make a similar argument here that OA is not subject to the Federal Records Act.  The Court need not concern itself with this argument in

will help focus the location of the missing federal record e-mails and thus serve to move the lawsuit forward in the most tailored way.

The backdrop of this case presents compelling reasons why expedited commencement of discovery is warranted. Under the current administration, millions of email have gone missing and the White House has done nothing to restore and archive those historically important federal records or take steps to prevent further historical records destruction. When confronted with requests for information about the missing email problem, the White House has refused to give adequate assurances of preservation, refused to enter into any judicially monitored agreement concerning preservation, and refused to even meet with plaintiff's counsel to plan for discovery. The defendants' conduct – coupled with the risk that critical information about significant events in U.S. policy will not be preserved – provide ample support for the commencement of discovery at this juncture.

Finally, the Court should compel the parties to meet as soon as possible to meet and confer pursuant to Rule 26(f) of the Federal Rules of Civil Procedure. Under Rule 26(f), the parties to a civil lawsuit "must, as soon as practicable" confer on a number of matters, including "the nature and basis of their claims and defenses," to arrange for the initial disclosures, "to discuss any issues relating to preserving discoverable information," and "to develop a proposed discovery plan …." In light of the serious concerns raised by the government's statements and submissions in *CREW v. EOP*, which was filed after this case but is virtually identical to this case, the Archive has attempted to set up such a

---

relation to this motion for expedited discovery because, regardless of the outcome of that legal issue, there are many other agency components of the EOP that are subject to the Federal Records Act and that rely on the OA to manage, maintain, and back-up their email systems. The EOP cannot avoid these obligations by shifting records to a non-agency entity. Accordingly, there is no serious argument that plaintiff does not have a likelihood of success on the merits.

conference.  Counsel for the government acknowledged the Archive's request but has not responded to the request.  In light of the pressing need for discovery and the time-sensitive nature of this lawsuit, as discussed above, the Court should order the parties to engage in a Rule 26(f) conference as soon as possible.

## CONCLUSION

For these reasons, the Court should grant plaintiff's motion for expedited discovery and order the parties to meet pursuant to Rule 26(f) as soon as possible.  A proposed order is attached.

Respectfully submitted,

DATED: October 26, 2007

_____
JOHN B. WILLIAMS (D.C. Bar No. 257667)
SHEILA L. SHADMAND (D.C. Bar No. 465842)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
202.879.3939

MEREDITH FUCHS (D.C. Bar No. 450325)
THE NATIONAL SECURITY ARCHIVE
The Gelman Library
2130 H Street, N.W., Suite 701
Washington, D.C., 20037
202.994.7059
***Attorneys for Plaintiff The National Security Archive***

## <u>CERTIFICATE OF SERVICE</u>

I hereby Certify that on October 26, 2007, one copy of the Plaintiff's Motion for Leave to Serve Expedited Discovery Requests and to Compel Rule 26(f) Conference, the memorandum in support thereof, and proposed order of the National Security Archive filed on this day was served by United States Mail and electronic mail on the attorney listed below who has identified herself in correspondence as the attorney for the government defendants in this action:


Helen H. Hong
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box. 883
Washington, DC 20044


_____
Meredith Fuchs

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON,

     **Plaintiff,**

     **v.**                                        07-1707 (HHK/JMF)

EXECUTIVE OFFICE OF THE
PRESIDENT *et al.*,

     **Defendants.**

# REPORT AND RECOMMENDATION

This matter has been referred to me for a Report and Recommendation concerning

Plaintiff's Motion for a Temporary Restraining Order.[1]

I.    <u>Plaintiff's Complaint</u>

Plaintiff, Citizens for Responsibility and Ethics in Washington ("CREW"),

describes itself as a "non-profit, non-partisan corporation." Complaint, ¶5. CREW files

many requests for records pursuant to the Freedom of Information Act, 5 U.S.C. §552.[2]

It therefore claims a "direct interest in ensuring that these records are maintained,

preserved and made accessible to the public in accordance with federal law." <u>Id.</u>, ¶6.

II.    <u>Plaintiff's Concerns About the Backup Tapes</u>

To "backup" a computer or a network is "to create a copy of data as a precaution

against the loss or damage of the original data. Many users backup their files, and most

---

[1] Since notice has been given and a hearing has been held, plaintiff's motion will be deemed one for a preliminary injunction. The Federal Rules of Civil Procedure that will take effect on December 1, 2007 make this distinction clear. <u>See</u> Proposed Amendment of Fed. R. Civ. P. 65 (Effective December 1, 2007).

[2] All references to the United States Code are to the electronic version that appears in Westlaw or Lexis.

computer networks utilize automatic backup software to make regular copies of some or all of the data on the network."[3]  CREW, complaining that the White House has deleted millions of e-mails that it was supposed to keep, seeks a temporary restraining order requiring the White House to keep all back up tapes or similar media which may contain the e-mails that have been, according to CREW, improperly deleted.

III.    The Narrow Dispute Presented

        The dispute among the parties about preserving backup media while this case is litigated is now extremely narrow.  The government,[4] without conceding that it is under any obligation to do so, insists that it will preserve the backup media that it has, but balks at entering into any stipulation that would in effect serve as the premise of an order requiring that it do so.  The government also insists that CREW should instead accept a declaration from an authorized official expressing the defendants' intention to preserve all the backup media it has in its possession.

IV.     An Order Should Issue

        While stipulations entered into between parties can save time and money, there is no obligation upon a party to accept one.  See United States v. Caldwell, 543 F.2d 1333, 1359 n.134 (D.C. Cir. 1975).  While the government insists that a declaration would eliminate any concern that backup media will be recycled and destroyed while this matter is pending, a declaration does not have the force of an order.  Unlike a court order, a declaration is not punishable by contempt.  In other words, without such an order, destruction of the backup media would be without consequence.  As a result, CREW

---

[3] **The Sedona Conference Glossary For E-Discovery and Digital Information Management (May 2005 Version), available at http://www.thesedonaconference.org/dltForm?did=tsglossarymay05.pdf**

[4] "The government" is a shorthand reference to all defendants.

would remain threatened with irreparable harm.  I therefore conclude that the order should issue, despite the government's proposed declaration.

V.     Standards for the Relief Sought

The Court of Appeals for the D.C. Circuit has recently stated the familiar standard for the award of a preliminary injunction:

> When deciding whether to grant a preliminary injunction, the district court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction."  Id. at 1317-18 (citing Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)).  A court must balance these factors, and "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. at 1318 (quoting City Fed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir.1995)).

Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007).

First, if, as CREW contends, the e-mails have been deleted, then the backup media are the only place where they may be and the obliteration of this backup media obviously threatens CREW with irreparable harm.  Indeed, the threat of such obliteration is a text book example of irreparable harm.  Second, issuing the injunction will not injure the government or burden it in any way.  Indeed, the government insists that it is already doing and will continue to do what an injunction would require it to do—preserve the backup media until the court can rule on the substantive issues before it.  Third, there is no public interest in the destruction of the backup media.  To the contrary, there is a public interest in their preservation, at least until this Court rules, since the e-mails at issue may have historical and public importance.

3

Finally, there are several legal issues that divide the parties and, in my view, these issues are substantial and warrant careful consideration. In what one authoritative treatise[5] describes as the most often-quoted statement of the principle that the likelihood of success must be weighed against the likelihood of harm to the movant if the court does not act, the Second Circuit has stated:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953) (Frank. J.)

In the instant action, one of the several legal issues separating the parties is whether one of the defendants, the "Executive Office of the President, Office of Administration," is an agency and therefore subject to the Federal Records Act. See 44 U.S.C. § 2901 (14). The parties explained to me that this precise issue awaits resolution in a case pending before Judge Kollar-Kotelly.[6] I have now reviewed the briefs on that issue in that case and am certain that the issue is substantial and complicated. I certainly cannot say that CREW has no likelihood of prevailing on that issue.

Instead, I must say that weighing the substantiality of the legal questions presented against the irreparable harm that CREW may suffer and the clear absence of any harm to the government justifies the order I am recommending the Court issue to

---

[5] 11 CHARLES ALAN WRIGHT, ARTHUR MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.3 (2d ed. 1995).
[6] Citizens for Responsibility and Ethics in Washington v. Office of Admin., No. 07-964 (D.D.C. filed May 23, 2007).

prevent the destruction of the backup media.  A proposed order accompanies this Report and Recommendation.

Failure to file timely objections to the findings and recommendations set forth in this report may waive your right to appeal from an order of the District Court adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140 (1985).


___/S/_____
JOHN M. FACCIOLA
October 19, 2007                          UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON,

      **Plaintiff,**

      **v.**                                   **07-1707 (HHK/JMF)**

**EXECUTIVE OFFICE OF THE
PRESIDENT** *et al.*,

      **Defendants.**

**PROPOSED ORDER**

Having considered Plaintiff's Motion for a Temporary Restraining Order [#4], the

opposition thereto, and the entire record herein, it is **ORDERED** that the motion is

granted, and that defendants will preserve media, no matter how described, presently in

their possession or under their custody or control, that were created with the intention of

preserving data in the event of its inadvertent destruction. Defendants shall preserve the

media under conditions that will permit their eventual use, if necessary, and shall not

transfer said media out of their custody or control without leave of this Court.

      **SO ORDERED.**

                                         _____
                                       **HENRY H. KENNEDY**
October 19, 2007                     **UNITED STATES DISTRICT JUDGE**

**EXHIBIT 2**

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113
TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

Direct Number:  (202) 879-3736
slshadmand@jonesday.com

October 18, 2007

VIA FACSIMILE 202.616.8460 AND U.S. MAIL

Helen H. Hong
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box. 883
Washington, DC 20044

Re:     Rule 26(f) Conference in *National Security Archive v. Executive Office of the President*, No. 1:07-cv-01577 (D.D.C. filed Sept. 5, 2007)

Dear Ms. Hong:

As you are aware, Federal Rule of Civil Procedure 26(f) requires us to confer to develop a proposed discovery plan.  By Monday, October 22, please let us know your availability to hold this conference, as Rule 26(f) requires this conference to take place "as soon as practicable."  We are available to meet next week (October 22-26) either in person or by teleconference.  Given that a related case is also pending, *Citizens for Responsibility and Ethics in Washington v. Executive Office of the President*, No. 1:07-cv-01707 (D.D.C. filed Sept. 25, 2007), it would be efficient to include in our conference counsel in that case.

Please be aware that if you are unable to hold this discovery conference with us in the near future, we will seek leave from the court to conduct expedited discovery.  Thank you for your attention to this matter.

Sincerely,

Sheila L. Shadmand

cc     Anne Weissman, Esq.

**EXHIBIT 3**



October 18, 2007

**<u>Via Facsimile and Email</u>**

Helen H. Hong
U.S. Department of Justice
Civil Division
Room 6132
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530
Fax:  (202) 616-8460

   Re:  <u>CREW v. EOP, et al.</u>

Dear Helen:

   As mandated by Rule 26(f) of the Federal Rules of Civil Procedure, I write to request that you provide me as soon as possible with dates and times that you are available to confer.  Under the express language of Rule 26(f), the parties are to confer "as soon as practicable" to discuss a variety of issues, including the development of a proposed discovery plan and to make or arrange for the disclosures required by Rule 26(a)(1).

   I am available all of next week (October 22-26) and can meet in-person or am available for a telephone conference.  Given the pendency of the related case, <u>National Security Archive v. Executive Office of the President</u>, Civil No. 07-1577 (HKK), it would be most efficient if counsel in that case were also included in our conference.

   I look forward to your prompt reply.

       Sincerely,

       ANNE L. WEISMANN
       Chief Counsel

**EXHIBIT 4**

Exhibit 4 10222007 Email from Hong RE Civil Action 07-1577  Motion to Consolidate.txt
From: Hong, Helen (CIV) [Helen.Hong@usdoj.gov]
Sent: Monday, October 22, 2007 2:35 PM
To: Meredith Fuchs
Cc: Sheila L. Shadmand
Subject: RE: Civil Action 07-1577 Motion to Consolidate

Dear Ms. Fuchs:

We do not oppose the motion to consolidate.  In addition, I have received your
letter regarding a Rule 26(f) conference and will be considering your requests this
week.

Please let me know if you have any questions or concerns.

Sincerely,

Helen Hong

-----Original Message-----
From: Meredith Fuchs [mailto:mfuchs@gwu.edu]
Sent: Monday, October 22, 2007 2:31 PM
To: Hong, Helen (CIV)
Cc: 'Sheila L. Shadmand'
Subject: Civil Action 07-1577 Motion to Consolidate

Ms. Hong,

Attached is the motion to consolidate that the National Security Archive filed
today.  I also am sending a hard copy by first class United States mail.

Sincerely,

Meredith Fuchs, General Counsel
National Security Archive
George Washington University
Gelman Library Suite 701
2130 H Street, NW
Washington, DC   20037

Tel: 202-994-7000
Fax: 202-994-7005
E-mail: mfuchs@gwu.edu
Visit our website at: www.NSArchive.org

**EXHIBIT 5**

**U.S. Department of Justice**
Civil Division

| | |
|---|---|
| *First Class Mail*<br>P.O. Box 883<br>Washington, DC 20044 | *Courier Delivery*<br>Room 6132<br>20 Massachusetts Avenue, NW,<br>Washington, DC 20530 |

Helen H. Hong
Trial Attorney

| | |
|---|---|
| *Telephone* | (202) 514-5838 |
| *Fax* | (202) 616-8460 |
| *Email* | Helen.Hong@usdoj.gov |

October 8, 2007

## VIA FIRST CLASS MAIL, FACSIMILE AND ELECTRONIC MAIL

Sheila L. Shadmand
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001-2113
Fax: (202) 625-1700
slshadmand@jonesday.com

     Re:    October 3, 2007 Letter from NSA to Alan R. Swendiman

Dear Ms. Shadmand:

      I represent the defendants, including Mr. Alan R. Swendiman, in NSA v. Executive Office of the President, et al., Civil Action No. 07-1577 (HKK) (D.D.C.). I write in response to your letter addressed to Mr. Swendiman dated October 3, 2007, requesting a written response about "back-up media" in the possession of the Office of Administration. Please be assured that the Office of Administration is complying with its document preservation obligations under Federal Rule of Civil Procedure 26. In particular, the Office of Administration is maintaining, and will continue to maintain for the pendency of this litigation, unless otherwise permitted by the court or agreed upon or stipulated to by the parties, and in a manner that complies in all respects with Rule 26, all disaster recovery tapes – tapes formatted to focus on restoring systems and point-in-time data in the event of an emergency – that were in the Office of Administration's possession as of September 5, 2007. By this letter, defendants do not waive any defenses to or make any other representations about the above-referenced matter.

                                      Sincerely,

                                        Helen H. Hong

**EXHIBIT 6**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY | ) |
| AND ETHICS IN WASHINGTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EXECUTIVE OFFICE OF THE | ) |
| PRESIDENT, EXECUTIVE OFFICE | ) |
| OF THE PRESIDENT, OFFICE OF | ) Civil Action No: 1:07-cv-01707 (HKK/JMF) |
| ADMINISTRATION, ALAN R. | ) |
| SWENDIMAN, HEAD OF THE | ) |
| OFFICE OF ADMINISTRATION, | ) |
| THE NATIONAL ARCHIVES AND | ) |
| RECORDS ADMINISTRATION (NARA), | ) |
| and DR. ALLEN WEINSTEIN, | ) |
| ARCHIVIST OF THE UNITED STATES, | ) |
| | ) |
| Defendants. | ) |

---

**DEFENDANTS' LOCAL RULE 72.3(b) OBJECTIONS TO REPORT**
**AND RECOMMENDATIONS ON PLAINTIFF'S**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**

Pursuant to Local Civil Rule 72.3(b), defendants submit their objections to the Report

and Recommendations ("Report"), issued on October 19, 2007, concerning Plaintiff's Motion for

a Temporary Restraining Order. By conducting a <u>de novo</u> analysis of the familiar four-factor

test for emergency injunctive relief, this Court must conclude that plaintiff has failed to make the

"persuasive demonstration" required in this Circuit to justify the extreme remedy of threshold

injunctive relief. <u>See</u> LCvR 72.3(c) (requiring <u>de novo</u> review of portions of report to which a

non-movant objects).

As set forth more fully in defendants' opposition to plaintiff's motion, which is incorporated in its entirety here, plaintiff has offered absolutely <u>no evidence</u> that it will irreparably harmed absent an injunction; nor has plaintiff demonstrated that the four-factor test in total compels injunctive relief.  Among other errors, the Report improperly equates plaintiff's mere <u>allegation</u> of the <u>possibility</u> that it will suffer some harm with a demonstration, based on actual facts, that such harm is "certain, great and actual – not theoretical – and imminent."  <u>Wisc. Gas Co.</u>, 758 F.2d at 674.  Plaintiff's failure to demonstrate such harm requires, without more, that its motion be denied.  But defendants have also provided unambiguous commitments in writing demonstrating that all disaster recovery tapes relating to the official, unclassified Executive Office of the President email system that are the subject of this suit (and were in existence as of September 5, 2007) are being preserved and defendants have further offered to incorporate these commitments into a declaration signed under penalty of perjury.[1]  Those commitments make any injunction inappropriate, and the Report improperly penalizes defendants for having made them, by relying on them to conclude that any harm to defendants of an injunction would be minimal.  Where, as here, the commitments of government defendants make plain that there is no risk of irreparable harm to the plaintiff, the appropriate course is to deny the request for an injunction as unwarranted or moot.  <u>See, e.g.</u>, <u>CREW v. United States</u>

---

[1]  Disaster recovery tapes relating to the official, unclassified Executive Office of the President email system are media in the care, custody and control of the Office of Administration created with the intention of restoring systems in the event of a disaster and may potentially be used to restore data that may not have been otherwise preserved.  As explained to plaintiff, the disaster recovery tapes are the only so-called "back up tapes" referenced by plaintiff in its letter requests that are associated with the official, unclassified Executive Office of the President email system that are the subject of this suit.

Dep't of Homeland Sec., No. 06-1912, Or. (D.D.C. March 14, 2007) (Penn, J.) (denying as moot

motion for injunctive relief by accepting declarations setting forth preservation assurances).

 Even if an injunction were appropriate, the Report's Proposed Order sweeps too broadly

and fails the specificity requirement of Federal Rule of Civil Procedure 65(d) by potentially

requiring preservation of materials irrelevant to the suit.  If the Court is inclined to issue an

injunctive order – despite the absence of evidence of irreparable injury and plaintiff's complete

failure to justify emergency relief – defendants propose an alternative order below.

**I. THE REPORT FAILS PROPERLY TO CONSIDER THE D.C. CIRCUIT'S TEST FOR THE EXTREME REMEDY OF THRESHOLD INJUNCTIVE RELIEF, WHICH MILITATES AGAINST THE ISSUANCE OF AN INJUNCTIVE ORDER HERE BECAUSE PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM**

 The D.C. Circuit requires reversal of orders granting preliminary injunctions where "the

record does not show with any clarity" that irreparable harm will result.  See District 50, United

Mine Workers of Am. v. Int'l Union, United Mine Workers of Am., 412 F.R.D. 165, 167 (D.C.

Cir. 1969) (reversing grant of preliminary injunction for inadequate showing of irreparable

injury).  The Report recommends the issuance of an emergency injunctive order where there is

no record of injury at all, and based on the unsupported hypothetical that "CREW would remain

threatened with irreparable harm" if the "destruction of backup media would be without

consequence" in the absence of a court order.  (Oct. 19, 2007 Report and Recommendation [11]

("Report") at 2-3; see also id. at 3 (referring to unsupported hypothetical that, "if as CREW

contends, the emails have been deleted, then the backup media are the only place where they

may be and the obliteration of this backup media obviously threatens CREW with irreparable

harm") (emphasis added).)  Such hypotheticals are, however, as this Circuit instructs, inadequate

-3-

to justify the type of relief recommended in the Report. <u>See, e.g.</u>, <u>Wisc. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Despite these well-settled principles, the petitioners have premised their motions for stay upon unsubstantiated and speculative allegations of recoverable economic injury . . . [T]his allegation is purely hypothetical and will not be considered by this court."); <u>Nichols v. Agency for Int'l Dev.</u>, 18 F. Supp. 2d 1, 5 (D.D.C. 1998) ("To exercise its equitable discretion appropriately, the Court must rely on more than just the Plaintiff's conclusory beliefs."). As set forth more fully in defendants' opposition to plaintiff's motion and through argument of counsel at the October 17, 2007 hearing, plaintiff has not established that certain, great, actual and imminent harm will result if the court denies the order. (Defs.' Opp'n at 13-18.) Indeed, the totality of its representation of harm amounts to <u>allegations</u> that are the central focus of plaintiff's complaint, and plaintiff's unjustified skepticism about defendants' express commitments to continue to preserve all disaster recovery tapes associated with the official, unclassified Executive Office of the President email system that were in existence as of September 5, 2007. (<u>See, e.g.</u>, Pl.'s Reply in Support of Mot. at 8.) That does not warrant injunctive relief. For this reason alone, this Court should deny plaintiff's motion for emergency relief. <u>See</u> <u>Wisc. Gas Co.</u>, 758 F.2d at 674; <u>Judicial Watch, Inc. v. United States Dep't of Homeland Security</u>, No. 07-506, 2007 WL 2791371, *2-3 (D.D.C. Sept. 24, 2007).

The Report does not refer to any declaration, affidavit or evidence establishing harm, as plaintiff provided none. Nor does the Report discredit defendants' repeated commitments to plaintiff to maintain the disaster recovery tapes (Pl.'s Mot., Exs. 3, 5, 7), or defendants' offer to provide a declaration – under penalty of perjury – committing to continue to preserve disaster recovery tapes. <u>See</u> <u>Fed. Trade Comm'n v. Invention Submission Corp.</u>, 965 F.2d 1086, 1091

(D.C. Cir. 1992) ("[A]gencies are entitled to a presumption of administrative regularity and good

faith, . . . and with no indication that the [agency] will act cavalierly or in bad faith, <u>its assertions

. . . should be accepted at face value</u>.") (emphasis added) (internal quotations and citations

omitted).  Indeed, the Report does not cite to any evidence or even speculation of bad faith in the

representations that defendants have provided and offer to provide going forward.  In the

absence of such findings, the Report's recommendation of an injunctive order is wholly

improper.

      The Report suggests that an order may be proper instead because defendants are "already

doing and will continue to do what an injunction would require it to do – preserve the backup

media until the court can rule on the substantive issues before it."  (Report at 3.)  Defendants'

commitment, however, cuts exactly the other way, by both negating plaintiffs' mere allegations

of harm and by foreclosing any need for court intervention.[2]  <u>See</u> <u>Hester v. Bayer Corp.</u>, 206

F.R.D. 683, 686 (M.D. Ala. 2001) ("The possibility that a document preservation order might

induce a cavalier defendant to elect the moral high road" is inadequate absent "some evidence . .

. to justify such an extreme remedy.").  The stringent test for injunctive relief is not "why not

enter one," but instead requires a "convincing" and "persuasive demonstration of a need for

---

[2]  For that same reason, the focus of the Report's discussion of the public interest is misplaced.
(Report at 3.)  The public interest is not served by the issuance of an injunction because nothing
would change.  The public interest is, however, ill served by enmeshing this Court in the
superfluous and wasteful task of memorializing assurances that have already been made.  And
even assuming that the Court were to accept as true that the public interest may be served by a
judicial reiteration of preservation commitments, that would be insufficient to merit injunctive
relief.  <u>See, e.g.</u>, <u>Rumber v. District of Columbia</u>, No. 04-1170, 2005 WL 1903727 (D.D.C. July
19, 2005) ("But, because the public interest factor is the only prong that weighs in the plaintiffs'
favor, it is insufficient in and of itself to justify an injunction.").

-5-

injunctive relief."[3]  District 50, 412 F.2d at 167; see also Emily's List v. Fed. Election Comm'n,

362 F. Supp. 2d 43, 51 (D.D.C. 2005) (stating that preliminary injunction "is considered an

extraordinary remedy" that should "be granted only upon a clear showing of entitlement")

(emphasis added).  Because plaintiff fails to justify emergency relief, this Court's de novo

review of plaintiff's motion should conclude that an injunctive order is not merited here.

## II.    THE PROPOSED ORDER SWEEPS TOO BROADLY AND FAILS TO COMPLY WITH RULE 65(d)

Finally, the Proposed Order submitted with the Report sweeps too broadly and fails to

comply with the specificity requirements of Federal Rule of Civil Procedure 65(d).  First, the

Proposed Order would require all defendants[4] to "preserve media, no matter how described,

presently in their possession, or under their custody or control, that were created with the

---

[3]  The Report's discussion of the merits does not analyze the jurisdictional hurdles that face plaintiff and why plaintiff may not have substantial likelihood of success on the merits on standing grounds.  See Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998) (noting that failure to establish a substantial likelihood of success on the merits "effectively decides the preliminary injunction issue" and vacating preliminary injunction where plaintiff was not likely to succeed on the merits and the remaining factors were either "a wash" or "inextricably linked to the merits").  Thus, to the extent that the Report fails to apply appropriate D.C. Circuit standards on the merits prong, the Report does not support the issuance of an injunction.  Moreover, even if it were true that "serious, substantial, difficult and doubtful" questions are adequate to satisfy the merits prong of the 4-part injunction test, the Report's focus on the status of the Office of Administration does not support plaintiff's request for relief here.  Whether or not the Office of Administration falls within the definition of "agency" in the FRA, plaintiff must still establish the merits for Claims 1 through 4.

[4]  Because only the Office of Administration has care, custody and control of, and maintains all existing disaster recovery tapes relating to the electronic communications system referenced in plaintiff's Complaint, the government interprets the Proposed Order to exclude any "back up media" in the possession or control of NARA.  The Archivist and NARA currently possess and control countless records, totally irrelevant to the subject of the lawsuit, that are "media . . . that were created with the intention of preserving data in the event of its inadvertent destruction."

intention of preserving data in the event of its inadvertent destruction." (Report at 6.) As the Magistrate Judge recognized and as plaintiff conceded at the hearing, the subject of any preservation order should not extend, for example, to CDs or DVDs of individual employees, as distinguished from an official disaster-recovery process. The Office of Administration has the care, custody and control of all existing disaster recovery tapes that may contain emails from the official, unclassified Executive Office of the President system. To the extent that the Proposed Order sweeps broader, it is inappropriate. Second, the Proposed Order requires defendants to "preserve the media under conditions that will permit their eventual use, if necessary[.]" Although the Office of Administration is taking reasonable and appropriate steps to preserve the disaster recovery tapes under conditions that will permit their eventual use, if necessary, it is unknown what further actions, if any, are required to "preserve the media under conditions that will permit their eventual use, if necessary[.]" See also Judicial Watch v. Dep't of Commerce, 501 F. Supp. 2d 83, 91 (D.D.C. 2007) (stating that mandatory injunction requires showing of "extreme or very serious damage"); District 50, 412 F.R.D. at 167 (noting that the status quo is the "last uncontested status which preceded the pending controversy"). As such, the Proposed Order may run afoul of Rule 65(d) and its specificity requirements.

No injunctive relief is merited here. This is particularly so in light of defendants' representations and willingness even to offer a declaration setting forth defendants' preservation commitments.[5] But to the extent the court nonetheless entertains issuing an order, defendants

---

[5] Compare defendants' representations with the contours of the order issued in Armstrong v. Bush, 807 F. Supp. 816 (D.D.C. 1992). In Armstrong, the court – based on the court's finding of harm – issued an order directing defendants "from this day forward to preserve all the current and existing computer backup tapes in their custody as of the date of this order, or hereafter

respectfully propose the following language for any order, which addresses the concerns set forth

in this Part II:

> Having considered Plaintiff's Motion for a Temporary Restraining Order [#4], the opposition thereto, and the entire record herein, it is hereby **ORDERED** that the motion is granted, and that defendants will preserve media, no matter how described, presently in their possession or under their custody or control, that were created with the intention of restoring computer systems in the event of a disaster, and may potentially be used to restore data from the official, unclassified Executive Office of the President email system that may not have been otherwise preserved. Defendants shall take reasonable and appropriate steps to preserve the media under conditions that will permit their eventual use, if necessary, and shall not transfer said media out of their custody or control without leave of this Court.

//

//

//

//

//

---

created from the electronics communications systems. . . .  It is further ordered that the defendants are not to write-over, erase, or destroy any of the information on the aforementioned tapes."  <u>Id.</u>  Of course, defendants have provided similar assurances in this case already.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' Opposition to Plaintiff's Motion for a Temporary Restraining Order, plaintiff's motion for emergency injunctive relief should be denied.

Respectfully submitted this 23rd day of October, 2007.

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JOHN R. TYLER
Senior Trial Counsel

/s/ Helen H. Hong
HELEN H. HONG (CA SBN 235635)
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 883, 20 Massachusetts Ave., NW
Washington, D.C.  20044
Telephone: (202) 514-5838
Fax: (202) 616-8460
helen.hong@usdoj.gov

Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2007, a true and correct copy of the foregoing

Defendant's Local Rule 72.3(b) Objections to Report and Recommendation on Plaintiff's

Motion for a Temporary Restraining Order was served electronically by the U.S. District Court

for the District of Columbia Electronic Document Filing System (ECF) and that the document is

available on the ECF system.


<u>/s/ Helen H. Hong</u>
HELEN H. HONG

**EXHIBIT 7**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - x
                                 :
In the Matter of:               :
                                 :
CITIZENS FOR RESPONSIBILITY AND :
  ETHICS IN WASHINGTON, D.C.    :
                                 :
     Plaintiff,                 :
                                 :
          vs.                   : Civil Action No. 07-1707
                                 :
THE EXECUTIVE OFFICE OF         :
  THE PRESIDENT, et al.,        :
                                 :
          Defendants.           :
                                 : Washington, D.C.
- - - - - - - - - - - - - - - x October 17, 2007
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        ANNE L. WEISMANN, ESQ.
                          MELANIE SLOAN, ESQ.

For the Defendants:       HELEN HONG, ESQ.
                          JOHN TYLER, ESQ.
                          CARL NICOLS, ESQ.

Proceedings recorded by the Court, transcript produced by
Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C.  20005, 202-347-5395, www.pro-typists.com
M2085V/bf

|    |    |
|----|----|
| 1  | **P R O C E E D I N G S** |
| 2  | THE CLERK:  Civil Case 07-1707, Citizens for |
| 3  | Responsibility and Ethics in Washington, D.C., versus the |
| 4  | Executive Office of the President, et al.  Anne Weismann |
| 5  | for the Plaintiff, Helen Hong for the Defendants.  This is |
| 6  | a motions hearing on a temporary restraining order for |
| 7  | Ms. Weismann (inaudible). |
| 8  | MS. WEISMANN:  Good morning, Your Honor, and I'm |
| 9  | here also with Melanie Sloan, our executive director. |
| 10 | THE MAGISTRATE JUDGE:  Good morning.  Good |
| 11 | afternoon, I'm sorry. |
| 12 | MS. HONG:  Good afternoon, Your Honor.  Helen Hong |
| 13 | on behalf of the United States Defendants, and along with me |
| 14 | are John Tyler and Carl Nicols. |
| 15 | THE MAGISTRATE JUDGE:  Good afternoon. |
| 16 | All right.  I've reviewed the papers here and I |
| 17 | was wondering if it is possible at this point to forge a |
| 18 | stipulation that would be similar to the stipulation that |
| 19 | the late Judge Penn brought about in 2006. |
| 20 | As I understand it -- and this is what confuses me |
| 21 | -- is the problem at this point and the difference between |
| 22 | you, the difference between backup tapes and disaster |
| 23 | recovery backup tapes?  And if so, what is the difference |
| 24 | between those two things, if there is a difference. |
| 25 | MS. WEISMANN:  May I address that, Your Honor? |

1              THE MAGISTRATE JUDGE:  Please.

2              MS. WEISMANN:  Thank you.  Your Honor, that's one

3    issue, but let me tell you --

4              THE MAGISTRATE JUDGE:  Well, it's the issue I want

5    to talk about right now.

6              MS. WEISMANN:  Right, okay, yes.  Because --

7              THE MAGISTRATE JUDGE:  If you -- let me ask you

8    this.  As your understanding is, we know that effective on

9    September 27 when this lawsuit got started, the government -

10   - I'll use the word as broadly as I can, because there are

11   so many Defendants here -- stopped recycling tapes because

12   of the existence of this lawsuit.  Do you understand that

13   any other backup tapes exist that came into existence before

14   September 27th, 2007, and have not been recycled?  And if

15   that's so, why can't we just put them to one side for the

16   time being?  Would that resolve your concern?

17             MS. WEISMANN:  I am answering your question, but

18   with a little latitude because here's the problem.  What we

19   don't know and what we have been trying to get from the

20   White House Defendants is an explanation of what the

21   existing body of backup tapes and copies are.  And I say

22   "copies" because it's our understand that they may exist in

23   other mediums besides tapes, but all that we have been told

24   is the word "disaster recovery tape," and we don't know if

25   that encompasses these other mediums.

1          And of course there is a disagreement, just so you

2    appreciate, Your Honor, between them saying their only

3    obligation is under the Federal Rules of Civil Procedure and

4    our position, which is by law you are required to preserve a

5    much larger universe of tapes than just what was in your

6    possession as of September 25th.

7          So the only representation that we have today,

8    and this is all I can tell you because this is all that the

9    government has told us, is that whatever they had in their

10   hands as far as disaster recovery tapes on September 25th

11   they will keep, I have no idea what that encompasses.  If it

12   does not encompass all of the backup copies that they have,

13   we say that it is patently deficient.

14         So because -- and I think that is -- we had hoped,

15   Your Honor, and that's why we went back to them again and

16   again, to be able to forge some kind of a stipulation, but

17   we just couldn't get the necessary information.  So I

18   certainly welcome this opportunity if this Court is more

19   successful than we are.

20         THE MAGISTRATE JUDGE:  Let's see.  Let's assume

21   this was the ordinary civil case, Suzie Smith against Joe

22   Blow or something.  All right.  We know, under the amended

23   Federal Rules, parties would be obliged to get together and

24   talk about preservation.  The issue would quickly arise, I

25   suppose, what kind of backup tapes are in existence.  And

1   that's my question to you.  And it's the same question I

2   just asked her.

3           Independently of the backup tapes that were in

4   existence on September 27, 2007, are there other backup

5   tapes that are present in existence and, if they are, would

6   you be willing to preserve those until Judge Kennedy can

7   rule more substantively on the issues presented.

8           MS. HONG:  Sure.  Your Honor, I think --

9           THE MAGISTRATE JUDGE:  "Sure," you will?

10          MS. HONG:  Well, let me address that in two parts.

11  The first is, we have represented what we mean by disaster

12  recovery tapes.  In Exhibit 5 to Plaintiff's motion, we've

13  indicated to Plaintiff that the disaster recovery tapes are

14  the backup tapes to which CREW referred in their first and

15  second letters.  Second, there are additional backup tapes

16  in addition to the ones that were in the Office of

17  Administration's possession on September 25th.

18          We have represented that to the extent that there

19  are backup tapes for e-mails generated by EOP components

20  after September 25th, that those backup tapes are not being

21  recycled and will be maintained by the Office of

22  Administration consistent with its preservation obligations.

23          THE MAGISTRATE JUDGE:  Well, let me -- you can

24  help me here.  Let me tell you what happens in this

25  courthouse.  All right?

1          On Tuesday evening, the backup tapes for our

2    operation on Monday and Tuesday are delivered to IMM and

3    taken from the premises.  On Thursday, the same people come

4    back and bring the tapes they have and exchange them for the

5    ones that have been created for Wednesday and Thursday.

6    That constant recycling process is always going on.  Which

7    leads me to believe that on Thursday, the backup tape that

8    was used on Tuesday has been obliterated and recycled.

9          Is that what you mean?

10         MS. HONG:  The backup tapes that have been created

11   after September 25th, 2007, have not been recycled.

12         THE MAGISTRATE JUDGE:  So they are sitting

13   somewhere, and there's no doubt in anyone's mind that you

14   will preserve those and you will not recycle them.

15         MS. HONG:  As we have indicated to Plaintiff on

16   numerous occasions.

17         THE MAGISTRATE JUDGE:  All right, but you see

18   Plaintiff's problem.  She wants to know about all these

19   other backup tapes that are in existence that are somewhere

20   in that office that came into existence before

21   September 25th, 2007.  And what I thought she was trying to

22   get with her letters was an assurance from you that whether

23   or not they are subject to the FRA, they will be preserved

24   so that her lawsuit doesn't become an academic exercise.

25   Because they will be the only depository of that which is --

1    it may be gone.  And therefore, you will keep them.

2           In a sense, the same obligation I would at least

3    consider imposing on ordinary civil litigants before me.

4    All right, don't destroy that stuff just yet.  I don't know

5    if they're entitled to it, I don't know if they'll ever get

6    near the backup tapes, but there's no reason to worry about

7    that.  All we got to do is put them in a separate drawer so

8    they can't be recycled.  Are you willing to do that?

9           MS. HONG:  We have represented to the Plaintiff

10   that all of the backup tapes, or the disaster recovery

11   tapes, in the Office of Administration's possession before

12   September 25th, 2007, are being and will continue to be

13   maintained during the course of this litigation.

14          THE MAGISTRATE JUDGE:  And they will not be

15   recycled.

16          MS. HONG:  They will not be recycled and have not

17   been recycling -- recycled.

18          THE MAGISTRATE JUDGE:  Does that satisfy you,

19   ma'am?

20          MS. WEISMANN:  No, Your Honor, it doesn't.  I

21   still think -- excuse me -- what we're getting is --

22          THE MAGISTRATE JUDGE:  Why don't you sit down,

23   counsel.

24          MS. WEISMANN:  We're getting a very -- I think if

25   you listen carefully, we're getting a --

1          THE MAGISTRATE JUDGE:  I'm trying to listen

2    carefully.

3          MS. WEISMANN:  -- very narrowly tailored response.

4    Because first of all, let me point out that the Defendants

5    in this case include the others beyond the Office of

6    Administration.  And if I heard correctly, I heard an

7    admission from White House counsel -- from their counsel

8    that there are documents or backup copies in other entities'

9    possession.  So we believe that what they must be

10   accountable here for is the -- whatever backup copies were

11   created from 2003 forward.  And if they have been

12   transferred to contractors, if they've been transferred to

13   other entities with the Executive Office of the President,

14   which is itself a named Defendant here, they must be

15   accountable for them.

16         And I guess my concern, Your Honor, is that what

17   I'm hearing is this very -- what to me sounds like a very

18   narrow representation.  Which, again, comes down to,

19   whatever they physically had in their possession they will

20   continue to preserve, but what they haven't said is, beyond

21   that what's the universe.

22         And I go back to, in our minds there is still not

23   a common understanding of what disaster recovery tapes

24   means.  And when we asked very specifically, what about

25   disks, what about DVDs, what about CDs, we didn't get a

1   straight answer, and that's not a complicated question.

2           THE MAGISTRATE JUDGE:  Well, I think we'd all

3   agree we would put DVDs and CDs in a very different category

4   of disaster recovery tapes.  Disaster recover tapes are what

5   I talk about when Iron Mountain comes here.  The large

6   magnetic tapes on which data is recorded.  CDs and DVDs, I

7   agree -- I think we all agree, do not fall within the

8   definition of disaster recovery tapes.  But you want them

9   preserved as well.

10          MS. WEISMANN:  Well, it's my understanding -- and

11  I have no way to test this unless the government is willing

12  to give me this information -- that some of what we would

13  call disaster recovery tapes may be stored in mediums like

14  DVD that in fact -- I know in the corporate world they are

15  going toward these optical things.  So I'm still talking

16  about what we would call the backup copies that were

17  intended, you know, to be a backup copy in the wake of a

18  disaster where the material is deleted.

19          THE MAGISTRATE JUDGE:  But, you know, but that's

20  not semantic.  That's very different.  The process I'm

21  talking about, the Iron Mountain process, that happens

22  independently of my will as a participant in the network.

23  But as recently as yesterday, to keep the clutter of my

24  e-mail from driving me crazy, I transferred quite a few of

25  the e-mails to a DVD.  Now, I put that away.

1          MS. WEISMANN:  Right.

2          THE MAGISTRATE JUDGE:  But I would not consider

3   that any sort of a backup tape in the same sense that if,

4   God forbid, there was a tragedy here and the court system

5   collapsed, we could still open tomorrow morning because

6   these tapes are in existence.  That DVD doesn't have the

7   same function.  And I would not call it part of a disaster

8   backup tape.  It's a different thing.  I think it's fair to

9   say it is other media designed, intended or capable of

10  preserving information, and you want that preserved, as

11  well.

12         MS. WEISMANN:  What we want preserved is whatever

13  backup media the institution of the Executive Office of the

14  President, through the Office of Administration, is our

15  understanding, uses to preserve data that can be used

16  forensically for discovery recovery.

17         If individuals within the White House create

18  separately their own DVDs, we had not intended that to be

19  encompassed, but I just want to be clear, because I feel

20  like there's been such a reluctance to engage in a dialogue

21  or have information flow, that when we say "tapes," if in

22  fact, as an institutional matter, they automatically back up

23  things in a DVD and it happens beyond the will of any

24  individual, that that would be encompasses, as well.

25         We just want those assurances, or else to be told,

1    "Well, as it turns out, the only medium we use is tapes,"

2    and that's what we've been after.  I'm not asking that every

3    individual within the White House must preserve every copy.

4    And we haven't gotten that kind of assurance.

5         THE MAGISTRATE JUDGE:  Is that clear now?

6         MS. HONG:  You know, I don't know how the White

7    House Defendants could have made more clear --

8         THE MAGISTRATE JUDGE:  Okay.  Maybe -- I've looked

9    at the exchange of correspondence between you.  Is it

10   helpful to look at the -- I assume there's a -- there must

11   be, I know I saw this, so I assume it's correct -- there is

12   an order in here that Defendants proposed?

13        MS. HONG:  There was a proposed order, Your Honor.

14        THE MAGISTRATE JUDGE:  All right.  If we could

15   find that, maybe you could show me where its deficiency is

16   and we could get down to practical cases and talk

17   specifically about what we're going to say and resolve it.

18   Give me a moment.  I'll have to find it.

19        MS. HONG:  You know, I'm thinking that I may not

20   have it.  I'm sorry.

21        THE MAGISTRATE JUDGE:  No, here's the proposed

22   order here.

23        MS. HONG:  No, I know we submitted it.  I'm just

24   not sure I brought the copy with me.

25        THE MAGISTRATE JUDGE:  All right.  Let me read it

1   so we both have it.  Did you want me to -- why don't we take

2   two minutes and get copies for everybody.

3           MS. HONG:  I apologize.

4           THE MAGISTRATE JUDGE:  Get copies of this for

5   everyone.  We'll get a copy for you, counsel.  Just a

6   moment.  Thank you.

7           All right, let's look at the proposed order.

8   Okay.  What I was thinking of doing, since the surest way to

9   destroy a document is have it drafted by a committee, I was

10  thinking of taking a ten-minute recess to see if you can

11  maybe work this out.  If you can, I'll come back.  So why

12  don't we say 2:30, okay?  I'm sure sweet reason will

13  prevail.

14          We'll be in recess till 2:30.  Talk to each other,

15  okay?

16          (Whereupon, a brief recess was taken.)

17          THE CLERK:  We're back on the record, Judge.

18          THE MAGISTRATE JUDGE:  How are we doing?

19          MS. WEISMANN:  Well, Your Honor, speaking for the

20  Plaintiff, we made two proposals, neither of which was

21  accepted.

22          First, we were advised about midway through, that

23  in fact the White House Defendants are both completely

24  unwilling to --

25          THE MAGISTRATE JUDGE:  Why don't you sit down,

1   counsel, so she can --

2          MS. WEISMANN:  Completely unwilling to agree to a

3   Court-ordered -- to a Court order.

4          THE MAGISTRATE JUDGE:  Okay.

5          MS. WEISMANN:  And that we also then proposed what

6   about a stipulation between the parties that's submitted to

7   the Court for _____ and were told that that also was

8   not acceptable.

9          Before that we had proposed some modifying

10  language to our own order to address what we understood

11  their concerns were.  And in addition, the offer they have

12  made and I'm certainly happy to let them explain it, is

13  they're willing to do a declaration _____ that they

14  would provide to us.  And that's unacceptable and I can tell

15  the Court why, but we're happy to _____.  But as I said

16  --

17         THE MAGISTRATE JUDGE:  Why don't you tell me why

18  so I can tell Judge Kennedy.

19         MS. WEISMANN:  Okay.  Really, there's a couple of

20  reasons.  First of all, as we've tried to explain to them,

21  we believe we're talking about the -- we are talking about

22  the body of backup copies that exists throughout the EOP,

23  and it's difficult to imagine what declarant they could get

24  that would have the authority to talk to all that.

25         But I think more significant, Your Honor, we

1  really need something that, if it's not complied with, we

2  have some mechanism to seek relief.  And we also think, Your

3  Honor, just the course of the dealings between the parties

4  on this issue so far really, you know, brings very

5  heightened concerns, you know, that there's so much

6  wordsmithing and parsing going on, we think what's critical

7  this point, we just need a crystal-clear order that both

8  parties understood exactly what it means.

9         And, you know, what I don't want to happen and I'm

10 sure nobody does, is that we have a lot of satellite

11 litigation over this issue.  So we think the best way is

12 through a Court order or, as I said, we're willing to agree

13 to a stipulation that's entered as a Court order . Either

14 way.

15        THE MAGISTRATE JUDGE:  But that's not acceptable

16 to the United States, is that true?

17        MS. HONG:  Yes, Your Honor.  Our position is that

18 the Plaintiff has not presented the predicate case for an

19 order on a temporary restraining order to --

20        THE MAGISTRATE JUDGE:  Okay, well, let's -- I

21 understand your position.  Let me then turn to that issue.

22        We're all agreed that the standards are well

23 articulated in the case law of this jurisdiction.  So we

24 have, first of all, likelihood of success on the merits, we

25 have a threat of irreparable harm, we have to ascertain

1    where the public interest lies.

2         Now, in terms of irreparable harm and the public

3    interest, would you concede that obviously if information is

4    destroyed that is at the very heart of a lawsuit, that the

5    harm threatened, at least, to the Plaintiffs is irreparable

6    and that there is a public interest in its preservation at

7    least until Judge Kennedy can act?

8         MS. HONG:  And there is no harm threatened here,

9    Your Honor.  The Defendants have made the representation

10   that it would preserve and maintain the backup tapes or the

11   disaster recovery tapes that were in existence as of

12   September 25th, 2007.  In our discussions, we offered to

13   provide a declaration to that effect.  The Office of

14   Administration maintains possession and control --

15        THE MAGISTRATE JUDGE:  Counsel, can I ask you

16   something?  What's so terribly significant about

17   September 27?  Admittedly, the Federal Rules of Civil

18   Procedure as amended direct our attention to the

19   commencement of the lawsuit.

20        But at common law, as the many cases on spoliation

21   indicate to us, parties have a common law responsibility to

22   preserve what may be evidence.  So it would follow, then,

23   that electronic evidence that came into existence prior to

24   the inception of this lawsuit may nevertheless have to be

25   preserved at the risk of there being spoliation.

1           Do you disagree with that?

2           MS. HONG:  In all of the evidence that was in

3  existence at that time -- we're not stating that we will

4  preserve only those tapes that came into existence on

5  September 25th going forward.  But all of those tapes that

6  were in the Office of Administration's possession or custody

7  or control will be maintained throughout the pendency of

8  this litigation.

9           THE MAGISTRATE JUDGE:  But you won't agree to that

10  in a stipulation.

11           MS. HONG:  What we would be willing to agree to is

12  offer a declaration, signed under penalty of perjury, that

13  would, as in the other cases in which Plaintiff litigated,

14  that would moot out the need for any motion for a temporary

15  restraining order.

16           THE MAGISTRATE JUDGE:  Okay --

17           MS. HONG:  Even absent that declaration, though,

18  Your Honor, we believe that the Plaintiff has not made out

19  the predicate --

20           THE MAGISTRATE JUDGE:  Well, let's talk a little

21  about the other predicates.  I think I have your issue on

22  irreparable harm.  How about the public interest?  Wouldn't

23  that be a public interest, at least in terms of conservation

24  of judicial resources?  That this stuff, whatever media it

25  is, would be preserved pending Judge Kennedy's decision?

1    MS. HONG:  Yeah, and based on the representations

2    that Defendants have made, there is no need to again enmesh

3    the Court in that type of determination.

4    THE MAGISTRATE JUDGE:  And finally, on success on

5    the merits.  This may take a bit of time.  I apologize if I

6    keep you up there too long.

7    But as I understand your position, and I hope I'm

8    getting it right, we'd all agree in light of the Circuit's

9    decision in Armstrong versus the Executive Office of the

10   President, that there are two statutes at issue, the

11   Presidential Records Act and the Federal Records Act are

12   mutually exclusive.  It's impossible for a document to be

13   in both places.  It's either one or the other.

14   Plaintiffs contend, nevertheless, that there is

15   an independent statutory responsibility under the Federal

16   Records Act that would pertain to the maintenance of records

17   by this part, section or division within the White House,

18   it's Defendant called the Executive Office of the President,

19   Executive Office of the Present Office of Administration.

20   But as I understand your position from your

21   papers, you drop a footnote and you contest whether those

22   entities are agencies for the purposes of the application of

23   the Federal Records Act.  Is this a true statement of your

24   position?

25   MS. HONG:  For the Office of Administration

1    specifically.  The Office of Administration does not fall

2    within the definition of agency as used in the FRA.  Yes,

3    Your Honor.

4              THE MAGISTRATE JUDGE:  Well, and that's what

5    concerns me.  Because I found Judge Richey's decision in

6    1995, in which he stated, quotes, "In a related case,

7    Armstrong v. Executive Office of the President --" for

8    purposes of the record it should note that I'm reading from

9    876 Fed. Sup., 1300, what's said to be page 3 here in the

10   Lexis copy of this.

11             I read again, "In a related case, Armstrong versus

12   Executive Office of the President --" delete citations --

13   "this Court held that electronic records created by the

14   agency components of the Executive Office of the President

15   are subject to the Federal Records Act and enjoin the

16   archivist to take all necessary steps to preserve the

17   electronic federal records generated by the executive

18   agencies in this system."  Then he goes on to say, "This

19   injunction did not apply to presidential records that are

20   subject to the Presidential Records Act rather than the

21   FRA."

22             When I read that along with the Court of Appeals'

23   decision in Armstrong versus the Executive Office of the

24   President, isn't it fair to say that at least Plaintiffs

25   have some likelihood of success upon prevailing upon their

1    contention that the two Defendants here, the Executive

2    Office of the President, the Executive Office of the

3    President's Office of Administration, are in fact agencies

4    subject to FRA?

5          MS. HONG:  No, I think if you look at the specific

6    claims that are at issue for the temporary restraining order

7    here, Counts 1 through 4, they claim there that the head of

8    the agencies as well as the archivist has failed in their

9    what they call a mandatory duty to initiate action to

10   recover perhaps missing or deleted records.  Those statutes,

11   by their terms, apply to the head of the agencies or to the

12   archivists, not necessarily to the agencies in toto.

13         To the extent that there are obligations for

14   agency components of the Executive Office of the President

15   to maintain records under the Federal Records Act, certainly

16   we would agree that the Federal Records Act does apply to

17   certain agencies within the Executive Office of the

18   President.  There is currently ongoing litigation, however,

19   about whether the Office of Administration falls within the

20   definition of an agency within the meaning of the FRA.

21         THE MAGISTRATE JUDGE:  Current ongoing

22   administration, is that the case before Judge Penn?

23         MS. HONG:  No, Your Honor.

24         THE MAGISTRATE JUDGE:  The case before Judge Penn

25   involves what agency or component of the President's Office?

1              MS. HONG:  The case before Judge Penn involved the
2    Department of Homeland Security.
3              THE MAGISTRATE JUDGE:  Oh, that's right.  I
4    thought that involved the Secret Service, is that --
5              MS. HONG:  And the Secret Service, you're correct.
6              THE MAGISTRATE JUDGE:  And Armstrong versus the
7    EO, Executive Office of the President, involved the National
8    Security Council.
9              MS. HONG:  As one of the agency components of the
10   Executive Office of the President, although --
11             THE MAGISTRATE JUDGE:  But again, is Judge Richey
12   wrong in his interpretation of FRA?  This Court held that
13   electronic records created by the agency components of the
14   Executive Office of the President are subject to the Federal
15   Records Act.  Are not the Executive Office of the President
16   Office of Administration, is that not an agency component to
17   which Judge Richey was referring?
18             MS. HONG:  The agencies within the Executive
19   Office of the President include, for example, OMB or CEQUA.
20   The Office of Administration, however, is not one of those
21   agencies that falls within the definition of an agency
22   within the meaning of the FRA.
23             THE MAGISTRATE JUDGE:  In the cases before the
24   Court of Appeals and Judge Richey's decisions, there was
25   specific reference to the statutes that created NSC in terms

1   of attempting to understand what the Court of Appeals called

2   whether they had independent statutory responsibility.

3   Where would I find the statutory definition of the

4   responsibilities of the Executive Office of the President,

5   the Office of Administration?

6           MS. HONG:  If you hold on one moment, Your Honor.

7   If I may?

8           THE MAGISTRATE JUDGE:  Well, I didn't mean to put

9   you on the spot, but is it congressionally created or was it

10  created by the president pursuant to a CFR.  From where does

11  it draw its authority?

12          MS. HONG:  I haven't had an opportunity to review

13  all of those materials --

14          THE MAGISTRATE JUDGE:  All right.

15          MS. HONG:  -- and I can confer with my counsel

16  here, if you would like.  You know --

17          THE MAGISTRATE JUDGE:  But the point I'm trying to

18  make is Judge Richey's decision, as the man who, after all,

19  decided Armstrong versus EOP, is that the agency components

20  of the EO, the Executive Office, are subject to the FRA.

21          MS. HONG:  Right, and the agency components, to

22  the extent they are agencies within the meaning of the

23  Federal Records Act.  We wouldn't contest --

24          THE MAGISTRATE JUDGE:  But he said agency -- but

25  he said agency components.  Did he mean something different?

1          MS. HONG:  Because the Federal Records Act defines

2     what an agency is, I don't -- you know, I'm not sure what

3     Judge Richey meant, but to be consistent with the statute he

4     would have meant, or he would have had to mean agencies

5     within the meaning or that fell within the definition of the

6     Federal Records Act.

7          THE MAGISTRATE JUDGE:  If the Executive Office

8     of the President is not an agency, who would bear the

9     responsibility for compliance with the FRA?  Within the

10     Executive Office.

11          MS. HONG:  Right, and just to make clear, we're

12     not contending that the Executive Office of the President is

13     not necessarily an agency within the meaning of the Federal

14     Records Act.  It's that the Office of Administration does

15     not fall within the definition of agency within the FRA.

16          THE MAGISTRATE JUDGE:  But if they're not doing

17     it, who will do it?

18          MS. HONG:  No, and the Executive Office of the

19     President does have agency components, including OMB, for

20     example, or CEQUA, and those agencies, the head of those

21     agencies and the Office of Administration maintains custody

22     and possession and control over, in this instance, the

23     disaster recovery tapes for e-mails generated from those EOP

24     components.  Accordingly, the Office of Administration has

25     made the representation that all of the disaster recovery

1   tapes in its possession as of September 25th, 2007, are
2   being maintained.
3           I think that Judge Richey's order in the first
4   Armstrong case, the 807 F. Sup., 816 case decided in 1992,
5   is instructive for our purposes here.  There, the Court's
6   order, understanding the certain narrow and emergency relief
7   that was requested in the temporary restraining order
8   motion, there Judge Richey ordered, "Defendants hereby are
9   directed and ordered from this day forward to preserve all
10  the current and existing computer backup tapes in their
11  custody as of the date of this order or hereafter created
12  from the electronic communication systems.  It is further
13  ordered that the Defendants are not to write over, erase or
14  destroy any of the information on the aforementioned tapes."
15          Defendants here, the Office of Administration, has
16  provided to Plaintiff precisely that representation.  Has
17  offered to provide that information in a declaration.  And
18  Plaintiff has found that inadequate.  To the extent that
19  they seek the Court to exercise its emergency powers here,
20  they have provided not a shred of evidence indicating that
21  irreparable harm would accrue, particularly in light of the
22  representations that the Defendants have made.
23          THE MAGISTRATE JUDGE:  But I think you'd have to -
24  - as I understand what they're saying is, there is still a
25  possibility that without a Court order that may happen.  And

1    since the burden on you is not that great; indeed, it is no

2    greater than the burden you are willing to undertake, then

3    how can you say that the public interest is not advanced by

4    doing that.

5         I mean, if the TRO standards are, as we know,

6    an ever-sliding calculus, the burden to you is either

7    nonexistent, because you say you're willing to undertake it,

8    or infinitesimal.  There is at least a complicated legal

9    issue with reference to whether or not the Office of

10   Administration is an agency subject to FRA.  There is no

11   downside risk to the public interest by the preservation.

12   Haven't they made out their case for a TRO?

13        MS. HONG:  No, the legal standard requires that

14   Plaintiff present a convincing presentation or persuasive

15   demonstration that irreparable is likely, and it's not only

16   likely but it will and imminently occur.  Based on

17   Defendants' representations to the Plaintiff and its further

18   assurances to provide what is more than -- what is required

19   more than under the law, by providing a declaration,

20   Plaintiff has simply not made out a case at all for the

21   issuance of a temporary restraining order, because they have

22   provided no evidence and they can't provide evidence based

23   on Defendants' representations that irreparable harm would

24   accrue to them.

25        THE MAGISTRATE JUDGE:  Thank you.  Counsel?

```
 1           MS. WEISMANN:  I'd like to start off by talking
 2    about what we still don't know, because I think that's
 3    important on the relief issue and on the merits of our
 4    request for relief.  With all of the words that have been
 5    exchanged with the Court today, we still do not know what
 6    the body of existing backup recovery tapes, whether we call
 7    them disaster recovery tapes or backup tape -- I mean,
 8    assuming we mean the same thing, we don't know what they
 9    are.  All we have are representations about what is in the
10    OA's custody and control.  And as we have explained to them,
11    in trying to craft a stipulated order, that the relief we
12    are seeking is broader than that.
13           Unless they can tell us that any and all copies,
14    if they exist, would only be there, and they haven't been
15    willing to say that.  This is not a suit brought only
16    against the Office of Administration.  They have not been
17    willing to tell us, for example, if tapes were transferred
18    off-site to contractors, et cetera.  You made reference to
19    the fact that the tapes for the courthouse are stored off-
20    site.  It is just not simply -- it's not true, Your Honor,
21    it's simply not true that they have provided adequate
22    assurances.  And that alone, we think, is enough for our
23    relief.
24           I want to, without sort of being too piecemeal
25    about this, I want to address the issue that was in the
```

1    Armstrong Court that counsel has asked this Court to use as

2    a model.  The factual setting was very different, and I

3    think that's critical.  Armstrong came about because there

4    was about to be a presidential transition.  And the concern

5    was not what had happened in the past, but the fact, the

6    likelihood that in the course of that transition records

7    would get lost.  And that is why the emergency relief that

8    was sought and awarded was prospective going forward.

9           We have a very different case, Your Honor.  As you

10   know, our lawsuit is premised on what has happened, in part,

11   over the last three years.  The fact that millions of e-mail

12   have been deleted from White House servers, the fact that

13   the White House has refused to take steps to recover those

14   tapes, to preserve, restore those tapes.  The fact that to

15   this date the White House still does not have an appropriate

16   and effective electronic record-keeping system.  That's what

17   the core of our lawsuit is about.  It's a very, very

18   different factual situation than Armstrong, which is why we

19   don't think the same order is appropriate here.

20          I also want to talk a little --

21          THE MAGISTRATE JUDGE:  How would it be improved,

22   in your point of view?

23          MS. WEISMANN:  I think, again, it can't -- it has

24   -- well.  Looking from our language, I mean, it just has to

25   say everything that's in their possession, custody and

1    control as of a date-certain will be preserved.  And just

2    to be, you know -- so let me tell you what exactly it is,

3    looking at our order, the tweaks that we had proposed.

4         One was that in the fourth line, it says "Archival

5    condition backup copies in existence as of --" and the date

6    that we would propose is September 5th, 2007, the reason

7    being that the National Security Archive has also filed a

8    lawsuit also before Judge Kennedy.  Their lawsuit was filed

9    on September 5th.  So that seems the appropriate date to

10   begin with.

11        We would include language that says that this

12   obligation applies to any and all copies in the possession,

13   custody or control of any and all of the White House

14   Defendants.

15        And finally, Your Honor, we would want language

16   at the end that makes it clear that by agreeing to that date

17   the Plaintiff reserves the right to seek relief for any

18   destruction of backup tape or documents that occurred prior

19   to that date.

20        But those are the minor -- what I think are

21   relatively minor tweaks.  And then I think we have an order

22   that I think appropriately provides us the kind of relief

23   we're seeking here, so we can litigate and get to the

24   merits.

25        And I just want to make a -- Your Honor had

 1   started out with Judge Penn's order.  I'm counsel of record

 2   in that case.  I'm also counsel of record in the Office of

 3   Administration case, which is before Judge Kollar-Kotelly.

 4   That's the case that raises the issue of the OA status as an

 5   agency.  So I'm pretty well versed in those arguments and

 6   would be happy to answer your questions.

 7        But Judge Penn's case, again, was a very different

 8   case.  We were sort of in the midst, you know, ongoing

 9   litigation when a document that the government filed raised

10   a concern to us that they were not preserving documents.

11   We brought a motion.  And what happened there, we had

12   argument, the Judge -- I mean, there's a written transcript,

13   so what I'm saying is reflected in the transcript.  The

14   Court was very concerned that the government had not

15   provided any proof, they wanted to rest simply on the

16   statements of counsel.  Once the government offered sworn

17   declarations -- and there was an order that accompanied them

18   -- we did agree voluntarily that the case was moot.

19        I mean, the concern we have here, as I said

20   earlier, however, is that we just feel like there's been so

21   much wordsmithship and narrowness, and just on a real basic

22   level a refusal to provide sort of basic information, that

23   we just -- we feel that a Court order is critical.

24        And I would say that in the case before Judge

25   Penn, the other thing that was so different than here is we

1  knew exactly what they were talking about.  They came in

2  with declarations that said, "These are all the records we

3  have, and this is where they're being preserved and how

4  they're being preserved."  And in fact, every time in that

5  case that the Secret Service or one of its components has

6  discovered new records, they have come into Court with a new

7  declaration, making it clear this is what's in existence.

8       Here we can't even get the most basic explanation,

9  even if we have an order, of what that's going to cover, and

10  we think that would be critical.  We think everybody needs

11  to know what are their obligations and, you know, are they

12  complying with them.

13       On the merits, I think -- to answer some of your

14  questions about the Office of Administration.  It was

15  created by President Carter by an executive order.  It's a

16  creation of executive order.  And since its inception, it

17  has always acted as an agency.  Until our litigation it has

18  had a whole FOIA scheme, it published regulations.  If you

19  went to the White House web site, until quite recently, it

20  in fact said very expressly that the Office of

21  Administration is an agency.  It listed it along with the

22  EQ101B.

23       But, Your Honor, I don't even think you need to

24  delve too deeply into that issue, because whether or not the

25  Office of Administration is an agency, we're talking about

1  records that include federal records, and the government

2  can't deny that.  The problem is, they're commingled.

3  Unlike the Clinton administration, which had an effective

4  electronic record-keeping system called ARMS, which dumped

5  things in buckets, either it was a federal record or a

6  presidential record, this administration has dumped them in

7  servers, they're all commingled.  So whether or not the

8  Office of Administration is an agency, it can't be denied

9  that the missing e-mails include federal records and that

10 the backup tape include federal records. So I think in some

11 respects it's sort of a red herring to go down that road.

12        I'd be happy to answer any questions you have on

13 the merits.

14        THE MAGISTRATE JUDGE:  I mean, I think you've

15 answered all of them.  What I would like you to do, if you

16 would, is, if you'd be so kind, is, in light of today's

17 discussion, if you wanted to send me a revised proposed

18 order by e-mail, I'd like to take a look at it.

19        MS. WEISMANN:  Yes, I will do that this afternoon,

20 Your Honor.  Thank you.

21        THE MAGISTRATE JUDGE:  Anything else?

22        MS. HONG:  I just want to address one of the first

23 points that Ms. Weismann raised, which was her concern that

24 there are disaster recovery tapes or other tapes outside of

25 the Office of Administration's custody, possession or

1   control that are relevant to this lawsuit.  The Office of

2   Administration has made the representation that it will

3   maintain and preserve all backup tapes in its possession,

4   custody or control, which include all the relevant disaster

5   recovery tapes.

6         THE MAGISTRATE JUDGE:  Yes, I don't know, and

7   obviously would have no way of knowing whether the model we

8   used here is the same one used there.  I don't know if they

9   off-site.

10         MS. HONG:  Unless you have any further questions,

11   (inaudible) Your Honor.

12         THE MAGISTRATE JUDGE:  No, I don't.  I just would

13   be, frankly, very surprised if they didn't go off-site.

14   That's why you send them off-site, so in the event of a

15   disaster you can (inaudible).  Okay.  Thank you very much.

16   I appreciate your _____ answer.

17         I take it that in the next couple of days, as I

18   formulate what I'm going to do for Judge Kennedy, thee will

19   be no destruction.  I have your assurance that nothing will

20   change, is that true?

21         MS. HONG:  The representations we have made remain

22   true, that the Office of Administration will maintain and

23   will continue to maintain for the pendency of this

24   litigation the disaster recovery tapes that were in

25   existence as of September 25th or September 5th, 2007.

1          THE MAGISTRATE JUDGE:  Thank you.

2          MS. WEISMANN:  Your Honor, I don't mean to be

3    difficult here, but can we take that to mean anything within

4    the custody, possession or control of the White House

5    Defendants?

6          THE MAGISTRATE JUDGE:  That's the way I'm

7    interpreting it, yes.  I mean, all I can do here is resort

8    to ordinary principles in the interpretation of the Federal

9    Rules of Civil Procedure.  And they have, since 1938, been

10   interpreted to extend to information or documents which are

11   a party's possession, custody or control.

12         MS. WEISMANN:  But I just wanted to --

13         THE MAGISTRATE JUDGE:  So I give notice that I

14   interpret those words in the same exact way.

15         MS. WEISMANN:  Okay.  And for all the White House

16   Defendants and not (inaudible).

17         THE MAGISTRATE JUDGE:  For all the Defendants in

18   this case, yes.

19         MS. WEISMANN:  Thank you.

20         THE MAGISTRATE JUDGE:  Until I rule.  That's my

21   understanding.  If I'm mistaken in that understanding, I

22   expect somebody to tell me very soon.  Thank you.

23         The Court will be in recess.

24         (Whereupon, proceedings were concluded)

UNITED STATES OF AMERICA )
                         ) Civil Action No. 07-1707
DISTRICT OF COLUMBIA     )

       I, PAUL R. CUTLER, do hereby certify that a recording of the foregoing proceedings in the above matter was duplicated from an original recording by the Office of the Clerk, United States District Court for the District of Columbia, and that said duplicate recording of the proceedings was transcribed under my direction to typewritten form.

_____
           PAUL R. CUTLER

       I do hereby certify that the foregoing transcript was typed by me and that said transcript is a true record of the recorded proceedings to the best of my ability.

_____
           BONNIE FURLONG

**EXHIBIT 8**

EXHIBIT 1

# National Archives at College Park

8601 Adelphi Road    College Park, Maryland 20740-6001

NOV  8 1995

**FILE**

Mr. James B. Wright
Acting Director
Information Systems and
  Technology Division
Office of Administration
Executive Office of the President
Washington, DC  20503

Dear Mr. Wright:

I am happy to enclose your copy of the approved schedule for the records created or received on the Office of Administration OASIS ALL-IN-1 electronic communication system after July 14, 1994.

There are two provisions of this schedule that I would like to highlight.

1.  Transfer of the records to NARA.  As indicated in item 1A of the schedule, OA will transfer the records to us in accordance with the provisions of 36 CFR 1228.188.  We are in the process of revising these transfer standards and expect that they will be in place by the end of next year. The proposed changes will provide more detailed instructions for the transfer of electronic text files.  We will keep you informed of developments during the process of revising the regulations.

2.  Implmentation of item 1B.  Since only the records in item 1A have sufficient value for transfer to NARA, it is essential that OA implement item 1B of the schedule.  We will not accept transfer of the permanent records in this schedule until the temporary records identified in item 1B have been separated from them.

Approval of this schedule is a milestone for both of our agencies.  We will be happy to provide any further guidance you may need as you take the necessary steps to implement it.

Sincerely,

JAMES W. MOORE
Assistant Archivist for
Records Administration

enclosure

| REQUEST FOR RECORDS DISPOSITION AUTHORITY | LEAVE BLANK (NARA use only) |
|---|---|
| (See Instructions on reverse) | JOB NUMBER N1-429-95-2 |

TO: NATIONAL ARCHIVES and RECORDS ADMINISTRATION (NIR)
WASHINGTON, DC 20408

DATE RECEIVED 6-6-95

1. FROM (Agency or establishment)
EXECUTIVE OFFICE OF THE PRESIDENT

NOTIFICATION TO AGENCY

2. MAJOR SUBDIVISION
OFFICE OF ADMINISTRATION

In accordance with the provisions of 44 U.S.C. 3303a the disposition request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10.

3. MINOR SUBDIVISION
RECORDS MANAGEMENT OFFICE

4. NAME OF PERSON WITH WHOM TO CONFER
Nell Doering

5. TELEPHONE
(202) 395-6471

DATE
11-8-95

ARCHIVIST OF THE UNITED STATES
John W. Carl

6. AGENCY CERTIFICATION

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposition of its records and that the records proposed for disposal on the attached __8__ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies,

[X] is not required;    [ ] is attached; or    [ ] has been requested.

| DATE 5/30/95 | SIGNATURE OF AGENCY REPRESENTATIVE Nell Doering | TITLE EOP RECORDS MANAGEMENT OFFICER |
|---|---|---|

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
|---|---|---|---|
| | Executive Office of the President, Office of Administration, OASIS ALL-IN-1 Applications and other VAX Cluster Applications records schedule attached. | | |

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION

This schedule applies to the VAX Cluster in the EOP DATA Center at the Office of Administration, Executive Office of the President.

OASIS ALL-IN-1 APPLICATIONS

The following applies to the records of the Executive Office of the President that are created or received on the Office of Administration OASIS ALL-IN-1 electronic communications system after July 14, 1994.

1.   E-Mail Records.  E-mail messages that are created or received on the OASIS ALL-IN-1 electronic communications system that have been determined to be Federal records. E-mail records include transmission data (identities of sender and recipient, and the date of transmittal), and receipt data, where necessary.  The records consist of the message and any attachments (including drafts).  Nonrecord material will be deleted after monitoring.  All Federal records will be transferred to an electronic recordkeeping system for preservation.

   A.   Master File of Recordkeeping System Data.  (Not authorized for disposal as described under 1.B.).

        DISPOSITION:   PERMANENT

        Transfer data file to NARA at the end of each Presidential Administration in accordance with 36 CFR 1228.188.  A separate Master File of Recordkeeping System Data will be transferred to NARA for each EOP Federal component.

   B.   Records in the Recordkeeping System containing temporary Federal records about routine, short-term, day-to-day administrative matters such as civilian personnel, fiscal accounting, procurement, travel and transportation, communications, printing, and other internal housekeeping activities that are unrelated to the official program functions of an office and add no substantial information to the agency official administrative records.

1

DISPOSITION:   TEMPORARY

Delete when the agency determines that they are no longer needed for administrative, legal, audit, or other operational purposes.

C.   E-Mail Records Documentation.

The documentation for each data file will include any additional information about the format of the data file and/or the context in which the data file was created.

DISPOSITION:   PERMANENT

Transfer a copy of the E-mail records documentation to NARA with the records described in 1.A (above). Transfer any updates to the documentation with subsequent transfers of records.

NOTE:   All transfers of documentation will conform with requirements in 36 CFR 1228.

D.   Electronic Version of the E-Mail Federal Records on the "Live" OASIS ALL-IN-1 System.

DISPOSITION:   TEMPORARY

Delete when Federal records have been copied to the recordkeeping system.

2.   Federal Record Calendars and Task Tracking Created on the OASIS ALL-IN-1 System of Designated High-Level Officials.

Federal calendars created by the Executive Office of the President designated high-level officials.

A.   Electronic Version.

DISPOSITION:   TEMPORARY

Delete after printing and filing calendar in appropriate file.

B.   Paper Version.

DISPOSITION:   PERMANENT

Interfile with official records and transfer to NARA according to the approved schedule controlling those records.

2

3.   Indices.  Lists maintained on the system of the contents of electronic folders of OASIS All-IN-1 users.

DISPOSITION:  TEMPORARY

Delete when no longer needed for administrative, legal, audit, or other operational purposes.

4.   Distribution Lists.  Mailing lists on the OASIS ALL-IN-1 System created by users for sending e-mail messages to groups of recipients.  All recipients of e-mail messages are identified in full on the message itself.

DISPOSITION:  TEMPORARY

Delete when no longer needed for administrative, legal, audit, or other operational purposes.

5.   EOP Directory.  The data on the EOP Directory contains names of individuals, their organization affiliation, room number, and telephone numbers.  This is a dynamically changing list of EOP personnel.

A.   Electronic Copy.

DISPOSITION:  TEMPORARY

Print out paper copy quarterly.  Delete and/or update as necessary.

B.   Paper Copy.

DISPOSITION:  PERMANENT

Retire printed copy with Office of Administration, Information System and Technology Division official files in accordance with NARA approved records schedules.

6.   Phone Messaging.  The Desk Management function allows the user to send phone messages through the computer.  Phone messages that are records because they contain substantive information on agency activities must be documented and incorporated into the agencies official files.

A.   Electronic Copy.

DISPOSITION:  TEMPORARY

Delete when one month old.

3

B.   Paper Copy.

     Interfile with official records and handle according to
     the approved schedule controlling those records.

7.   Pager Requests.   The Desk Management function allows the
     user to send paging requests.

     DISPOSITION:   TEMPORARY

     Delete when one month old.


OASIS ALL-IN-1 AND OTHER VAX CLUSTER APPLICATIONS

8.   Backup Tapes.   Backup tapes created after July 15, 1994, of
     the VAX Cluster which includes VMS System related software,
     user directories, training packages for system operators,
     and Presidential and Federal applications, consisting of
     copies of temporary records authorized for destruction,
     nonrecord materials, and records that are duplicated
     elsewhere for preservation and disposition.   See Information
     Note concerning Presidential records.

     DISPOSITION:   TEMPORARY

     Daily Backup Tapes.   Delete when set of weekly backup tapes
     has been created without error.

     Weekly Backup Tapes.   Delete when 90 days old.

4

INFORMATION NOTE:  The following applications are authorized for disposition under the NARA General Records Schedules.

OASIS ALL-IN-1 APPLICATIONS

1.  User Directory.  The user directory is an electronic feature of the system that provides users with a short-cut to entering the name of the intended recipient of a message. This is a dynamically changing list of system users.

    DISPOSITION:   TEMPORARY

    Delete when no longer needed for administrative, legal, audit, or other operational purposes.

2.  WAVES Appointment Requests.  Requests to the Secret Service to clear visitors into the White House complex.  The Secret Service preserves all requests that it receives.

    A.  Electronic Requests.

        DISPOSITION:   TEMPORARY

        Delete when no longer needed for administrative, legal, audit, or other operational purposes.

    B.  Requests made on Paper Forms.

        DISPOSITION:   TEMPORARY

        Destroy when no longer needed for administrative, legal, audit, or other operational purposes.

3.  Bulletin Board.  The bulletin board is used to notify OASIS All-IN-1 users of scheduled events such as blood drives, classroom training, and insurance open seasons.  The record copy of announcements is maintained in the recordkeeping system of the originating office and is separately scheduled.

    DISPOSITION:   TEMPORARY

    Delete when no longer needed for administrative, legal, audit, or other operational purposes.

4.  Suggestion Box.  Electronic messages from OASIS All-IN-1 users suggesting improvements to the system.

    DISPOSITION:   TEMPORARY

    Delete when no longer needed for administrative, legal, audit, or other operational purposes.

5

OASIS ALL-IN-1 APPLICATIONS (continued)

5.   User Set-up.  Consists of user passwords, locations, work
     hours, calendar and date formats, and log-in/log-out data.

     DISPOSITION:   TEMPORARY

     Delete when no longer needed for administrative, legal,
     audit, or other operational purposes.

6.   Federal Record Calendars and Task Tracking of Staff (Other
     than Designated High-Level Officials).

     DISPOSITION:   TEMPORARY

     Delete when two years old.

7.   System Distribution Lists.  Mailing lists created by system
     managers to facilitate system messages to users.

     DISPOSITION:   TEMPORARY

     Delete when no longer needed for administrative, legal,
     audit, or other operational purposes.


OTHER VAX CLUSTER APPLICATIONS

8.   DB/2 Services Request Form.  This application allows clients
     to request DB/2 system and data base administration
     services.

     DISPOSITION:   TEMPORARY

     Delete when no longer needed for administrative, legal,
     audit, or other operational purposes.

9.   Security Files.  These are system generated data that are
     used to monitor user attempts to access any computer
     resource from outside the EOP complex; also contains a log
     file of all accesses to the system using dial-up and a
     security report file on every day log-in errors.

     DISPOSITION:   TEMPORARY

     Delete when no longer needed for administrative, legal,
     audit, or other operational purposes.

6

OTHER VAX CLUSTER APPLICATIONS (continued)

10.    **Supply Order Form.**  This application is accessed through the Desk Management function and allows the user to order supplies.

      DISPOSITION:    TEMPORARY

      Delete when no longer needed for administrative, legal, audit, or other operational purposes.

11.    **Training Schedules (SCHED).**  This function allows customer support to register clients for computer classes and produce attendance reports.

      DISPOSITION:    TEMPORARY

      Delete when no longer needed for administrative, legal, audit, or other operational purposes.

12.    **Weekly Usage Reports.**  This is system generated data used to monitor system usage.

      DISPOSITION:    TEMPORARY

      Delete when no longer needed for administrative, legal, audit, or other operational purposes.

NOTE:    A data tape that conforms with 36 CFR 1228 of OASIS ALL-IN-1 electronic communications that contain Presidential records (excluding nonrecord materials) will be transferred to the White House Office of Records Management at the end of each year or more often should the volume exceed more than one data tape per year.

7

INFORMATION NOTE:  The following applications are nonrecord:

## OASIS ALL-IN-1 APPLICATIONS

1.  **Calculator.**  The Desk Management function provides access to a calculator for the users personal use.

2.  **Information Management.**  This function displays commercial and other non-agency information such as the news and weather.

3.  **Lock Keyboard.**  This function allows the user to insert a special password to lock the keyboard when not in use.

4.  **Personal Rolodex.**  The Personnel Directory function provides this feature that allows users to create personal address and telephone lists for ready reference and not for circulation.

5.  **Training Routines and HELP Files.**  The interactive training routines allows the users to become familiar with the various functions on the system.  The HELP file contains text to assist users as they are executing their applications.

6.  **World Wide Time.**  The Desk Management function allows the user to find the time in major foreign and United States cities.

## OTHER VAX CLUSTER APPLICATIONS

7.  **Personnel Vacancy Search Request.**  This function provides access to specific lists of government-wide vacancies.

8.  **Presidential Remarks On-Line.**  This is a Library application used by the library staff to access Presidential public statements and speeches.

8

**EXHIBIT 9**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, 1400 Eye Street, N.W., Suite 450 Washington, D.C. 20005, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, | ) ) ) |
| EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION, | ) ) ) ) |
| ALAN R. SWENDIMAN, HEAD OF THE OFFICE OF ADMINISTRATION (in his official capacity), Eisenhower Executive Office Building 725 17th Street, N.W. Washington, D.C. 20503, | ) ) ) ) ) ) ) |
| THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (NARA), | ) ) ) |
| and | ) ) |
| DR. ALLEN WEINSTEIN, ARCHIVIST OF THE UNITED STATES (in his official capacity), 8601 Adelphi Road College Park, MD 20740, | ) ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No: 1:07-cv-01707 (HKK)

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR A TEMPORARY RESTRAINING ORDER

**INTRODUCTION**

On three separate occasions over the span of only one week, defendants have assured plaintiff that they are preserving, and will continue to preserve, <u>all</u> documents in defendants' possession relevant to plaintiff's lawsuit – including disaster recovery tapes.  Despite defendants' repeated written assurances, and notwithstanding the fact that this lawsuit (and motion) could have been filed over six months ago, plaintiff nevertheless presses this Court to exercise its extraordinary emergency powers to assist plaintiff in obtaining what defendants have already provided: a commitment to maintain "back-up tapes in the White House defendants' possession."  (Pl.'s Mot. for a Temporary Restraining Or. ("Pl.'s Mot.") at 12.)

This Court should deny plaintiff's request, as other courts have done in analogous circumstances, including in cases involving this plaintiff.  <u>See, e.g.</u>, <u>CREW v. United States Dep't of Homeland Security</u>, No. 06-1912, Or. (D.D.C. March 14, 2007) (Penn, J.) (denying as moot motion for a temporary restraining order requesting preservation of records because defendants had provided assurances that it was preserving relevant records).  Because defendants have provided plaintiff all assurances to which it could be entitled under its motion, plaintiff cannot establish the touchstone required for interim injunctive relief:  irreparable harm.  This is particularly so where, as here, plaintiff has not provided a single affidavit, declaration, or anything more than bare allegation to support its claim of irreparable injury.  That absence of harm, alone, is sufficient to deny plaintiff's requested relief.  <u>See, e.g.</u>, <u>Wis. Gas Co. v. Fed. Energy Regulatory Comm'n</u>, 758 F.2d 669, 674 (D.C.Cir.1985) (requiring evidence of imminent irreparable harm and rejecting bare allegations for injunctive relief, in that case a stay of an order).

-2-

Plaintiff goes further, however, by requesting not only temporary relief, but the Court's assistance in conducting premature discovery about defendants' disaster recovery tape system, a function wholly improper under Federal Rule of Civil Procedure 65.  Because plaintiff cannot establish even irreparable harm, let alone "extreme or very serious damage," plaintiff cannot obtain additional relief to the extent it disturbs – rather than maintains – the status quo.  See, e.g., Judicial Watch, Inc. v. Dep't of Commerce, 501 F. Supp. 2d 83, 91 (D.D.C. 2007) ("[B]ecause the plaintiff seeks a mandatory injunction that would alter the status quo, the plaintiff must demonstrate beyond the familiar 4-part test for injunctive relief that he is 'clearly' entitled to the relief he seeks, or 'extreme or very serious damage will result.'").

Plaintiff's request would also harm the public interest by wasting court resources in the superfluous task of reiterating preservation obligations already imposed by the pendency of litigation, and which defendants already have acknowledged in writing.  Enmeshing the Court in determining whether it should enter injunctive relief that duplicates the obligations stemming from the filing of a lawsuit would waste judicial resources and render those obligations a nullity. A preservation order, particularly when defendants have provided assurances of compliance with their obligations, is simply unnecessary.  Cf. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002) ("The presumption that government officials act in good faith is nothing new to our jurisprudence."); Citizens to Preserve Overton Park, 401 U.S. 402, 415 (1971) (presumption of regularity for agency action).  Although plaintiff contends without support that "defendants' preservation obligations go well beyond what the discovery rules may require" under the Federal Records Act, 44 U.S.C. §§ 2101-18, 2901-09, 3101-07, 3301-24

("FRA"), that is flatly untrue.[1]  (Pl.'s Mot. at 20.)  Under the FRA, defendants would be

permitted to recycle disaster recovery tapes every 90 days.  (See Ex. 1 at 4 ¶ 8 ("Approved

Schedule for the Records Created or Received on the Office of Administration.").)  In contrast,

defendants are maintaining, and not recycling, all disaster recovery tapes in its possession as of

the filing of the lawsuit.  The public interest in ensuring appropriate use of judicial resources

would be ill served by the order plaintiff requests now, especially when plaintiff has adduced no

evidence that defendants are proceeding in bad faith.

      Finally, even though the above factors are sufficient to preclude relief, plaintiff cannot

establish a substantial likelihood of success on the merits of those claims relating to the

requested emergency relief.  Although plaintiff is ambiguous about which claims in its complaint

merit the preservation of "all back-up copies of any and all emails deleted from White House

servers from March 2003 through the present"[2] (Pl.'s Mot. at 1), it is clear, at a minimum, that

Claims Five through Eight – relating to the future "establishment of an adequate electronic

---

[1]  Plaintiff also contends that the Presidential Records Act, 44 U.S.C. §§ 2201-2207 ("PRA"), imposes additional obligations justifying emergency relief.  (Pl.'s Mot. at 20.)  Under prevailing D.C. Circuit authority, any claims about record keeping duties under the PRA are not reviewable.  See Armstrong v. Bush, 924 F.2d 282, 287 (D.C. Cir. 1991) ("[T]he PRA precludes judicial review.").

[2]  Rule 65(d) requires that all temporary injunctions "shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained."  Fed. R. Civ. P. 65(d).  By requesting a preservation of "back-up copies of any and all emails deleted from White House servers from March 2003 through the present," but without identifying what emails are actually deleted or missing, the preservation duty under plaintiff's request would be unknown.  Although the Office of Administration may preserve all disaster recovery tapes in its possession, plaintiff's failure to identify what "back-up copies" are required for its order is fatal to plaintiff's request.  See S.E.C. v. Washington Inv. Network, 475 F.3d 392, 398 (D.C. Cir. 2007) (remanding under Rule 65(d) for imprecise contours of injunction).

records management system" – are unrelated to the preservation of any disaster recovery tapes.[3]

See, e.g., Adair v. England, 193 F. Supp. 2d 196, 200 (D.D.C. 2002) ("Even when a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion."). Thus, those claims cannot support plaintiff's instant request for immediate relief.

Claims One and Two, in turn, request that the Court compel defendants to "request that the attorney general initiate action or seek other legal redress to recover the deleted emails."[4] (Compl. at 16-21.) Without addressing in depth the reasons those claims lack merit, defendants merely note that serious questions exist about plaintiff's standing to pursue them. And to the extent plaintiff suggests in its motion that it ultimately will request an order from this Court requiring the defendants to restore any missing emails, that claim is non-justiciable. Simply put, the FRA does not authorize a plaintiff to seek such a restoration order, which would go beyond,

---

[3] Accordingly, defendants do not address here why those claims lack merit, though plaintiff may be jurisdictionally barred from raising Claims Five through Eight, and those claims fail on the merits as well.

[4] The statutory provisions referenced in Claims One through Four cover only the "head of the Federal agency" or "the Archivist," not the other defendants. See 44 U.S.C. §§ 2905, 3106. The other defendants therefore must be dismissed for those claims and plaintiff establishes no likelihood of success on its claims against them. To the extent that plaintiff seeks the Director of the Office of Administration to comply with the FRA for records created by the Office of Administration, plaintiff cannot pursue that claim because the Office of Administration does not fall within the definition of "agency" under the FRA.

Plaintiff also cannot bring Claims Three and Four, which are substantially identical to Claims One and Two but are brought as requests for writs of mandamus, because APA review could be available for the types of asserted claims. See, e.g., Am. Chiropractic Ass'n v. Shalala, 108 F. Supp. 2d 1, 11 (D.D.C. 2000) (noting that availability of review under APA precludes alternative relief for a writ of mandamus).

and therefore exceed, the waiver of sovereign immunity provided in the APA.  See Armstrong,

924 F.2d at 294-95 (describing limited review of FRA claims); 5 U.S.C. § 701(a)(1) (no waiver

of sovereign immunity if "statut[e] preclude[s] judicial review").

At base, plaintiff's requested relief is not the type of extraordinary, narrow relief

permitted under Rule 65, particularly in light of defendant's assurances and plaintiff's failure to

establish any imminent harm.  Indeed, defendants regret that this Court must even address this

motion.

## BACKGROUND

### I.      Factual Background

In April 2007, plaintiff published a report alleging that millions of emails from White

House servers were missing in violation of federal law.  (Pl.'s Mot. at 3; Compl. ¶ 34.)  Plaintiff

asserted then that the allegedly missing emails resulted from an inadequate archival system for

Executive Office of the President components, and concluded that allegedly missing emails were

caused either by a malfunction in the servers or by manual deletion by persons with access to the

server.  (Compl. ¶ 35.)  Plaintiff filed suit six months later on September 25, 2007, raising eight

claims relating to the recovery, restoration, and preservation of certain electronic

communications created and/or received by Executive Office of the President components.

On September 25, 2007, plaintiff sent defendant Director of the Office of Administration

a letter threatening to seek a judicially enforceable order of preservation if he did not respond

within five business days to plaintiff's demands.  (See Pl.'s Mot., Ex. 3.)  Specifically, plaintiff

requested written assurances that the "OA has taken, and will continue to take, all steps

necessary to preserve the back-up tapes and ensure their integrity and ability to be used in

restoring any missing e-mail." (Id.)  By letter dated October 2, 2007, the Director, through

counsel, responded to plaintiff's demands, explaining that the "Office of Administration is

maintaining, and will continue to maintain for the pendency of this litigation, unless otherwise

permitted by the court or agreed upon or stipulated by the parties, all disaster recovery tapes that

were in its possession as of September 25, 2007," the date on which plaintiff filed suit.  (See id.,

Ex. 4.)

  Notwithstanding defendants' express commitments, plaintiff responded by letter on

October 2, 2007, again threatening court action if plaintiff alone determined that it had not been

provided adequate assurances that "back-up tapes" were being properly preserved.  (Id., Ex. 5.)

Plaintiff demanded a response less than one business day later, and set forth various detailed

inquiries in the nature of discovery requests.  Plaintiff asked, inter alia, (1) how, if at all, the term

"disaster recovery tape" differed from "back up tape" as defined as "those tapes that contain any

of the emails missing from White House servers from March 2003 through the present;" (2) what

universe of tapes the Office of Administration possessed as of September 25, 2007; (3) whether

additional back-up tapes or disaster recovery tapes may contain any deleted emails that were not

in the Office of Administration's possession as of September 25, 2007; (4) the type of

environment in which the tapes were being maintained; and (5) requested a written stipulation to

file with the Court relating to defendants' preservation efforts.  (Id.)

  Defendants responded on October 3, 2007.  (Id., Ex. 6.)  Defendants' counsel explained

that "the Office of Administration is complying with its document preservation obligations under

Federal Rule of Civil Procedure 26," and identified specifically that defendants were maintaining

all disaster recovery tapes in the Office of Administration's possession as of the filing of the suit.

(Id.)  In specific response to plaintiff's question about the difference between "back-up tapes"
and "disaster recovery tapes," counsel explained that disaster recovery tapes included the "only
so-called 'back-up' tapes, as referenced in [plaintiff's] letters."  (Id.)

Despite these additional assurances, plaintiff's counsel followed up with an email on
October 5, 2007, this time demanding responses to thirteen enumerated questions and suggesting
a telephone call the next business morning, Tuesday, October 9, 2007, to discuss those questions.
(Id., Ex. 7.)  Plaintiffs' new questions included requests, among others, for information about the
time period covered by the disaster recovery tapes in the Office of Administration's possession,
whether any other entity maintained back-up copies of emails, whether back-up copies of emails
created after September 25, 2007 were being maintained, the preservation conditions of the
tapes, and on what mediums any back-up tapes were stored.  (See id.)  Defendants' counsel
responded by email on October 9, 2007, explaining that counsel would be unavailable for a
conference call that morning, but again assuring plaintiff that the "letter response of October 3,
2007 addresses [plaintiff's] concerns."  (Id., Ex. 8.)  Moreover, defendants' counsel informed
plaintiff that

> Although we appreciate the difference between discovery under the Federal Rules
> of Civil Procedure and the ultimate relief that plaintiff seeks, our representation
> about the Office of Administration's Rule 26 preservation compliance should
> address your concerns.  In addition, to the extent your questions suggest that the
> Office of Administration has been recycling disaster recovery tapes for emails
> generated within EOP components after September 25, 2007, please be assured
> that those disaster recovery tapes have been maintained, not recycled.  Defendants
> are aware of the ongoing litigation and are proceeding in good faith compliance
> with their attendant obligations.

(Id. (emphasis added).)

Notwithstanding the Office of Administration's representation on three separate occasions that it is maintaining, and will continue to maintain, all disaster recovery tapes (the only so-called back-up tapes referenced in plaintiff's letters) that were in the Office of Administration's possession as of the date the lawsuit was filed, as well as the further assurances that defendants were proceeding in good faith compliance with the attendant obligations of pending litigation, plaintiff filed the present motion on October 11, 2007, seeking a "temporary restraining order to guard against the destruction or degradation of back-up tapes in the White House defendants' possession[.]" (Pl.'s Mot. at 12.)  Plaintiff submitted no affidavits, declarations or testimony in support of its motion.

## II.    Statutory Framework[5]

The Federal Records Act is "a collection of statutes governing the creation, management, and disposal of records by federal agencies."  Public Citizen v. Carlin, 184 F.3d 900, 902 (D.C. Cir. 1999).  See 44 U.S.C. §§ 2101-18, 2901-09, 3101-07, 3301-24.  The FRA "authorizes the head of each Federal agency to establish a records management program and to define the extent to which documents are appropriate for preservation as agency records."  Kissinger v. Reporters Committee For Freedom of the Press, 445 U.S. 136, 147 (1980).  Agency heads are directed by the FRA to "establish and maintain an active, continuing program for the economical and

---

[5]  As noted above, Presidential Records Act recordkeeping practices and decisions are unreviewable.  Plaintiff's suggestion that it may be afforded relief owing to defendants' obligations under the PRA is therefore misplaced.  Armstrong, 924 F.2d at 47 ("Allowing judicial review of President's general compliance with the PRA at the behest of private litigants would substantially upset Congress' carefully crafted balance of presidential control of records creation, management, and disposal during the President's term."); see also Pl.'s Mot. at 5 ("CREW's lawsuit is based on [defendants'] . . . violation of their obligations under the Federal Records Act and the Presidential Records Act.") (emphasis added).

efficient management of the records of the agency," and "shall establish safeguards against the

removal or loss of records [they] determine[] to be necessary and required by regulations of the

Archivist."  Id. § 3105.  Additionally, the Act "provides the exclusive means for record

disposal."[6]  Id.; see 44 U.S.C. § 3303(a).

> Records covered by the FRA include
>
> all books, papers, maps, photographs, machine readable materials, or other
> documentary materials, regardless of physical form or characteristics, made or
> received by an agency of the United States Government under Federal law or in
> connection with the transaction of public business and preserved or appropriate
> for preservation by that agency . . . as evidence of that organization, functions,
> policies, decisions, procedures, operations, or other activities of the Government
> or because of the informational value of the data in them.

44 U.S.C. § 3301.  By regulation, records under the FRA are deemed either "permanent" or

"temporary."  Permanent records include any federal record that "has been determined by [the

National Archives Record Administration ("NARA")] to have sufficient value to warrant its

preservation in the National Archives of the United States."  36 C.F.R. § 1220.14 (2006).

Temporary records are any records "which have been determined by the Archivist of the United

States to have insufficient value . . . to warrant its preservation by [NARA]."  Id.  Temporary

records may be disposed based on schedules authorized by NARA.  By schedule dated

November 8, 1995, "backup tapes created [by the Executive Office of the President DATA

Center] after July 15, 1994 . . . consisting of copies of temporary records authorized for

destruction, nonrecord materials, and records that are duplicated elsewhere for preservation and

---

[6] The Records Disposal Act, 44 U.S.C. § 3101, et seq., controls the disposition of records, but as
the D.C. Circuit has treated the RDA as a portion of the FRA, Public Citizen v. Carlin, 184 F.3d
900, 902 (D.C. Cir. 1999) (referring to "the RDA portion of the FRA"), defendants do so as well.

disposition" were designated as "TEMPORARY" records.  (Ex. 1 at 4 ¶ 8.)  By schedule,

therefore, the Office of Administration was permitted under the FRA to recycle, or delete,

backup tapes "when 90 days old."  (Id.)

The FRA also establishes an administrative enforcement scheme, comprised of two

complementary mechanisms for protecting records.  Armstrong v. Bush, 924 F.2d 282, 294 (D.C.

Cir. 1991).  Under 44 U.S.C. § 2905, if the Archivist learns that documents are being mishandled

in certain material ways, then he or she may notify the relevant agency head, assist the agency

head in initiating an action through the Attorney General (or initiate the action himself or herself

if the agency head refuses), and (in certain situations) notify Congress:

> "[The Archivist] shall notify the head of a Federal agency of any
> actual, impending, or threatened unlawful removal, defacing,
> alteration, or destruction of records in the custody of the agency that
> shall come to his attention, and assist the head of the agency in
> initiating action through the Attorney General for the recovery of
> records unlawfully removed and for other redress provided by law.
> In any case in which the head of the agency does not initiate an action
> for such recovery or other redress within a reasonable period of time
> after being notified of any such unlawful action, the Archivist shall
> request the Attorney General to initiate such an action, and shall
> notify the Congress when such a request has been made."

44 U.S.C. § 2905(a).  Under 44 U.S.C. § 3106, in turn, each agency head may alert the Archivist

of the material mishandling of documents and seek to initiate an action through the Attorney

General to put a stop to the improper practice(s):  "The [agency head] shall notify the Archivist

of any actual, impending, or threatened unlawful removal . . . or destruction of records in the

custody of the agency. . . [and] shall initiate action through the Attorney General for the recovery

of records he knows or has reason to believe have been unlawfully removed from his agency[.]"

44 U.S.C. § 3106.

-11-

Only limited review of compliance with the FRA is available.  Although a plaintiff may

seek (under the APA) judicial review of an "agency head's or Archivist's refusal to seek the

initiation of an enforcement action by the Attorney General," or the adequacy of an agency's

record-keeping guidelines, the Court of Appeals has made clear that the FRA does not authorize

judicial review in order to enjoin "an agency official from improperly destroying or removing

records." Armstrong, 924 F.2d at 294, 295.

## **ARGUMENT**

A request for emergency injunctive relief is an extraordinary remedy, and the power to

issue such an injunction "should be sparingly exercised." Dorfmann v. Boozer, 414 F.2d 1168,

1173 (D.C. Cir. 1969) (quotation marks omitted).  For a plaintiff to prevail in its motion for a

temporary restraining order, it "must demonstrate: 1) a substantial likelihood of success on the

merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an

injunction would not substantially injure other interested parties, and 4) that the public interest

would be furthered by the injunction." CityFed Fin. Corp. v. Office of Thrift Supervision, 58

F.3d 738, 746 (D.C. Cir. 1995).  The plaintiff must satisfy each of these four factors separately,

and the court must further find that these four factors together justify the drastic intervention of a

preliminary injunction. See CityFed Fin. Corp., 58 F.3d at 747; Chaplaincy of Full Gospel

Churches v. England, 454 F.3d 290, 304 (D.C. Cir. 2006).  Nonetheless, while courts may

balance weakness in one or more prongs against strong showings in others, CityFed Financial

Corp., 58 F.3d at 747, two prongs of the familiar four-part inquiry – the likelihood of success on

-12-

the merits and irreparable harm – must be established.  See District 50, United Mine Workers of

Am. v. International Union, United Mine Workers of Am., 412 F.2d 165, 167 (D.C. Cir. 1969).[7]

## I.   The Court Should Deny Plaintiff's Motion for a Temporary Restraining Order Because Plaintiff Has Not Established Imminent, Certain, and Irreparable Injury

"[I]rreparable harm to the moving party is 'the basis of injunctive relief in the federal

courts,'" Almurbati v. Bush, 366 F. Supp. 2d 72, 77-8 (D.D.C. 2005), citing CityFed Financial

Corp., 58 F.3d at 747 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)), and the absence of

irreparable injury, alone, is adequate to deny preliminary relief.  See Wis. Gas Co., 758 F.2d at

674; CityFed Fin. Corp., 58 F.3d 738, 747.  "To obtain injunctive relief, the petitioners must

show that the threatened injury is not merely 'remote and speculative'." Almurbati, 366

F.Supp.2d 72, 78, quoting Milk Indus. Found. v. Glickman, 949 F.Supp. 882, 897 (D.D.C. 1996).

Proving irreparable injury is a considerable burden, requiring proof that the movant's injury is

"certain, great and actual - not theoretical - and imminent, creating a clear and present need for

extraordinary equitable relief to prevent harm." Wisc. Gas Co., 758 F.2d at 674 (emphasis

added).  Bare allegations are insufficient to prove irreparable injury.  See id.; see also Roth v.

Rufus, 2003 WL 25152300, *1 (D.D.C. June 2, 2003) (same).

---

[7]  In addition, when a movant seeks mandatory injunctive relief, i.e., an injunction that "would alter, rather than preserve, the status quo . . . the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quoting Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997)), aff'd, 159 F.3d 636 (D.C. Cir 1998).  "A district court should not issue a mandatory preliminary injunction unless the facts and the law clearly favor the moving party." Nat'l Conference on Ministry to Armed Forces v. James, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (internal quotations omitted).

Plaintiff falls far short of its burden to establish that certain, great, actual and imminent harm will result if the Court denies the "extraordinary" and "unusual" emergency injunctive relief plaintiff seeks. Lehman, 623 F. Supp. at 334; Role Models Am., Inc. v. White, 193 F. Supp. 2d 76, 80 (D.D.C. 2002). Indeed, plaintiff has not established that any harm at all will accrue if relief is not granted.[8] Relying only on the allegations in its Complaint, plaintiff offers only rank speculation to claim that "preservation [of disaster recovery tapes] is by no means assured," and merely asserts that the "prior conduct of the White House – which led to the improper deletion of millions of electronic records – coupled with its refusal to give adequate assurances that all of the back-up tapes are being properly preserved present a serious risk that valuable records will be forever lost absent the Court's immediate intervention." (Pl.'s Mot. at 12; see also id. at 20-21 (offering only allegations, with no citations to any record evidence).) It is well established, however, that "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." Wisc. Gas Co., 758 F.2d at 674 (emphasis added).

Plaintiff itself appears to recognize the speculativeness of its allegations of harm. It does not refer to "actual," "certain," "great," or "imminent harm," but merely a "risk that the last remaining copies of important historical documents will not be preserved." (Pl.'s Mot. at 2.)

---

[8] Indeed, plaintiff contends that it suspected FRA violations as far back as April 2007, when it published a full report about the allegedly missing emails. (Pl.'s Mot. at 4.) Plaintiff comes only now, six months later, advancing claims of "immediate" and "irreparable harms." At a minimum, plaintiff's delay in filing suit or seeking injunctive relief belies its claims of immediate, irreparable harm.

Risk alone, especially of the most remote sort, is insufficient to merit temporary, emergency relief and plaintiff's reflexive, unsupported claims to the contrary do not merit injunctive relief.

The absence of any evidence of irreparable harm is underscored when juxtaposed against the assurances that the Office of Administration has provided to plaintiff.  Although regularity in an agency's or government official's dealings is typically presumed absent contrary evidence, see Citizens to Preserve Overton Park, 401 U.S. at 415, plaintiff has been provided with significantly more:  (1) plaintiff has been assured that the Office of Administration is complying with its document preservation obligations under the Federal Rules of Civil Procedure; (2) plaintiff has been assured that the Office of Administration is maintaining – and will continue to maintain for the pendency of this litigation, and in a manner that complies in all respects with Rule 26 – all disaster recovery tapes (which are the "only so-called 'back up' tapes, as referenced in plaintiff's letters") that were in the Office of Administration's possession as of the filing of the lawsuit; (3) plaintiff has been assured that the Office of Administration has been maintaining, and not recycling, disaster recovery tapes for emails generated within EOP components after the filing of the lawsuit; and (4) plaintiff has been assured that defendants are aware of the ongoing litigation and are proceeding in good faith compliance with their attendant obligations.  (See Pl.'s Mot., Exs. 4, 6, 8.)  Those specific and express commitments are more than sufficient to resist emergency relief.

Courts have denied preservation orders in analogous circumstances, even without the type of assurances described above.  In Hester v. Bayer Corporation, for example, the court vacated a preservation order imposed in state court prior to removal to federal court because the plaintiff there "provided the state court with no evidence suggesting the possibility that evidence

was at risk; the one page request for the preservation order was based entirely upon 'information

and belief.'" 206 F.R.D. 683, 686 (M.D. Ala. 2001). The court explained that

> Whenever a lawsuit is filed, the defendant is automatically required to take all appropriate steps to preserve any and all information which might be relevant to that litigation. See Fed. R. Civ. P. 26. To supplement every complaint with an order requiring compliance with the Rules of Civil Procedure would be a superfluous and wasteful task, and would likely create no more incentive upon the parties than already exists. The possibility that a document preservation order might induce a cavalier defendant to elect the moral high road, however,

was inadequate to justify entry of an order absent "some evidence . . . to justify such an extreme

remedy." Id. at 685, 686. The court used similar reasoning in Schnall v. Annuity & Life Re

(Holdings) Ltd., XL, in denying a preservation order given extant statutory preservation duties,

and defendants' affirmative statements that they were fully aware of their statutory obligations

and sanctions for failure to comply. No. 302-2133, 2004 WL 51117, *2 (D. Conn. Jan. 2, 2004)

(citing also for same proposition In re Tyco Int'l, Ltd. Sec. Litig., 2000 WL 33654141, at *2

(D.N.H. 2000)). The logic of such cases applies with equal force here. (See Pl.'s Mot. at 20

(claiming that "defendants' preservation obligations are rooted in the FRA and PRA," which

may provide extant statutory obligations, like the Federal Rules, similar to the obligations

discussed in the cases above).) Defendants have provided express assurances that they are

complying with their obligations to maintain the disaster recovery tapes in the Office of

Administration's possession as of the filing of the lawsuit.[9] Nothing more can be provided in

---

[9] For that reason and others, this case differs significantly from Armstrong v. Bush, 807 F. Supp. 816, 820-21 (D.D.C. 1992), where a preservation order was entered to preserve back-up tapes during a change in Presidential administrations. In Armstrong, unlike here, defendants did not provide assurances that records would be maintained during the transition between administrations, when past history showed that records were lost during such transitions. Moreover, in Armstrong, the court stated that "[a]ll the relief that is required . . . is that the

response to plaintiff's motion.[10]  (Id. at 21 ("The immediate relief that CREW seeks will require nothing more of the defendants than what the law already mandates . . ..") (emphasis added).).

Given that "the showings made fall so far short that [its] petition should not have been filed," and that plaintiff's failure "to provide any substantiation is a clear abuse of this court's time and resources," Wisc. Gas Co., 758 F.2d at 674, one wonders what motivation drives plaintiff's instant request.  Based on plaintiff's follow-up communications when defendants provided assurances of preservation, it appears that plaintiff really wants far-reaching discovery concerning defendants' disaster recovery system.  Plaintiff is simply not entitled to such relief at this time.  Defendant respectfully submits that such discovery is not appropriate in this case at any time, but even if it were, plaintiff's efforts are premature.  See, e.g., Fed. R. Civ. P. 26(d) (describing discovery timing).  Plaintiff may not attempt to use the temporary restraining order as a vehicle for discovery, as such action alters, rather than maintains, the status quo.  See Columbia Hosp. for Women Found., Inc., 15 F. Supp. 2d at 4.

---

Defendants save these tapes instead of reusing (and thereby erasing) them," assurances that defendants have already provided here.  Id. at 821 n.7.  Finally, in Armstrong, the court presumed that back-up tapes constituted actual permanent records within the meaning of the statutes and could therefore be preserved as back-up tapes themselves, rather than as means from which to restore any other records.  Id. at 821 n.8.  Here, plaintiff has not contended that the disaster recovery tapes are permanent records, but that missing records may be restored off of the tapes.  In any case, the most material difference is in the presence of actual harm from an administration change in Armstrong, and the absence of like circumstance here.

[10]  Plaintiff's complaint that defendants failed to provide an inventory of all disaster recovery tapes in its possession is entirely unrelated to any status-quo-maintaining relief it could seek. (Pl.'s Mot. at 20.)  And absent any evidence of harm, plaintiff would be unable to provide the more stringent proof required to disturb the status quo, even if that were possible.

Plaintiff has simply failed to establish imminent, irreparable, and certain harm.  For that

reason alone, its motion for an extraordinary emergency injunction to preserve any records

should be denied.  See CityFed Fin. Corp., 58 F.3d at 747.

**II.      The Court Should Deny Plaintiff's Motion for Preliminary Injunction Because The
         Public Interest Would Not be Furthered and Relief Would Impose an Undue
         Burden on Defendants By Sanctioning Routine Preservation Orders Based on Mere
         Allegation, and Not Evidence, of Bad Faith**

The public's interest in appropriate, and non-wasteful, use of judicial resources would be

harmed by the issuance of a temporary restraining order here.  As described above, "[t]o

supplement every complaint with an order requiring compliance with the Rules of Civil

Procedure would be a superfluous and wasteful task, and would likely create no more incentive

upon the parties than already exists."  Hester, 206 F.R.D. at 686.  Such disregard for extant

obligations, including any obligations due to the pendency of litigation and duties under the

FRA, would demote the significance of the independent statutory obligations in favor of

expensive and time-consuming court-ordered preservation responsibilities.  A preservation order,

particularly when defendants have provided assurances of compliance with their obligations, is

simply unnecessary and would deprive those obligations of independent significance.

The public's interest in ensuring that interim injunctive relief is not abused would be

harmed by the issuance of an injunction here as well.  Allowing a party to obtain emergency

relief based on allegations alone – without a hint of any real evidence – would greatly expand the

possibility of Rule 65 abuse.  Wisc. Gas Co., 758 F.2d at 756 ("The fact that petitioners have not

attempted to provide any substantiation is a clear abuse of this court's time and resources.").

Although defendants do not address here the blatant mischaracterizations and unsupported

allegations littering plaintiff's complaint and motion – because they are immaterial to the resolution of the instant motion – it suffices to say that conferring mere allegations with enough weight to support injunctive relief would "be an affront to the proper gamesmanship inherent in the adversarial system." Hester, 206 F.R.D. at 686. Conversely, plaintiff would not be harmed by the absence of any injunction because defendants are obligated to comply with their litigation obligations and plaintiff has all the assurances to which it could be entitled.

Defendants, for the same reason, would be burdened by the issuance of an injunction. Creating precedent for the unsuppported issuance of a preservation order would subject countless government agencies or officials to prophylactic motions at the outset of cases to reiterate legal burdens based on allegation alone. Allowing an injunction to issue without supporting evidence would harm defendants' institutional interests, and run afoul of the well-established presumption that government officials and agencies act in good faith and according to the dictates of law, no matter how inflammatory the mere allegation. See Am-Pro Protective Agency, 281 F.3d at 1239 ("The presumption that government officials act in good faith is nothing new to our jurisprudence."); Citizens to Preserve Overton Park, 401 U.S. at 415 (presumption of regularity for agency action).

### III. The Court Should Deny Plaintiff's Motion for a Temporary Restraining Order Because Plaintiff Cannot Establish the Likelihood of Success on the Merits of the Relevant Underlying Claims

The first three factors addressed above unambiguously establish that plaintiff has no right to temporary Rule 65 relief. See, e.g., Judicial Watch, Inc. v. United States Dep't of Homeland Security, No. 07-506, 2007 WL 2791371, *2-3 (D.D.C. Sept. 24, 2007) (rejecting motion for preliminary injunction because plaintiff had not established irreparable harm, defendant would

-19-

be burdened, and the public interest would not be served, and not analyzing the last prong

regarding likelihood of success on the merits).  Thus, there is no reason to dwell long on the

merits prong for awarding injunctive relief.  Nonetheless, by way of example,[11] and for the only

claims of the complaint relevant to plaintiff's injunctive request, see supra at 4-5, there is a

serious question about plaintiff's standing to maintain its APA cause of action under the FRA, as

well as whether plaintiff may seek a judicially enforceable order of restoration from the disaster

recovery tapes.  Accordingly, plaintiff cannot establish the likelihood of eventual success on the

merits of its underlying claims.  District 50, UMWA, 412 F.2d at 167.

Article III, § 2, of the Constitution "extends the 'judicial power' of the United States only

to 'Cases' and 'Controversies.'"  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102

(1998).  Article III standing requires that a plaintiff have suffered "an (1) injury in fact--an

invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical--(2) which is fairly traceable to the challenged act, and

(3) likely to be redressed by a favorable decision."  Nat'l Treasury Employees' Union v. United

States, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (internal quotation marks and citation omitted); see

also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The doctrine of standing is

"an essential and unchanging part of the case-or-controversy requirement of Article III,"  Lujan,

504 U.S. at 560, and "the party invoking federal jurisdiction bears the burden of establishing its

existence."  Steel Co., 523 U.S. at 104.

---

[11]  Defendants certainly do not intend these examples to be an exhaustive analysis of plaintiff's
jurisdictional and merits bars to suit.

Even assuming that plaintiff had pleaded a specific injury,[12] and even if plaintiff were able to show that it such injury was caused by the actions it challenges, plaintiff would still be unable show redressability – "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (internal citation omitted). Where "the necessary elements of causation . . ..hinge on the independent choices of a . . . third party . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting Lujan, 504 U.S. at 562) (internal quotation marks omitted). Thus, to the extent that plaintiff requests that the Archivist and Director of the Office of Administration request that the Attorney General initiate some action to redress plaintiff's perceived wrongs, plaintiff's relief is dependent on a third party not subject to

---

[12] This case squarely presents a question left open in prior FRA cases, namely, whether denial of access to records in the public interest, is sufficient for standing purposes. Courts in this Circuit have suggested that its sufficiency is "questionable." See Am. Friends Serv. Comm. v. Webster, 720 F.2d 29, 46 (D.C. Cir. 1983); Am. Friends Serv. Comm. v. Webster, 485 F. Supp. 222, 227 (D.D.C. 1980). In Webster, three categories of plaintiffs brought an action to challenge the FBI's record destruction program. One category of plaintiffs included "organizations whose goals and purposes are alleged to require access to the files and records of the FBI in order to enable them to disseminate information for organizational, educational, and political purposes." Id. These plaintiffs claimed that if the FBI's files were destroyed, "they w[ould] be deprived of raw material for primary research in the areas of their activities." Id. The district court regarded that claimed injury as "questionable" for standing purposes. Id. However, because the other plaintiffs had adequately shown injury for standing purposes, the district court concluded that it was "not necessary to decide that question." Id. In the subsequent appeal, the D.C. Circuit also refrained from deciding that question "[s]ince the district court based its finding of standing only on the injuries . . . [of the other] groups of plaintiffs." Webster, 720 F.2d at 282. Thus, it is "unsettled whether the requisite injury-in-fact standard is met" by an organization's claimed need for files to "disseminate information" for organizational, educational, or political purposes. See Webster, 485 F. Supp. at 227.

this suit.  The Court of Appeal has left open the question about the reviewability of the Attorney

General's decision to initiate an enforcement action at the request of the Archivist or head of an

agency.  Armstrong, 924 F.2d at 296 n.11.  It is likely that such decision would be unreviewable

under 5 U.S.C. § 701(a)(2) and committed to the Attorney General's discretion by law.  See

Heckler v. Chaney, 470 U.S. 821, 833 (1985).  But plaintiff has not even sued the Attorney

General, so its injury may not be redressed here.

Moreover, to the extent plaintiff's preservation request is tethered to a request for this

Court to order the retrieval of records from the disaster recovery tapes, the Court is without

jurisdiction to do so.  The Court of Appeal has held that the FRA precludes APA claims seeking

this sort of injunctive relief because under the FRA such relief can be sought, if at all, only by

the government through the FRA's detailed and exclusive administrative enforcement system.[13]

---

[13]  The plaintiffs in Armstrong sued the President, the Archivist, and the National Security
Council to prohibit them from erasing certain materials stored on the Council's computer system.
924 F.2d at 284.  Plaintiffs alleged, among other things, that some Council officials and staff
members were destroying federal records in violation of the Council's regulations governing the
treatment of federal records, which were promulgated pursuant to the FRA.  Id. at 291, 294.  To
remedy this alleged violation of the FRA, plaintiffs brought a claim under the APA seeking an
injunction against the destruction of such records.  Id.

The Armstrong court dismissed that APA claim, holding that it was precluded by the FRA.  924
F.2d at 294.  Under the FRA, the court held, an order enjoining the destruction or removal (or
relatedly, requiring the retrieval) of records could be sought only by the government through the
FRA's carefully crafted system of administrative enforcement:  "Because it would clearly
contravene [the] system of administrative enforcement to authorize private litigants to prevent an
agency official from improperly destroying or removing records, we hold that the FRA precludes
judicial review of such actions."

There is no relevant difference under Armstrong between a request for an order enjoining
removal and a request for an order requiring retrieval because an action for retrieval upsets the
system of administrative enforcement, Kissinger v. Reporters Committee For Freedom of the
Press, 445 U.S. 136, 148-50 (1980), just as an action for an injunction preventing removal does,

-22-

Armstrong v. Bush, 924 F.2d 282, 294 (D.C. Cir. 1991); see also 44 U.S.C. §§ 2101-18, 2901-09, 3101-07, 3301-24.

As a result, plaintiff's APA claim is non-reviewable to the extent it seeks court-ordered restoration of records because the lack of an applicable waiver of sovereign immunity is a jurisdictional defect.  See, e.g., Council on American Islamic Relations v. Ballenger, 444 F.3d 659, 661 (D.C. Cir. 2006).  Where, as here, a statute precludes review under the APA, the APA does not waive the United States' sovereign immunity.  See 5 U.S.C. § 701(a)(1) (explaining that the APA applies except to the extent that "statutes preclude judicial review"); Chaney, 470 U.S. at 828 (noting that APA review is inappropriate unless a plaintiff "clear[s] the hurdle of § 701(a)"); High Country Citizens Alliance v. Clarke, 2006 WL 2037154, at *2 (10th Cir. July 21, 2006) ("In other words, before the waiver of sovereign immunity under § 702 applies, 'a party must first clear the hurdle of § 701(a).' "); Tozzi v. EPA, 148 F. Supp. 2d 35, 43 (D.D.C. 2001) ("The APA's sovereign immunity waiver does not apply where a statute has explicitly precluded judicial review.").  And the FRA itself does not waive the United States' sovereign immunity.  See 44 U.S.C. §§ 2101-18, 2901-09, 3101-07, 3301-24.  Without a waiver of sovereign immunity, the Court lacks subject matter jurisdiction.

*    *    *

Defendants already have assured plaintiff that they are complying, and will continue to comply, with their obligations to preserve documents in their possession relevant to plaintiff's lawsuit.  That reason alone is sufficient to deny plaintiff's request to seek extraordinary relief,

---

Armstrong, 924 F.2d at 294.  Armstrong acknowledges this fact by relying on Kissinger, 445 U.S. at 148, which involved a request for an order of retrieval. Armstrong, 924 F.2d at 294.

needlessly, from this Court.  Moreover, plaintiff's motion for a temporary restraining order should be denied because plaintiff fails to establish irreparable injury, because an injunction would ill serve the public interest and impose systemic burdens on defendants, and because plaintiff's have not established a likelihood of success on the merits of the relevant claims.  For all these reasons, defendants respectfully request that the Court deny all injunctive relief requested in plaintiff's motion.

//

//

//

//

//

//

//

//

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a temporary restraining order should be denied.

Respectfully submitted this 12th day of October, 2007.

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

LISA OLSON
Senior Trial Counsel

/s/ Helen H. Hong
HELEN H. HONG (CA SBN 235635)
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 883, 20 Massachusetts Ave., NW
Washington, D.C.  20044
Telephone: (202) 514-5838
Fax: (202) 616-8460
helen.hong@usdoj.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, a true and correct copy of the foregoing Defendant's Motion to Dismiss was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.

/s/ Helen H. Hong
HELEN H. HONG

## CERTIFICATION OF FAMILIARITY WITH LOCAL RULES

I, Helen H. Hong, pursuant to Local Civil Rule 83.2(j), hereby certify that I am familiar with the Local Rules of the United States District Court for the District of Columbia, and other materials set forth in Local Civil Rules 83.8(b) and 83.9(a).

/s/ Helen H. Hong
HELEN H. HONG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
THE NATIONAL SECURITY ARCHIVE,        )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )         Civ. No. 07-1577 (HHK)
                                       )
EXECUTIVE OFFICE OF THE PRESIDENT,     )
      et al.,                          )
                                       )
            Defendants.                )
_____)

**PROPOSED ORDER GRANTING MOTION FOR LEAVE TO SERVE
EXPEDITED DISCOVERY REQUESTS AND
TO COMPEL RULE 26(f) CONFERENCE**

Upon full consideration of the National Security Archive's (the Archive) Motion for Leave to Serve Expedited Discovery Requests and to Compel a Rule 26(f) Conference, and any oppositions and replies thereto, and the entire record herein, it is hereby ORDERED, that the Archive's motion is GRANTED, and that the Archive is granted leave to serve its discovery requests; and it is FURTHER ORDERED that the parties meet and confer within three business days of this order pursuant to Rule 26(f) of the Federal Rules of Civil Procedure.

SO ORDERED.


DATE:                          _____
                               Henry H. Kennedy, Jr.
                               United States District Judge