IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 07-1577 (HKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | ) | (Consolidated with Civil Action No. 07-1707 (HKK)) |
| Defendants. | ) | **ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

The Federal Records Act ("FRA") requires the preservation of federal records, mandates the institution of guidelines to ensure their preservation, and expressly provides for their recovery in the event of their loss or potential loss. In the event of a loss, the FRA commands the Archivist of the United States or the head of the agency with records at risk to initiate action to preserve or recover those records. This obligation is absolute. And neither the Archivist nor the agency head is given any discretion under the FRA in acting to recover the records. Nor do they have discretion in instituting adequate recordkeeping policies and guidelines. In the event that the Archivist and the head of the agency fail to take these mandatory actions, Congress and the courts have expressly authorized private litigants to bring suit to compel them to act.

That is precisely the relief the National Security Archive (the "Archive") seeks in this litigation. Indeed, the language of the FRA and its legislative history make clear that Congress' intent in drafting the statute was to ensure that private researchers and historians like the Archive

have access to the documentary history of the federal government.  And courts interpreting the

FRA have held that the Archive and similar organizations therefore have standing to enforce the

mandates of the FRA.  Despite several public statements by the White House press secretary

acknowledging the deletion of millions of e-mails comprising this documentary history, neither

the Archivist nor the heads of the agencies with control over these records (the Defendants in this

case) have initiated the action required by the FRA.  This lawsuit seeks to initiate precisely the

procedural mechanisms mandated under the FRA:  to compel the Archivist and the heads of the

agencies to commence action to restore those records, and to compel them to develop adequate

recordkeeping guidelines as required by the statute.

## STATUTORY FRAMEWORK

### *Federal Records and The Federal Records Act*

The Federal Records Act ("FRA") is a set of statutes governing the creation, management,

and disposal of federal or "agency" records.  44 U.S.C. §§ 2101-18, 2901-09, 3101-07, 3301-24.

The FRA is intended to ensure, among other things, "[a]ccurate and complete documentation of

the policies and transactions of the Federal Government."  *Id.* § 2902(1).

#### *Mandatory, Non-Discretionary Duty to Make and Preserve Records*

To that end, most of the FRA's provisions contain language that leaves no discretion to

the agencies or the Archivist of the United States to make and preserve federal records.  The

FRA mandates that "[t]he head of each Federal agency *shall make and preserve* records

containing adequate and proper documentation of the organization, functions, policies, decisions,

procedures, and essential transactions of the agency . . . ."  44 U.S.C. § 3101 (emphasis added).

The FRA defines federal agencies as "any executive agency or establishment in the legislative or

judicial branch of the Government . . . ."   *Id.* § 2901(14).

Furthermore, disposal of federal records – defined to include electronic communications such as e-mails – is governed by specific provisions of the FRA, 44 U.S.C. §§ 3301 *et seq*., and disposal or destruction of *any* federal record must take place through this "exclusive" FRA procedure. *Id.* § 3314. Under these provisions, federal records may not be disposed of or destroyed without the authorization of the Archivist of the United States, who is head of the National Archives and Records Administration ("NARA"). The disposal of federal records is only authorized by law where a series of mandatory steps has been completed. *Id.* § 3303.

### *Mandatory, Non-Discretionary Duty to Initiate Action Through Attorney General to Restore Records*

In enacting the FRA, Congress also provided several mechanisms for the restoration of lost or destroyed agency records. Like the provisions relating to the preservation and disposal of agency records, the mechanisms provided by Congress for restoration leave no discretion to the agencies or the Archivist. If records are lost or destroyed, the Archivist and the heads of the agencies "shall" take action to recover those records.

First, the FRA places an independent, non-discretionary duty on the Archivist to initiate action to recover agency records. Namely, if the Archivist becomes aware of any "actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records" in the custody of an agency, he "shall" notify the agency head and assist the agency head in initiating action through the Attorney General "for the recovery" of the records and for other legal redress. 44 U.S.C. § 2905(a). If the agency head refuses to pursue legal remedies, the Archivist "shall" request that the Attorney General initiate the action "for recovery" and "shall" inform Congress that he has made this request. *Id.*

Second, the FRA places a similar independent, non-discretionary duty on the head of each federal agency. Specifically, the head of an agency "shall" notify the Archivist of any

actual, impending or threatened destruction of records in the custody of his agency, and with the assistance of the Archivist, "shall" initiate action through the Attorney General for the recovery of those records. 44 U.S.C. § 3106. If the agency head refuses to pursue legal remedies himself, the Archivist, again, "shall" request that the Attorney General initiate action to restore the records and "shall" inform Congress that he has made this request. *Id.* As the use of the imperative word "shall" makes clear, these duties of the Archivist and agency heads are mandatory, and the administrative process for recovery of the records must be initiated — without discretion.

### Mandatory, Non-Discretionary Duty to Promulgate and Maintain Recordkeeping Guidelines

In addition to his duties described above, the Archivist also has an affirmative duty to guide and assist federal agencies to ensure the adequate and proper documentation of the policies and transactions of the government agency. 44 U.S.C. § 2904(a). In furtherance of these duties, the Archivist: "shall" provide guidance and assistance to agencies to ensure adequate documentation of the policies and transactions of the government, as well as ensuring proper records disposition, *id.*; "shall" promulgate standards and guidelines for federal agency records management, *id.* § 2904(c); and "shall" establish standards for selective retention of records containing value and assist the agencies in applying the standards to records in their custody. *Id.* § 2905(a).

The heads of the federal agencies are under concomitant mandatory and non-discretionary duties to implement the standards and guidelines for the retention of federal records. Specifically, each agency head "shall" maintain an active records management program that provides for effective controls over the creation and use of federal records, as well as ensuring the application of the Archivist's standards and procedures for the preservation of federal records.

- 4 -

44 U.S.C. § 3102. Furthermore, agency heads "shall" establish safeguards against the removal

or loss of records determined by the agency to be necessary and required by regulations of the

Archivist. *Id.* § 3105.

**Presidential Records and The Presidential Records Act**

    While the Archive's Complaint seeks relief related to the FRA, Defendants'

Memorandum in Support of their Motion to Dismiss ("MTD") spends considerable time arguing

that the Presidential Records Act ("PRA") bars judicial review of these claims. Thus, a brief

description of the PRA is necessary to understand the full statutory framework under which this

lawsuit does, and does not, operate.

    The PRA places a duty on the President to maintain "Presidential records," 44 U.S.C.

§ 2203, which are defined as:

> documentary materials . . . created or received by the President,
> his immediate staff, or a unit or individual in the Executive
> Office of the President whose function is to advise and assist
> the President, in the course of conducting activities which
> relate to or have an effect upon the carrying out of the
> constitutional, statutory, or other official or ceremonial duties
> of the President.

*Id.* § 2201(2). Furthermore, the PRA mandates that records created or received in the White

House, "the function of which is to advise and assist the President, shall, to the extent practicable,

be categorized as Presidential records or personal records upon their creation or receipt and be

filed separately." *Id.* § 2203(b).

    A sitting president may dispose of presidential records only after he makes a finding that

they "no longer have administrative, historical, informational, or evidentiary value" and obtains a

written statement that the Archivist does not intend to take action. 44 U.S.C. § 2203(c). Even

then, the President must submit his disposal schedules to the appropriate Congressional

committees and wait sixty days before destroying the records. *Id.* § 2203(d). Once a President

has left office, the Archivist assumes full custody and control over all remaining presidential records and has sole responsibility for preserving these records and preparing them for public access. *Id.* § 2203(f)(1). Once they are in the Archivist's custody, the Archivist "shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of" the PRA. *Id.*

## FACTUAL ALLEGATIONS

At this stage of the proceedings, the following facts alleged in the Archive's Complaint are to be taken as true, with all inferences drawn in the Archive's favor. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The Executive Office of the President ("EOP") includes the agency known as EOP, as well as its individual agency components that are subject to the FRA. Complaint ("Compl.") ¶ 7; *see also Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1 (D.D.C. 1997) (Friedman, J.), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999). The agency components of Defendant EOP include, but are not limited to: the Office of Administration, the Council on Environmental Quality, the Office of Management and Budget, the Office of National Drug Control Policy, the Office of Science and Technology Policy, and the Office of the United States Trade Representative. Compl. ¶ 7. The Office of Administration ("OA") is a component of the EOP and is an agency under the meaning of the FRA and Administrative Procedure Act ("APA").[1] *Id.* ¶ 8; *see also* 44 U.S.C. §§ 2101, 2901(14), 5 U.S.C. § 701(b).

---

[1] Although the Defendants make a bare assertion (in a footnote to their Motion to Dismiss) that the OA is not an agency and therefore not subject to the FRA, the Defendants provide no support for this contention other than a reference to a brief they filed in another lawsuit arguing the same notion. MTD at 17 n.5. Moreover, the question of whether an entity is an agency for purposes of FOIA and the FRA turns largely on the entity's functions and conduct, which raise factual questions not susceptible to resolution on a motion to dismiss. *See Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993); *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971). Thus, the factual allegation that the OA is an agency must be taken as true for purposes of this Motion to Dismiss.

In 1994, the EOP implemented the Automated Records Management System ("ARMS"). Compl. ¶ 29. ARMS was an electronic records management system that automatically captured, preserved and categorized all e-mail sent through the EOP e-mail system. *Id.* ARMS was used to archive records subject to the FRA, as well as records subject to the PRA, and was able to segregate, categorize, and archive each type of record separately. *Id.* ARMS also had certain controls in place to maintain the security of the archival system, which prevented the accidental or intentional deletion of e-mails. *Id.*

In 2002, the EOP discontinued use of the ARMS automatic archiving system. Compl. ¶ 30. The EOP did not replace ARMS with any system for automatic preservation of e-mails or any separate categorization of federal or presidential records represented by those e-mails. *Id.* Without any replacement for ARMS, it became possible for archived e-mails on the servers to be manually deleted. *Id.* ¶¶ 30, 31.

In October 2005, in response to government subpoenas, the OA discovered that many electronic communications of the EOP had not been properly preserved. Compl. ¶ 32. After discovering the problem, the OA conducted a detailed analysis, and concluded that commencing in March 2003, there were hundreds of days worth of missing e-mails created or received between March 2003 and October 2005. *Id.* The OA further estimated that as of that time, approximately five million e-mails had been deleted from the servers, and are recoverable only from backup tapes. *Id.* There were at least two potential causes of the deletions: (1) a malfunction in the servers; and (2) the manual deletion of e-mails by users. *Id.* ¶ 32. Both causes could and would have been prevented had there been in place an automatic archival management system similar in function to the defunct ARMS. *Id.* ¶¶ 35-36.

Subsequent to this discovery, the OA developed a plan to recover the missing e-mails from the back-up tapes, and to implement an appropriate archival management system to comply with recordkeeping guidelines and to prevent continued deletion of records. Compl. ¶ 34. This plan, however, was rejected by EOP officials. *Id.*

The current retention system for EOP e-mails is severely deficient. Compl. ¶¶ 35-43. The only e-mails that are archived are those that are manually extracted and saved in a file on the server. *Id.* ¶¶ 35-36. This procedure has no adequate safeguards in place to ensure that saved messages are not later modified or deleted, and is highly susceptible to human error. *Id.* ¶¶ 36-43. As such, the current retention system is arbitrary and capricious and not in conformance with the FRA. *Id.* ¶¶ 36-43, 73-75, 80-82, 89, 97.

Since the abandonment of the ARMS system, the only known repository of deleted e-mails is the set of backup tapes currently in the possession of the EOP and the OA.[2] Compl. ¶¶ 32, 34, 36, 37. To date, however, neither the Archivist, nor the EOP, nor the heads of EOP component agencies such as the OA, have taken any action to restore the deleted e-mails or to protect against future deletions, despite being aware of the destruction of millions of records and the impending destruction of more. *Id.* ¶¶ 38-40. Neither the Archivist nor the heads of any of the agencies have initiated the action mandated by the FRA to begin the process to recover those records. *Id.* Moreover, neither the Archivist, nor the heads of the EOP or OA have put in place the kind of adequate recordkeeping system and guidelines that the FRA requires. *Id.*

The National Security Archive ("the Archive") is a non-partisan, non-profit, 501(c)(3) research institute and library based at George Washington University. Compl. ¶¶ 5, 88, 96. The Archive collects, catalogues, indexes, and publishes declassified and unclassified government

---

[2] There may be other repositories in which the e-mails are saved. Discovery is necessary to flesh out this issue.

documentation on national security and foreign affairs policy, practices and activities, and makes such records available to historians, researchers, and individuals throughout the country.[3]  *Id.*  In response to the loss of millions of federal records important to its research and archival work and the threat that many more may be lost, the Archive has brought suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, seeking review of the failure of the Archivist and EOP agency heads to take action to recover records and plug the leaks in the EOP recordkeeping system, as required by the FRA.

## PROCEDURAL HISTORY

The Archive's eight-count Complaint, filed on September 5, 2007, seeks orders compelling Defendants to initiate the mandatory FRA enforcement process and to develop adequate recordkeeping systems in place of the current arbitrary and capricious guidelines.  The Defendants are the Executive Office of the President and its agency components, including the Office of Administration; agency head Alan R. Swendiman in his official capacity; the National Archives and Records Administration; and Dr. Allen Weinstein, Archivist of the United States.

On September 25, 2007, the group Citizens for Responsibility and Ethics in Washington ("CREW") brought a similar suit naming the same Defendants and seeking the same relief. These related cases were consolidated before this Court on November 12, 2007.  The same day, this Court issued a Preservation Order adopting Magistrate Judge Facciola's October 19, 2007 Report and Recommendation, and enjoining the destruction of media that may contain the deleted e-mails at issue in this case.  On November 29, 2007, Defendants filed a Motion [39] to Dismiss both Complaints under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

---

[3] For further information on the Archive and its activities, see the detailed discussion *infra* at pages 22-31.

## STANDARD ON MOTIONS TO DISMISS

"The court may dismiss a claim under Fed. R. Civ. P. 12(b)(6) only if it appears, assuming the alleged facts to be true and drawing all inferences in plaintiff's favor, that plaintiff cannot establish 'any set of facts consistent with the allegations in the complaint.'" *Robinson v. District of Columbia*, No. 06-171, 2007 WL 1948614, at *1 (D.D.C. July 2, 2007) (Kennedy, J.) (quoting *Twombly*, 127 S. Ct. at 1969; *Kowal*, 16 F.3d at 1276). "In evaluating a Rule 12(b)(6) motion to dismiss, the court is limited to considering facts alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." *Nat'l Cmty. Reinvestment Coal. v. Nat'l Credit Union Admin.*, 290 F. Supp. 2d 124, 131 (D.D.C. 2003) (Kennedy, J.) (internal citations omitted). On the other hand, "[i]n resolving a Rule 12(b)(1) motion for lack of jurisdiction, unlike motions brought pursuant to Rule 12(b)(6), courts are generally free to consider relevant materials outside the pleadings." *Id.*

## ARGUMENT

While the stakes of this case are high, this lawsuit is simple. The Archive's Complaint raises traditional APA claims to compel agency action that is mandated by statute but has been unlawfully withheld or unreasonably delayed and for review of arbitrary and capricious agency action. The courts of this Circuit have specifically authorized this action under the APA to enforce the FRA. And no statute, doctrine of justiciability, or other principle precludes judicial review of the causes of action in this case.

It is important at the outset to be clear about what the Archive does and does not ask the Court to do. Indeed, in its Memorandum in Support of its Motion to Dismiss, the Government

completely misstates the nature of this suit and the claims for relief presented in the Archive's Complaint, even going so far as to move for dismissal of claims the Archive has not brought.

Simply put, the Archive has asked this Court in its eight-count Complaint to: (1) order the Defendants to initiate the FRA's mandatory administrative process for the preservation and restoration of federal records that are at risk of ultimate destruction; and (2) order the Defendants to comply with their duty under the FRA to promulgate guidelines that are not arbitrary and capricious, but instead adequately meet the recordkeeping requirements of the FRA. Defendants have a mandatory, non-discretionary duty to perform these acts under the statute.

No other source of law impedes review of the Archive's causes of action under the APA. For instance, while the PRA does preclude judicial review of the substance of the President's management decisions for presidential records, this precept does not bar review here because the Archive's Complaint does not seek review of the President's presidential records management decisions. Nor does the possibility that presidential records might be included among the deleted federal records preclude review of agency inaction under the FRA. The D.C. Circuit has stated that the PRA does not preclude review merely because presidential records might be involved.[4] The Archive's Complaint seeks an order compelling Defendants to initiate action mandated by the FRA to ensure compliance with its own requirements. As such, the Complaint seeks relief expressly provided by statute and condoned by governing precedent. The Defendants' Motion to Dismiss must therefore be denied.

---

[4] The deleted records at issue are federal records as defined by 44 U.S.C. § 3301 and are subject to the provisions of the FRA. But because Defendants have failed to comply with their duty to segregate and preserve federal and presidential records, it is possible that presidential records could be commingled with other records on the backup tapes. *See* Compl. ¶¶ 36-40. As discussed more fully *infra*, this does not affect the availability of review in this case. More fundamentally, the information regarding the deleted records is in the sole possession of Defendants, who have to date refused to provide information regarding the records.

I.    **THE ARCHIVE STATES A CLAIM FOR RELIEF UNDER THE APA FOR REVIEW OF AGENCY ACTION AND TO COMPEL AGENCY ACTION THAT IS REQUIRED BY THE FRA BUT HAS BEEN UNLAWFULLY WITHHELD**

This is a traditional APA case in which the Court is asked to order federal officials to take the procedural steps required of them by statute. Through the eight counts in its Complaint, the Archive asks the Court to review agency action and, because this case is largely about agency *in*action, to compel agency action unlawfully withheld or unreasonably delayed. These longstanding modes of review are hardly new or novel. *See* 5 U.S.C. §§ 701 *et seq*. The Court is not asked to compel a specific end result or to review the discretionary decisions of agency officials. Though the Court of Appeals for the D.C. Circuit has recognized the cause of action set forth by the Archive and even the specific forms of relief that are requested, the Government maintains that the Archive is not entitled to judicial review. Defendants' only arguments in support of that contention proceed from a mischaracterization of the Archive's Complaint and a misunderstanding of precedent.

**A.    *Armstrong* and Its Legacy**

Defendants rely almost exclusively on a Court of Appeals opinion known as *Armstrong I*. *See Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*"). In doing so, they reduce the *Armstrong* line of cases down to one opinion, while at the same time distorting that opinion's actual holdings. Put simply, the Court of Appeals in *Armstrong I* did not say what Defendants claim it said, and *Armstrong I* does not represent all that the Court of Appeals has had to say about the issues implicated in this case. For that reason, a bit of history is in order.

As its name implies, *Armstrong I* is part of a family of opinions spawned by federal records litigation in which the Court of Appeals, as well as Judge Richey and later Judge Friedman on the District Court, gave shape to the law in what had been a largely undeveloped

area. *Armstrong* began in the waning hours of the Reagan administration, when the plaintiffs,

including the Archive, sued the President, the Vice President, the Archivist, and the National

Security Council ("NSC") to enjoin the destruction of files stored on an executive computer

system. Plaintiffs in that case sought relief under both the PRA and FRA. After a temporary

restraining order was issued enjoining destruction of the files pending adjudication, Judge

Richey denied the Government's summary judgment motion, holding that he could conduct APA

review of executive implementation of and compliance with both the PRA and FRA.

The Court of Appeals affirmed in part and reversed in part in *Armstrong I. See*

*Armstrong I*, 924 F.2d 282. The *Armstrong I* court held as an initial matter that "judicial review

of the President's general compliance with the PRA at the behest of private litigants" was

unavailable under the APA because the President was not an "agency" and because the PRA

impliedly precludes a court from ruling on "the adequacy of the President's records management

practices or overrul[ing] his record creation, management, and disposal decisions." *Id.* at 290.

The Court then held that "there is APA review of the NSC's recordkeeping guidelines

and instructions, but only limited APA review of claims that records are being destroyed in

violation of such guidelines."[5] *Armstrong I*, 924 F.2d at 291. The Court held that private

plaintiffs could seek direct review of the adequacy of agency recordkeeping guidelines, but that

the FRA did not permit private plaintiffs to sue *directly* for review of agency compliance with

valid recordkeeping guidelines. Instead, the Court of Appeals pronounced that "if the agency

head or Archivist does nothing while an agency official destroys or removes records in

---

[5] The NSC was later held not to be an "agency" for purposes of the FRA. *Armstrong v. Executive Office of President*, 90 F.3d 553 (D.C. Cir. 1996) ("*Armstrong III*"). Yet *Armstrong I*'s statements on the contours of an APA cause of action to enforce the FRA remain the law of this Circuit. *See Armstrong v. Executive Office of President*, 1 F.3d 1274, 1279-80 (D.C. Cir. 1993) ("*Armstrong II*") (describing the APA claims recognized in *Armstrong I*); *see also id.* at 1282-88 (elaborating on the nature of judicial review under FRA and PRA and describing some of the available remedies for non-compliance with FRA requirements).

contravention of agency guidelines and directives, private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action." *Id.* at 295.

This is precisely the suit that the Archive has brought here: not an attempt to short-circuit the FRA's administrative remedies, but rather to jump-start them. The relief that the Archive seeks is in the form of an order compelling agency action unlawfully withheld,[6] and *Armstrong I* instructs that the Archive is entitled to seek that relief. First, this is a case where "the agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives," and the Court of Appeals flatly stated that "private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action." *Id.* at 295. Second, *Armstrong I* held that courts can review agency compliance with the requirement of promulgating adequate recordkeeping guidelines, and this is precisely the relief the Archive seeks in its second four causes of action.[7]

### B.    The Archive Is Entitled To An Order Compelling Defendants to Comply With Their Mandatory Statutory Duty To Initiate Administrative Action

"[P]rivate litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action" about the actual, impending, or threatened removal or destruction of federal records. *Armstrong I*, 924 F.2d at 295. This is the sole remedy sought by the first four claims in the Archive's Complaint, which seek to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Archive's Complaint alleges that federal records have been removed and destroyed,

---

[6] *See* Compl. ¶¶ 49, 54, 61, 68 (Counts I, II, III, and IV).

[7] *See* Compl. ¶¶ 75, 82, 90, 98 (Counts V, VI, VII, and VIII).

and alleges further impending destruction of records. *See* Compl. ¶¶ 32-40. Defendants

therefore have a mandatory, non-discretionary duty to take specific actions:

> Once the Archivist becomes aware of "any actual, impending, or
> threatened unlawful removal . . . or destruction of records," the Archivist
> "*shall* notify the head of [the] Federal agency" involved and "assist the
> head of the agency in initiating action through the Attorney General for
> the recovery of records unlawfully removed and for other redress provided
> by law." 44 U.S.C. § 2905(a) (emphasis added). Similarly, once the
> agency head becomes aware of "*any* actual, impending, or threatened
> unlawful, removal . . . or destruction of records," the agency head "*shall*
> notify the Archivist" and "with the assistance of the Archivist *shall* initiate
> action through the Attorney General." *Id.* § 3106 (emphasis added). If,
> however, the agency head does not initiate an enforcement action "within
> a reasonable period of time," the Archivist "*shall* request the Attorney
> General to initiate such an action, and *shall* notify the Congress when such
> a request has been made." *Id.* (emphasis added).

*Armstrong I*, 924 F.2d at 296 (emphasis in original).

"[T]he mandatory statutory language . . . indicates that the agency head and Archivist are

required to take action to prevent the unlawful destruction or removal of records and, if they do

not, private litigants may sue under the APA to require them to do so," which is what the

Archive is doing here. *Armstrong I*, 924 F.2d at 296 n.12. The Archive alleges that *millions* of

federal records are at risk of ultimate destruction, and this allegation is more than sufficient to

entitle the Archive to relief, given that where a plaintiff alleges that even "at least *some* federal

records will be permanently lost or destroyed [. . . t]his circumstance alone creates the predicate

for an order requiring the Archivist and the relevant agency heads to take the statutorily

prescribed steps to prevent the destruction of those [records]." *Armstrong II*, 1 F.3d at 1282

(emphasis in original). As the D.C. Circuit has thus made clear, judicial review of this cause of

action will be simple and straightforward, and will be limited to confirming the existence of the

factual statutory predicate, that the removal or destruction of federal records has occurred or is

impending.  Where the factual predicate exists, the Archivist and agency heads *must* act, and courts will order them to do so when they have not.

Defendants argue that "[t]o the extent plaintiffs' preservation requests in counts one through four are tethered to a request for this Court to order the retrieval of federal records from disaster recovery tapes, the Court is without jurisdiction to do so" and that "[t]he Court of Appeals has held that the FRA precludes APA claims seeking this sort of injunctive relief because under the FRA such relief can be sought, if at all, only by the government through the FRA's detailed and exclusive administrative enforcement system."  MTD at 12 (emphasis in Defendants' original) (citing *Armstrong I*, 924 F.2d at 294).  The first four counts of the Archive's Complaint, which speak for themselves and are not "tethered" to anything else, in fact seek an order "to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action."  Such an order is an authorized form of relief.  *Armstrong I*, 924 F.2d at 295.

The Government, however, turns *Armstrong I* on its head, arguing that it stands for the remarkable proposition that because a private party cannot sue to directly enjoin the destruction of federal records, she cannot bring *any* suit where the preservation of records might follow.  That is not what the court in *Armstrong I* said.  To the contrary:

> Nothing in the legislative history [of the FRA] suggests that Congress intended to preclude judicial review of either the agency head's or the Archivist's failure to take enforcement action.  Indeed, judicial review of the agency head's and Archivist's failure to take enforcement action reinforces the FRA scheme by ensuring that the administrative enforcement and congressional oversight provisions will operate as Congress intended.  Unless the Archivist notifies the agency head (and, if necessary, Congress) and requests the Attorney General to initiate legal action, the administrative enforcement and congressional oversight provisions will not be triggered, and there will be no effective way to prevent the destruction or removal of records.  Thus, if the agency head or Archivist does nothing while an agency official destroys or removes

records in contravention of agency guidelines and directives, private
litigants may bring suit to require the agency head and Archivist to fulfill
their statutory duty to notify Congress and ask the Attorney General to
initiate legal action.

*Armstrong I*, 924 F.2d at 295.  This is exactly what is happening in this case – "the agency head

or Archivist does nothing while an agency official destroys or removes records in contravention

of agency guidelines and directives" – and the Archive has responded by bringing the exact suit

that the Court of Appeals described as the proper private remedy "to require the agency head and

Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate

legal action." *Id.*  The cause of action and relief sought in this case have thus been provided by

statute and specifically recognized by the Court of Appeals, and the motion to dismiss must

therefore be denied.[8]

**C.** **The Archive Is Entitled To APA Review of The EOP and OA Recordkeeping Guidelines and Their Decision To Dismantle Their Prior Recordkeeping System, and Is Entitled To An Order Compelling Defendants To Promulgate Adequate Recordkeeping Guidelines, As Required By The FRA**

The Archive is entitled to the relief requested in counts five through eight of its

Complaint.  First, these claims call on the Court to review the EOP and OA's current

recordkeeping guidelines and their decision to dismantle their previous recordkeeping system

and guidelines, which the Archive contends was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," and which is an agency action that the Court should

therefore "hold unlawful and set aside."  5 U.S.C. § 706(2)(A).  Second, because Defendants

---

[8] The Defendants' inaccurate interpretation of *Armstrong I* leads to their misplaced reliance on *Kissinger v. Reporters Committee for Freedom of Press*, 445 U.S. 136 (1980).  In short, *Kissinger* held that private litigants could not use the Freedom of Information Act to secure an injunction ordering the State Department and others to retrieve documents from other entities, a form of relief the Archive does not seek in this case.  The *Kissinger* Court specifically left open the question that *Armstrong I* later resolved:  whether private parties could sue under the APA when "the administrators and the Attorney General have breached a duty to enforce the [FRA]."  *Id.* at 150 n.5. *Armstrong I* answered this question in the affirmative, and it told private parties how to do so.  In its Complaint, the Archive is following those instructions to the letter.

have a mandatory duty under the FRA to promulgate and maintain adequate recordkeeping guidelines and have failed to do so, the Archive seeks an order compelling this "agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

The Court of Appeals has explicitly authorized judicial review of agency compliance with the FRA's requirement that agencies promulgate recordkeeping guidelines adequate to accomplish the statute's objectives. Because the FRA was not meant to "preclude ordinary judicial review of the adequacy of an agency's recordkeeping guidelines and directives," *Armstrong I* held "that the district court on remand may entertain plaintiffs' claim that [the Government's] recordkeeping guidelines and directives . . . are inadequate because they permit the destruction of 'records' that must be preserved under the FRA." *Armstrong I*, 924 F.2d at 292, 291. This is what the Archive asks for in its last four counts.

In evaluating the Defendants' guidelines, this Court will follow the well-trod path of traditional APA review. As the Court of Appeals recognized, the FRA sets forth specific standards that guide a District Court's evaluation of whether an agency's recordkeeping guidelines satisfy the statutory requirements, or whether they are instead arbitrary, capricious, and contrary to law. *Armstrong I*, 924 F.2d at 295-97; *Armstrong II*, 1 F.3d at 1282-88. The Court of Appeals has acknowledged that if an agency recordkeeping policy or guideline "is inadequate under the FRA," then a District Court can "appropriately issu[e] a declaratory judgment invalidating its future use." *Armstrong II*, 1 F.3d at 1282.

Not only can a District Court issue declaratory relief, but it can compel an agency that has issued inadequate recordkeeping guidelines to promulgate new ones and can order periodic reviews of recordkeeping policies and such other injunctive relief as is appropriate under this form of APA review, including ordering the agency to follow specific court-ordered guidelines

until the agency develops new, adequate guidelines to replace the ones held inadequate.

*Armstrong II*, 1 F.3d at 1282-88 & n.12. For instance, the District Court in *Armstrong II* ordered

the Archivist "to 'seek the assistance of the Attorney General with notice to Congress, and take

all necessary steps to preserve, without erasure, all electronic Federal Records generated at the

defendant Agencies' and "enjoined all the defendants 'from removing, deleting, or altering

information on their electronic communications systems until such time as the Archivist takes

action . . . to prevent the destruction of federal records, including those records saved on backup

tapes.'" *Armstrong II*, 1 F.3d at 1281 (quoting *Armstrong v. Executive Office of President*, 810 F.

Supp. 335 (D.D.C. 1993)). The Court of Appeals affirmed the issuance of this injunctive relief,

holding that:

> [T]he district court did not abuse its discretion in ordering the Archivist to
> take the specific actions provided for in the statute. Similarly
> unpersuasive is the appellants' argument that the district court should not
> have enjoined the defendant agencies from destroying any electronic
> records until new guidelines were in place. Because these systems
> continue to produce federal records, the district court used its discretion
> appropriately in insisting upon a full-scale method for preventing the
> records' destruction until the agencies came up with new, adequate
> records management guidelines to replace the ones voided by the district
> court's declaratory order.

*Armstrong II*, 1 F.3d at 1288 n.12.

These unequivocal holdings by the D.C. Circuit deflate Defendants' claim that "plaintiffs

are not entitled to such specific injunctive relief" but rather are "permitted under the APA only to

'judicial review of [whether Defendants'] recordkeeping guidelines and directives' are arbitrary

and capricious, or contrary to law." MTD at 14 (citing *Armstrong I*, 924 F.2d at 296). The Court

of Appeals has not limited normal APA review in this way, and, as noted above, has specifically

recognized the kinds of relief requested here. This is traditional APA review, because "the

adequacy of [agency] recordkeeping guidelines and directive[s] is clearly appropriate for judicial

review.  Courts review the adequacy and conformity of judicial regulations and guidelines with statutory directives every day." *Armstrong I*, 924 F.2d at 294.

### D.  The Limited Preclusion of the Presidential Records Act Does Not Apply Here

"The presumption favoring judicial review of administrative action is well-established," *Armstrong I*, 924 F.2d at 290 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)), and "[t]he Supreme Court has traditionally not been sympathetic to arguments that judicial review is not available under the APA." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 39 (D.C. Cir. 1983).  Therefore, the APA "provide[s] that the action of an administrative agency is subject to judicial review unless a statute precludes review or the matter is by law committed to agency discretion." *Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222, 226 (D.D.C. 1980) (Greene, J.) (citing 5 U.S.C. §§ 701, 702, 706; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)).  "[O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories*, 387 U.S. at 141 (internal quotation marks omitted).  Defendants have not shown that any statute overcomes the presumption in favor of judicial review of the agency action at issue here.

Furthermore, any limited preclusive effect of the PRA does not affect this case, because the relief requested by the Archive's Complaint does not call on the Court to review the President's decisions regarding the management of presidential records.  Although *Armstrong I* held that there is no judicial review "at the behest of private citizens" of "the adequacy of the President's records management practices or [to] overrule his record creation, management, and disposal decisions," *Armstrong I*, 924 F.2d at 290, because the Archive's Complaint does not ask the Court to conduct such review, the PRA is not implicated as Defendants argue.

What the Archive seeks is an order compelling Defendants to switch on the FRA's mandatory enforcement mechanism. Defendants' attempt to insert PRA counts into the Archive's Complaint simply because the Complaint discusses the PRA cannot cut off judicial review. It is most definitely *not* the law of this Circuit that the PRA bars judicial review any time a case might come close to a presidential record.

Not only does the mere presence of presidential records not foreclose review in an FRA action, but the Court of Appeals has even held that judicial review is available in certain kinds of presidential records cases, *rejecting* the broad claim made by Defendants that the PRA "preclud[es] judicial review of any guideline affecting the status of a Presidential record." *Armstrong II*, 1 F.3d at 1281. Put simply, "[t]he *Armstrong I* opinion does not stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review." *Id.* at 1293. For instance, the PRA does allow "limited review to assure that guidelines defining Presidential records do not improperly sweep in nonpresidential records" which are subject to FOIA. *Id.* at 1278; *see also id.* at 1290. Therefore, the "initial classification of existing materials" and the "guidelines describing which *existing* materials will be treated as presidential records in the first place are subject to judicial review." *Id.* at 1294.

Under the PRA, "[t]his narrow, clearly defined limitation on the scope of the PRA is absolutely essential to preventing the PRA from becoming a potential Presidential *carte blanche* to shield materials from the reach of the FOIA." *Armstrong II*, 1 F.3d at 1292. Only "decisions that involve materials that are truly Presidential records are immune from judicial review," but decisions that relate simply to "asserted Presidential records" are not. *Id.* at 1293. Defendants'

argument for preclusion of judicial review because of the PRA is based on a fundamental misreading of the law.[9]

Judicial review related to presidential records may never be necessary in this case, but regardless, *Armstrong II* establishes that some judicial review is available, contrary to the assertions made in Defendants' motion. The fact that this Court's orders may lead to subsequent agency action involving presidential records is certainly not sufficient to preclude review of the Archive's specifically-authorized claims.

## II.  DEFENDANTS' OTHER ARGUMENTS DO NOT WARRANT DISMISSAL OF THE ARCHIVE'S WELL-PLEADED CLAIMS FOR RELIEF

### A. The Archive Presents a Justiciable Case or Controversy

"Derived from the Constitution's 'case-or-controversy' requirement for federal court jurisdiction, Article III standing requires plaintiffs to establish, as an 'irreducible constitutional minimum,' that they face 'injury in fact' caused by the challenged conduct and redressable through relief sought from the court." *Shays v. FEC*, 414 F.3d 76, 83 (D.C. Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). This test applies to the Archive because "[a]n organization has standing on its own behalf if it meets the same standing test that applies to individuals." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).

As established in its Complaint and the accompanying Declaration of Thomas S. Blanton ("Blanton Decl."), it is clear that the Archive has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues

---

[9] Other forms of judicial review may be available under the PRA as well, though the issue is not before this Court. *See, e.g., Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995) (Richey, J.) (Archivist's performance of statutory duties under the PRA is subject to judicial review); *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, ___ F. Supp. 2d ___, 2007 WL 2822027, (D.D.C. Oct. 1, 2007) (Kollar-Kotelly, J.) (allowing APA review of Archivist's performance under PRA).

upon which the court so largely depends for illumination of difficult . . . questions[.]" *Baker v. Carr*, 369 U.S. 186, 204 (1962).[10] The Archive is a frequent FOIA requester and has requested federal records from the EOP and OA; it presently has records requests pending in front of multiple EOP components, including OA; and it is certain to request federal records from EOP components in the future.[11] *See* Blanton Decl. ¶¶ 3, 10, 11, 15, 25-33; Compl. ¶¶ 5, 88, 96 (setting forth the Archive's functions, the records it uses, and the ways in which it uses them). The Archive's staff of researchers use these records in their functions as journalists and historians. *See* Blanton Decl. ¶¶ 4-10, 15, 32. Their work results in the dissemination of publications, records compilations, documentary films, and conferences and other events, each of which make use of released federal records. *See id.* ¶¶ 3-20 . The Archive has used several hundred records from EOP and its components in its publications. *See id.* ¶¶ 27-28. The Archive also, as its name implies, acts as an archivist or librarian of records, maintaining indexed archives of federal records that can be accessed by researchers and that are made available to the public in hard copy and online. *See id.* ¶¶ 3, 5, 10, 11, 16-18, 21-24.

In performing these functions, the Archive makes use of federal records obtained through FOIA and mandatory declassification review requests submitted by itself and others, and also makes use of historical government documents made public through other means, such as release under the Presidential Records Act or declassification. Federal records from EOP and its components are especially vital to these endeavors, because of the crucial role that EOP officials often play in the historical events on which the Archive's activities focus. In these and other

---

[10] The Court may properly consider matters outside the Complaint in assessing a plaintiff's standing. *CARE, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004); *Friends of Earth v. Dep't of Interior*, 478 F. Supp. 2d 11, 16 (D.D.C. 2007) (Lamberth, J.).

[11] One of the Archive's recent FOIA requests to OA is currently being litigated, based on OA's recent assertion that it is not an "agency" under FOIA. *See* Blanton Decl. ¶ 27.

ways, the Archive has shown that it has a present and future interest in access to federal records which it will use in its functions as journalist, historian, archivist, librarian, and publisher.

The Archive has alleged that it has been harmed by the destruction of White House e-mails that would otherwise be preserved as part of the historical record. This current denial of access constitutes an ongoing injury that is likely to continue to injure the Archive in different and recurring ways each time it seeks access to these portions of the historical record that have been destroyed or will be destroyed. *See* Blanton Decl. ¶¶ 30-34; Compl. ¶¶ 48, 53, 74, 81.

First, the White House has acknowledged that some five million e-mails have been deleted from the live system. The federal records contained within those e-mails are lost to the Archive, which cannot use them in its functions as a historian, archivist, and the like. Its research and publication projects documenting important U.S. policy and decisionmaking will be incomplete because relevant records from the Executive Office of the President's components are unavailable. *See* Blanton Decl. ¶¶ 30-34. This is why the Archive seeks an order to begin the process that will redress this existing and ongoing injury. Second, the EOP and OA decision to dismantle an existing, adequate recordkeeping system, and the subsequent failure to promulgate any adequate recordkeeping guidelines in its place, means that more e-mails will continue to be deleted and destroyed in the future, further injuring the Archive. The Archive seeks to compel Defendants to adopt adequate recordkeeping guidelines to prevent the likely recurrence of this injury in the future.

1. **The Current, Ongoing, and Future Denial of Access to Historical Government Records Constitutes a Concrete, Particularized Injury in Fact to the Archive in Its Role as a Historian, Journalist, Publisher, Archivist, and Librarian**

The first element of standing, injury in fact, "requires 'an invasion of a concrete and particularized legally protected interest.'" *Shays*, 414 F.3d at 83 (quoting *McConnell v. FEC*,

540 U.S. 93, 227 (2003)).  The Archive's claims for relief require that it allege "a real and

immediate – as opposed to merely conjectural or hypothetical – threat of future injury." *Natural

Res. Def. Council v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (internal quotation marks

omitted).  Here, the Archive states an injury in fact because it "points to a 'concrete and

demonstrable injury to [its] activities, not simply a setback to the organization's abstract social

interests.'"  *Spann*, 899 F.2d at 27 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379

(1982) (brackets in original)); *see also Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 4-5 (D.D.C.

1999) (Kennedy, J.) (organization establishes standing where denial of information from

government causes "concrete and demonstrable injury to the organization's activities").

The Archive has been found to have standing in circumstances almost identical to those

here.  The *Armstrong* plaintiffs, including the Archive, were found to have standing to litigate the

same causes of action in a case featuring circumstances almost identical to those here.  *See

Armstrong I*, 924 F.2d at 287-88, 297; *Armstrong II*, 1 F.3d at 1280.  The Archive had a

sufficient stake in the controversy and was within the zone of interests meant to be protected by

the records statutes because "one of the reasons that Congress mandated the creation and

preservation of federal and Presidential records was to ensure that private researchers and

historians would have access to the documentary history of the federal government." *Armstrong

I*, 924 F.2d at 287.  "[R]esearchers and historians who make extensive use of government

documents," such as the Archive, thus have standing to prevent the destruction of those records.

*Id.* at 288.

Similarly, the plaintiffs in *Public Citizen v. Carlin*, 2 F. Supp. 2d 1 (D.D.C. 1997)

(Friedman, J.), had standing and adequately pled injury in fact because they had demonstrated a

"real risk that records will not be available to them in electronic form," which they had requested

in the past and intended to request in the future pursuant to their roles as "historians, researchers,

journalists and authors." [12] *Id.* at 6. Judge Friedman separately found that the American Library

Association stated an injury in fact because of the risk that its members would be "directly and

dramatically affected" in their role as online depositories of government records by a federal

guideline restricting access to electronic government records. *Id.* at 6-7. As stated, the Archive

acts as a records library and depository of collections of records on important U.S. policy matters,

and thus would have had standing for these reasons as well. *See* Blanton Decl. ¶¶ 10, 17, 20-23.

The finding of standing in *Public Citizen* relied in part on the prior finding of standing in

*American Friends Service Committee v. Webster*, 720 F.2d 29, 47 n.24, 57 (D.C. Cir. 1983), in

which plaintiffs sought to enjoin the FBI's disposal of certain records. The District Court held

that "individuals and organizations whose claimed need for FBI documents arises out of their

professions as historians, journalists, teachers, film writers, or attorneys" had standing because

they "have a need for such documents and files in order to carry out research in their respective

fields, and they will suffer concrete and personal damage if the destruction of the documents is

allowed to continue." *Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222, 226 (D.D.C. 1980)

(Greene, J.) (footnote omitted). The Court of Appeals agreed that these plaintiffs had established

standing as a constitutional matter, and held that they also established prudential standing

because "Congress intended, expected, and positively desired private researchers and private

parties whose rights have been affected by government actions to have access to the

---

[12] While the Court of Appeals reversed Judge Friedman on the merits, it left undisturbed his finding of standing. *Public Citizen v. Carlin*, 184 F.3d 900 (D.C. Cir. 1999). The very fact that the Court of Appeals reached the merits demonstrates that it too was satisfied that the Archive and ALA had standing.

documentary history of the federal government." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d

29, 47 n.24, 57 (D.C. Cir. 1983).[13]

Defendants nonetheless persist in arguing that the Archive's injury is insufficient to

provide standing because it is "shared in substantially equal measure by all or a large class of

citizens." MTD at 16 (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 501 (1975)). But it is well

established that "informational injury," the denial of access to information that is provided by

statute, is a sufficiently concrete, particularized injury in fact for standing purposes, despite

"[t]he fact that other citizens or groups of citizens might make the same complaint."[14] *Public*

---

[13] Without acknowledging the actual holding of *American Friends*, which mandates that the Archive has standing in this case, the Government maintains that "[c]ourts in this Circuit have suggested" that the sufficiency of the Archive's injury in this case is "questionable," a proposition they support only by citation to *American Friends*. MTD at 17. Contrary to Defendants' argument, the standing of plaintiffs such as the Archive in cases such as this is not a question left open by *American Friends*, which held that "historians, journalists, teachers," and similar researchers had standing to prevent the destruction of federal records that might matter to their work. *American Friends Service Committee*, 485 F. Supp. at 227. In the same opinion, Judge Greene contemplated whether there was standing for "organizations which assert that their activities include the furtherance of civil liberties; civil rights; social, cultural, and economic change; and world peace," and which claimed "to have a need for access to FBI files under the FOIA to pursue their various goals," and that if the files were destroyed they would suffer injury insofar as "they will be deprived of raw material for primary research in the areas of their activities." *Id.* Judge Greene opined that it was "unsettled whether the requisite injury-in-fact standard is met by a claim that government documents, earmarked for destruction, are needed for organizational political purposes." *Id.* Yet he also recognized that groups with public interest agendas might nonetheless make use of government records in the same manner as journalists and historians, in which case they would have standing without question. *Id.* at 227 n.8. Because the other plaintiffs had already established their standing, Judge Greene did not need to rule on the standing of this category of plaintiff, and the Court of Appeals was not called upon to do so either.

Defendants point to this rather cryptic dicta from a thirty-year old case as evidence that the Archive's standing in this case is an open question. What they ignore is that the actual holding on standing in *American Friends*, which received the imprimatur of the Court of Appeals and is the law of this Circuit, is that researchers like the Archive have standing to prevent the imminent destruction of records that may be of use to them in their activities. Furthermore, if Judge Greene was suggesting that courts scrutinize the purposes for which FOIA requesters seek federal records, his statement was bad law, because "[o]ur decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records." *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989).

[14] Defendants are wrong when they imply that an injury must be economic in nature to support standing. *See* MTD at 17-18. When researchers are denied access to the records they need to conduct their work, "[i]t may be that the asserted damage to their career pursuits rises to the level of economic harm which has been the traditional test of standing to sue; but at a minimum it is equivalent to the type of non-economic injury recognized by the Supreme Court in *United States v. [Students Challenging Regulatory Agency Procedures]*, 412 U.S. 669, 686 (1972) as sufficient for standing purposes." *Am. Friends Serv. Comm.*, 485 F. Supp. at 226-27 (footnote omitted). As the Archive has noted, the "informational injury" caused by denial of the statutorily secured right of access to federal records is itself a cognizable injury sufficient to support standing. *Public Citizen*, 491 U.S. at 449; *see also Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999). Moreover, the Archive has alleged that it requires federal records to

*Citizen*, 491 U.S. at 449; *see also Byrd*, 174 F.3d at 243 (government "can make no serious challenge" to informational injury). The common statement that courts will not hear generalized grievances is meant to prohibit review "in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature – for example, harm to the 'common concern for obedience to law.'" *FEC v. Akins*, 524 U.S. 11, 23 (1998) (citation omitted). In this case, the Archive does not advance any such abstract interest in government adherence to law for its own sake. The Archive instead will be denied access to information it has requested or will request in the future for use in its publications, and that injury is particular to the Archive. That many other Americans will be injured by the destruction of federal records – in ways that are particular to their own interests in and uses of federal records – speaks to the multitude and magnitude of different injuries that will be caused by the government's conduct in this case, but does nothing to diminish the injury stated by the Archive.

The Archive's claims for prospective relief also allege "a real and immediate – as opposed to merely conjectural or hypothetical – threat of future injury." *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (internal quotation marks omitted). The Archive has established that it has specific requests for information pending before the EOP and its components, and that it is likely to make further requests in the future. *See* Blanton Decl. ¶¶ 25-34. It has experienced actual injury in the form of denial to access to records, and that injury is ongoing and will recur in different forms for as long as the deleted e-mails remain unavailable. There is also a significant risk of future injury from the loss of additional files. The Archive has alleged that it requests information from EOP and EOP's components, including the

---

(continued...)

conduct its work, and that the denial of records threatens its very existence, which would itself be a form of economic injury. *See* Blanton Decl. ¶ 30-32.

Office of Administration, has some 90 requests currently pending before EOP and its components, and is highly likely to make further requests in the future. Blanton Decl. ¶¶ 25-34. These requests include specific requests for electronic records and e-mails, and as a matter of law, FOIA requires agencies to search and review electronic records for release in response to FOIA requests just as they would non-electronic records. Blanton Decl. ¶¶ 25-27; 5 U.S.C. § 552(3)(C). As the Archive has alleged, the e-mails that are missing and others that might go missing are likely to be responsive to specific requests the Archive has made or is likely to make. As the Archive has also acknowledged, it is likely to make more requests in the future on topics that cannot be known at this time.[15]

Further, the Archive's request for an order compelling Defendants to establish an adequate system of recordkeeping does not rely merely on speculation that e-mails might go missing in the future. The Archive alleges that the EOP recordkeeping system, if it can be called that, has no safeguards to ensure compliance with the FRA. There is every reason to believe that a system that does not contain statutorily mandated safeguards will succumb to the very risk against which the statute sought to guard. Furthermore, it is hardly speculative for the Archive to allege that when a recordkeeping system was so flawed that some five million separate records were deleted, and no change has been made to that system in the interim, that the risk of further improper deletions is indeed significant.[16]

---

[15] Defendants seem to argue that the Archive must identify specific documents that it has an interest in using and that are at risk of destruction. Of course, without discovery the Archive cannot know precisely which documents are at risk of ultimate destruction, as this information is in the Defendants' sole possession. But the Archive would not even need to describe records in such detail in making a FOIA request. *See* 5 U.S.C. § 552(3)(A). The Archive certainly does not need to allege standing with such a degree of mathematical certainty, as a plaintiff "need only allege facts that demonstrate 'a realistic danger of . . . sustaining a direct injury.'" *Nat'l Cmty. Reinvestment Coal.*, 290 F. Supp. 2d at 131 (quoting *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497 (D.C. Cir. 1996)).

[16] Citation to *American Historical Association v. National Archives and Records Administration*, 310 F. Supp. 2d 216 (D.D.C. 2004) (Kollar-Kotelly, J.), is of no avail to Defendants. MTD at 20-21. There, Judge Kollar-Kotelly held that researchers failed to establish future injury in fact because the potential denial of access to

## 2.  The Relief Requested By The Archive Will Redress Its Injury

The other elements of standing, causation and redressability, are closely related, and

Defendants only challenge the redressability of Plaintiffs' injuries under their first four causes of

action.  MTD at 21.  Causation simply demands "a causal connection between the injury and the

conduct complained of," that is, the injury must be "fairly traceable" to the challenged conduct.

*Lujan*, 504 U.S. at 560.  The causation requirement is met here, as it is whenever a plaintiff

"demonstrates that the challenged agency action authorizes the conduct that allegedly caused the

plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *Animal Legal Def.*

*Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (*en banc*).

Redressability requires that it be "likely, as opposed to merely speculative, that the injury

will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560 (internal quotation marks

omitted).  "To satisfy the redressability element of Article III standing, there must be a

'substantial likelihood that the requested relief will remedy the alleged injury in fact.'" *Radack v.*

*Dep't of Justice*, No. 04-1881, 2006 WL 2024978, at *4, (D.D.C. 2006) (Kennedy, J.) (quoting

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)).  "Standing

can be established by showing that 'the practical consequence [of the court's order] . . . would

amount to a significant increase in the likelihood that the plaintiff would obtain relief that

directly redresses the injury suffered.'" Vol. 13 Charles A. Wright, *et al.*, *Federal Practice &*

---

(continued...)

Presidential records in the future would turn on future Presidential decisions that could not be predicted and were not scheduled to take place until a year or more into the future.  Here, there is a current, actual injury, and the risk of further records destruction is ongoing and turns not on some remote future decision, but simply on the continued operation of a system that is designed to fail.  Moreover, Defendants fail to acknowledge that Judge Kollar-Kotelly granted a motion to reconsider her standing decision based on changed factual circumstances, thus vacating the prior dismissal on standing grounds.  402 F. Supp. 2d 171 (D.D.C. 2005).  The opinion cited by Defendants is not even the law of *that* case, and is not applicable to the facts of this case in any event.

*Procedure* § 3531.6, at 997 (3d ed. 2007) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002) (brackets in original)).

There is a substantial likelihood that the relief sought by the Archive will remedy the alleged injury. First, an order compelling the agency heads and Archivist to initiate the FRA-mandated process to protect and restore the federal records at issue is likely to accomplish that goal. This is why Congress devised the remedy in the first place: it is likely to work.[17] Second, an order compelling the agency heads and Archivist to comply with the FRA by adopting and enforcing recordkeeping systems that perform the functions required by the FRA is very likely to prevent or substantially assist in preventing the future injury that the Archive fears. The Archive's Complaint alleges that the current, inadequate recordkeeping system – or lack thereof – has led to the improper destruction of records and will continue to do so. As noted above, plaintiffs similar to the Archive, and even the Archive itself, have been held to have standing in the past to pursue claims similar to those advanced here, because they sought relief that could redress their alleged injuries. *See, e.g.*, *Public Citizen v. Carlin*, 2 F. Supp. 2d at 7 (historians seeking to preserve federal records from improper destruction can redress the injury by obtaining judicial review of agency recordkeeping guidelines); *Am. Friends Serv. Comm.*, 485 F. Supp. at 227 (historians seeking to prevent destruction of FBI records can redress the injury by obtaining court order compelling Archivist to review agency disposal guidelines).

---

[17] Defendants contend that the Archive has failed to establish redressability on its first four claims because the requested relief turns on the conduct of a third party, the Attorney General. The Court of Appeals has recognized that effective relief may be had by ordering the Archivist and agency heads to initiate enforcement action, and that the Attorney General's decision is a separate matter. *See Armstrong I*, 924 F.2d at 295 n.11. Speculation at this point about the Attorney General's future conduct does not defeat the Archive's standing. Furthermore, Defendants' argument ignores the role Congress reserved for itself in the statutory enforcement scheme. When the Archivist and agency head request that the Attorney General initiate action to restore and preserve records, the FRA orders them to also inform Congress, which increases the likelihood that adequate relief will result.

## B.  The Archive's Complaint Names the Proper Parties

Defendants claim, without support, that EOP must be dismissed because the Archive can only sue individual EOP components.  To the contrary, the Archive has properly named the EOP and has requested relief directed at those EOP components that are subject to the FRA.  Compl. ¶ 7.  The EOP has been held to be an agency and a proper party to an FRA suit such as this one, and maintaining the EOP as a litigant "will not affect components of the EOP that are not governed by the FRA." *Public Citizen v. Carlin*, 2 F. Supp. 2d at 8-9.[18]  Just as EOP is an agency for FOIA purposes, *see* 5 U.S.C. § 552(f), it is an agency for FRA purposes, since the word "agency" has the same meaning under both statutes.  *Id.* at 8 (citing *Armstrong III*, 90 F.3d at 567 (Tatel, J., dissenting).  As the head of EOP has the authority to impose requirements on all of the EOP components in matters such as recordkeeping, *Public Citizen*, 2 F.Supp. 2d at 9, it follows that he is the "head" of a federal agency, at whom the FRA's command is directed.  44 U.S.C. § 3106.  Federal courts have adjudicated cases in which EOP was a defendant and APA review was sought, including the *Armstrong* line of cases, as well as FOIA cases where EOP acknowledged its agency status.  Furthermore, it is premature to begin carving up EOP, because there is no basis for the Court to determine which EOP components possess federal records or were implicated in the destruction of records.

## C.  Dismissal of the Archive's Well-Pleaded Mandamus Counts is Premature

Defendants contend that the Archive's mandamus claims are "duplicative" and "must be dismissed because they have raised claims under the APA seeking the same relief."  MTD at 22 (citing *Am. Chiropractic Ass'n v. Shalala*, 108 F. Supp. 2d 1, 11 (D.D.C. 2000) (Harris, J.)

---

[18] If the Court determines that EOP is not the proper party, then the Archive requests that the Court permit it an opportunity to seek leave to amend its Complaint to name the EOP's agency components and the heads of those agency components.

(holding that court would not hear mandamus claims because plaintiffs could get judicial review of same claims under APA). A plaintiff states a claim for mandamus relief where the plaintiff has a clear right to relief, the defendant has a clear duty to act, and no other adequate remedy is available. *See Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996). The Archive has alleged a failure by the agency heads and Archivist to comply with mandatory, non-discretionary duties prescribed by statute. Whether there is an alternative remedy under the APA remains to be seen, given Defendants' insistence that APA review is not available in this case. A plaintiff can plead alternate remedies, and it is premature to dismiss mandamus claims before determining whether adequate judicial review and remedy are available. *See, e.g., Bland v. Sec'y of Army*, No. 05-2143, 2007 U.S. Dist. LEXIS 20776, at *16 n.8, (D.D.C. Mar. 23, 2007) (Kennedy, J.) (dismissing mandamus claim *after* recognizing and adjudicating cause of action for identical relief under APA).[19]

---

[19] Defendants also make the specious argument that sovereign immunity bars the Archive's claims because, according to Defendants, the APA's waiver of immunity does not apply to the Archive's claims. MTD at 13 n.4. This simply duplicates Defendants' argument that the Archive does not have a cause of action under the APA. As the Archive has established, however, it does state claims for relief under the APA, and the waiver of sovereign immunity contained in that statute applies here. 5 U.S.C. § 702. Moreover, "sovereign immunity does not apply as a bar to suits alleging that an officer's actions were . . . beyond statutory authority," and the Archive has alleged that Defendants are in dereliction of mandatory statutory duties. *Swan*, 100 F.3d at 981 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-23 (1963)).

## CONCLUSION

For the foregoing reasons, the Archive's Complaint states valid claims for which relief may be granted under the APA, and which are within the jurisdiction of this Court. Therefore, Defendants' Motion [39] to Dismiss must be denied. **ORAL ARGUMENT IS RESPECTFULLY REQUESTED UNDER LOCAL CIVIL RULE 7(f).**

Respectfully Submitted,

DATED: December 13, 2007

_/s/ Sheila L. Shadmand_____

JOHN B. WILLIAMS (D.C. Bar No. 257667)
SHEILA L. SHADMAND (D.C. Bar No. 465842)
THOMAS A. BEDNAR (D.C. Bar. No. 493640)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
202.879.3939

MEREDITH FUCHS (D.C. Bar No. 450325)
THE NATIONAL SECURITY ARCHIVE
The Gelman Library
2130 H Street, N.W., Suite 701
Washington, D.C., 20037
202.994.7059

*Attorneys for Plaintiff The National Security Archive*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of December, 2007, I caused a copy of the foregoing

Plaintiff National Security Archive's Memorandum of Points and Authorities in Opposition to

Defendants' Motion to Dismiss to be served electronically by the United States District Court for

the District of Columbia's Electronic Case Filing ("ECF") and that this document is available on

the ECF system.

/s/    Sheila L. Shadmand
Sheila L. Shadmand

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1577 (HKK) |
| | ) | |
| EXECUTIVE OFFICE OF THE | ) | (Consolidated with |
| PRESIDENT, *et al.*, | ) | Civil Action No. 07-1707 (HKK)) |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF THOMAS S. BLANTON

I, Thomas S. Blanton, declare as follows:

1.    I am the Executive Director of the National Security Archive ("Archive"), a not-for-profit research institution located at the George Washington University in Washington, D.C. I served as the Archive's first Director of Planning & Research beginning in 1986, became the Archive's Deputy Director in 1989, and have served as Executive Director since 1992.  As Executive Director I am responsible for all aspects of the Archive's management and activities, including oversight of its research projects and publications.

2.    I am also the editor of the book, *White House E-Mail: The Top Secret Computer Messages the Reagan-Bush White House Tried to Destroy*, published in 1995 by The New Press in New York, and praised by *The New York Times* as "a stream of insights into past American policy, spiced with depictions of White House officials in poses they would never adopt for a formal portrait."  The book resulted from a sampling of White House e-mail backup tapes ordered by federal District Judge Charles Richey to test the government's claim in the *Armstrong*

*v. EOP* series of cases that e-mail messages were the equivalent of telephone message slips rather than historical documents that must be preserved under the records laws.  The National Security Archive was a plaintiff in those lawsuits.  The book included more than 500 historically valuable e-mail messages reproduced in facsimile with my annotations and introductions, ranging from detailed tasking of White House and Executive Office of the President staff arranging the covert shipment of arms to Iran, to White House and Executive Office of the President preparations for an upcoming summit with Soviet leader Mikhail Gorbachev.

3.    The Archive was established in 1985 to conduct research and public education on U.S. governmental and national security decision-making.  The Archive regularly collects, analyzes, and publishes declassified documents acquired through the Freedom of Information Act ("FOIA"), the mandatory declassification review ("MDR") procedure established by Executive Order 12958, as amended by Executive Order 13292, and systematic or special releases of historical records at the National Archives and Records Administration (NARA) or the various presidential libraries.  To accomplish these missions, the Archive promotes access to government records.

4.    The Archive currently employs 33 full- and part-time analysts, fellows, research associates, and research assistants whose responsibilities include systematic, in-depth research on U.S. government documents that help to shed light on the decision-making process of the U.S. government and provide the historical context underlying those decisions.  Seven of the 33 Archive staff hold Ph.D. degrees in history, political science, or international relations.  The Archive's projects focus on foreign policy, national security policy, intelligence policy and military policy.

5.     The Archive has an extensive history of publishing and disseminating its research and documentation in multiple formats, including paper, World Wide Web, CD-ROM, and microforms.  Archive publications include more than 50 books written by staff and fellows; 29 large reference collections of declassified documents included in the Digital National Security Archive subscription series published by ProQuest; hundreds of articles in major newspapers, magazines and academic journals; and more than 230 online "electronic briefing books" which consist of narrative and analytical descriptions of important events related to U.S. foreign, intelligence, and military policy, along with the original documents illustrating the events and U.S. government decisions and activities.  The Archive has also consulted on a number of documentary films and television and radio news specials.

6.     The Archive's journalistic work has received numerous awards, including most recently the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research.  In 1999 the Archive won the George Polk Award, one of U.S. journalism's most prestigious prizes, for—in the words of the citation—"piercing the self-serving veils of government secrecy, guiding journalists in the search for the truth and informing us all."  In 1998, the Archive shared the George Foster Peabody Award for the year's outstanding documentary broadcast series (CNN's *Cold War*).

7.     The Archive's World Wide Web site, www.nsarchive.org, has won numerous awards including 40 citations from the Internet Scout Report of the University of Wisconsin, which recognizes "the most valuable and authoritative educational resources online"; recommendations from The History Channel and the BBC Online; *Forbes* Magazine's "Best of the Web" award in 2005; and citation as one of the five "Top Sites" on the Web for terrorism-

related information, with "fascinating primary data," according to the *National Journal* (December 8, 2001).

8.     In pursuing their work for the Archive, staff and fellows have published more than 50 books, including the winners of the 1996 Pulitzer Prize, the 1995 National Book Award, the 1995 Lionel Gelber Prize, the 1996 James Madison Award Citation of the American Library Association, the *Boston Globe* Notable Book Award for 1999, and the *Los Angeles Times* Best Non-Fiction Books of 2003.  The publishers of Archive books range from university presses (such as Oxford, Harvard, Central European University, University Press of Kansas) to trade houses (W. W. Norton/New Press, Warner Books, Harper & Row) to academic publishers (Westview, Lynne Reinner, Routledge).

9.     Recent books published by Archive staff and fellows include, for example:  *The U.S. Intelligence Community*, 5th Edition, by Jeffrey T. Richelson (2007, Westview Press); *A Failed Empire: The Soviet Union in the Cold War from Stalin to Gorbachev*, by Vladislav Zubok (2007, University of North Carolina Chapel Hill); *From Solidarity to Martial Law: The Polish Crisis of 1980-81*, by Andrzej Paczkowski and Malcolm Byrne (2007, Central European University Press); *Spying on the Bomb: American Nuclear Intelligence from Nazi Germany to Iran and North Korea*, by Jeffrey T. Richelson (2006, W.W. Norton); *War Plans and Alliances in the Cold War: Threat Perceptions in East and West*, by Vojtech Mastny, Sven Holtsmark, and Andreas Wenger (2006, Routledge); *Safe for Democracy: The Secret Wars of the CIA*, by John Prados (2006, Ivan R. Dee); *Inside the Pentagon Papers*, ed. John Prados (paperback edition) (2005, University Press of Kansas); *White House Tapes: Eavesdropping on the Presidents*, ed. John Prados (paperback edition) (2005, The New Press/W.W. Norton); *Hoodwinked: The Documents That Reveal How Bush Sold Us a War*, by John Prados (2004, The New Press/W.W.

Norton); *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter

Kornbluh (2003, The New Press/W.W. Norton); *Partnership: The United States and Japan*

*1951-2001*, by Akira Iriye and Robert Wampler (2001, Kodansha); *The Wizards of Langley:*

*Inside the CIA's Directorate of Science and Technology,* by Jeffrey T. Richelson (2001,

Westview Press); *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* by

William Burr (1999, The New Press/W.W. Norton), *Bay of Pigs Declassified: The Secret CIA*

*Report*, by Peter Kornbluh (1998, The New Press/W.W. Norton), and *Atomic Audit: The Costs*

*and Consequences of U.S. Nuclear Weapons since 1940*, by Stephen I. Schwartz, with myself

and the Archive's William Burr as co-authors, *et al*. (1998, Brookings Institution Press).  In

addition to these books, Archive staff and fellows have contributed chapters and essays to

numerous other books and publications on related topics.

10.    Each of these publications by staff and fellows of the Archive is a direct

consequence of their work at the Archive.  Each of these publications relies heavily on the

information obtained by the Archive through its FOIA and MDR requests and through research

at Presidential libraries.  Most of these publications directly cite FOIA requests made by the

authors with and through the Archive.

11.    The Archive also produces large reference collections of declassified documents

obtained through FOIA, mandatory declassification review and other research, organized around

a central subject or topic, together with commentary, indexes, and finding aids created by

Archive analysts.  The Archive has produced 29 such document sets, which are available

digitally and on microfiche, are distributed to a broad range of libraries, universities, and

research institutes, and are available to the public in the Archive's reading room in the main

Gelman Library building on the George Washington University campus.  The publisher of these

collections is ProQuest Information and Learning, which is also the leading publisher of Ph.D. dissertations through its subsidiary UMI (formerly University Microfilms).

12.     More than 400 university libraries have purchased one or more of the Archive's reference collections, and 70 major university libraries ranging from Harvard to the entire University of California system have purchased the complete series of collections.  In addition, numerous federal institutions and agencies have purchased the Archive's reference collections, including the Department of Justice, the National Defense University Library, the Smithsonian Institution, the U.S. Military Academy at West Point, the Naval War College, the Central Intelligence Agency, and the Command and General Staff College.

13.     Recent Archive document sets include:  *U.S. Intelligence on Weapons of Mass Destruction from World War II to Iraq* (2006, 8,386 pages); *The Cuban Missile Crisis Revisited: An International Collection of Documents from the Bay of Pigs to the Brink of Nuclear War* (2006, 8,737 pages); *The Kissinger Transcripts: A Verbatim Record of U.S. Diplomacy 1969-1977* (2005, 28,286 pages); and *Terrorism and U.S. Policy: 1968-2002* (2002, 22,774 pages); *U.S. Policy in the Vietnam War, Part I, 1954-1968* (2004, 13,675 pages); *U.S. Policy in the Vietnam War, Part II: 1969-1975* (2004, 20,910 pages); *Japan and the United States: Diplomatic, Security, and Economic Relations, Part II, 1977-1992* (2000, 10,512 pages); and *Guatemala and the United States, 1954-1999* (2002, 17,244 pages).

14.     Additional documents sets already in the production queue for completion in the next 12-30 months include document sets on the following topics: (1) The Kissinger Telephone Transcripts; (2) Peru: Human Rights, Drugs and Democracy, 1980-2000; (3) The United States Intelligence Community After 9/11; and (4) The History of the National Security Agency.

15.     Articles written by Archive analysts based on records obtained from the United States Government have appeared in *The Washington Post*, *The New York Times*, *The Wall Street Journal*, *Congressional Quarterly*, *The Los Angeles Times*, *The Boston Globe*, *Harpers Magazine*, *The Miami Herald*, *Diplomatic History*, *Current History*, *The Nation*, *The International Herald Tribune*, *The Guardian*, *Vanity Fair*, *The Bulletin of the Atomic Scientists*, *World Policy Journal*, *Foreign Affairs*, *Foreign Policy*, *Newsweek*, *The International Journal of Intelligence and Counterintelligence*, *International Security*, *Intelligence and National Security*, and other publications.

16.     In addition to these publication activities, the Archive also distributes e-mail alerts on an almost weekly basis to over 7,000 subscribers.  These newsletters directly link to documents recently released to the Archive through its research activities and update the public on issues pertaining to the operations and activities of the U.S. Government.

17.     The alerts announce new "electronic briefing books" of documents on newsworthy topics, and provide direct links to the new postings on the Archive's Web site. Updated frequently, these alerts and briefing books provide a sampling of documents in the Archive's published and unpublished collections, and they provide online access to important declassified records on U.S. national security, foreign policy, diplomatic and military history, and intelligence policy.  Approximately 236 of those electronic briefing books are available at the Archive's website (http://www.gwu.edu/~nsarchive/news/).

18.     The Archive's website attracts nearly two million successful visits per month by 230,000 unique visitors per month, who download more than 15 million pages of declassified documents per month, according to statistics maintained by the George Washington University Information Systems and Services.

19.     In addition to the publication activities outlined above, the Archive has organized, co-sponsored, or provided the documentary basis for more than 60 major international academic conferences studying contemporary history and international relations.  The Archive's conferences center around documentary briefing books of newly available primary sources, and bring together scholars with policymaking veterans who can provide context and atmospherics, often from opposing sides of the same international crisis or issue.

20.     For example, the Archive co-organized with Harvard University's Kennedy School and then with Brown University's Watson Institute a series of six conferences between 1987 and 2002 on the Cuban Missile Crisis of 1962 – each of which generated worldwide news headlines and ultimately produced several volumes of new scholarship on the crisis.  The first such conference brought to the table every then-living member of President Kennedy's "ExComm" during the Cuban missile crisis (such as defense secretary Robert McNamara and presidential counsel Theodore Sorensen); subsequent conferences (including one in Moscow) added leading Soviet eyewitnesses such as foreign minister Andrei Gromyko and ambassador Anatoly Dobrynin; and the two anniversary conferences in Havana, Cuba in 1992 and 2002, attracted the full participation of Cuban president Fidel Castro, meeting with major delegations of American and Russian former officials and scholars.  The Archive also was the organizer of a major 2001 conference in Havana on the 1961 Bay of Pigs operation, also hosted by Fidel Castro, that included a delegation of Bay of Pigs veterans from Miami ("Bay of Pigs: 40 years After").  The Archive also co-sponsored major conferences on the anti-Soviet uprising in Hungary in 1956 (Budapest, 1996), the Prague Spring of 1968 (Prague 1994), the Berlin workers uprising of 1953 (Potsdam 1993), the emergence of Solidarity in Poland in the early 1980s (Jachranka 1997), and five conferences marking the 10th anniversary of the 1989 collapse of

Communism in Eastern Europe (with participants such as Czech president Vaclav Havel, former

Polish dictator Wojciech Jaruzelski, former U.S. national security adviser Zbigniew Brzezinski,

and the first Solidarity prime minister Tadeusz Mazowiecki).  Archive partners in these

conferences have included an extraordinary range of academic and research institutions, for

example:  leading dissident organizations such as the Moscow Helsinki Group and the 1956

Institute in Budapest; the post-Communist academies of science of Poland, Hungary, the Czech

Republic, and the Russian Federation; six Italian universities (Florence, Pavia, Padua, Urbino,

Perugia and Roma Tre); the Norwegian Nobel Institute; Ohio State University's Mershon Center;

the Woodrow Wilson International Center for Scholars in Washington D.C.; and the Federal

Institute of Technology's Center for Security Studies in Zurich, among many others.  The

Archive has also organized seven academic summer schools for university faculty in Russian

regional universities, with partners at Saratov, Voronezh and Kuban State Universities.

     21.    The Archive also serves as a repository of numerous collections of declassified

records that have been donated to the Archive for their long-term preservation and to ensure

continued access to the public.  These include collections of documents compiled by authors

such as John Marks ("The Search for the Manchurian Candidate: The CIA and Mind Control");

Don Oberdorfer ("The Two Koreas: A Contemporary History"); Eliahu Mizrachi (writer and

former Israeli government official); Arthur C. Helton (lawyer and human rights activist killed in

the bombing of the United Nations headquarters in Baghdad in August 2003 who wrote "The

Price of Indifference" on humanitarian crises); nuclear researcher Chuck Hansen ("U.S. Nuclear

Weapons: The Secret History" and "Swords of Armageddon: U.S. Nuclear Weapons

Development since 1945" CD-ROM); former ambassador Raymond Garthoff ("Détente and

Confrontation: American-Soviet Relations From Nixon to Reagan"); and Pulitzer Prize winner

Kai Bird ("The Color of Truth: McGeorge Bundy and William Bundy: Brothers in Arms" and "The Chairman: John J. McCloy, the Making of the American Establishment").

22.    In total, the Archive maintains approximately 186 titled collections that were donated by outside researchers. These collections include more than 2,200 bankers' boxes worth of materials. The Archive is in the process of digitizing the most popular of these collections.

23.    The Archive's archival collections are stored within the facilities of the Washington Research Library Consortium (WRLC) (WRLC's Website is http://www.wrlc.org/), which was established in 1987 by the major universities in the Washington D.C. area to share library collections and information technology in order to enhance the resources available to their students and faculty.

24.    The above referenced collections may be reviewed by any researcher. Indeed the Archive receives approximately 500 visiting researchers each year at its research room in George Washington University's Gelman Library for the use of its unpublished collections.

25.    The Archive has filed over 36,000 FOIA and MDR (Mandatory Declassification Review) requests with federal agencies in its 22 years of existence. Most recently, in 2006 the Archive filed 2,278 FOIA and MDR requests. As of the end of November 2007, the Archive has filed 2,027 FOIA and MDR requests in 2007.

26.    The Archive has filed approximately 250 FOIA requests in its history with the EOP and/or its components, excluding the National Security Council.

27.    There currently are over 90 FOIA requests filed by Archive analysts pending at the EOP or its components, including 33 pending at ONDCP, 50 pending at USTR, 1 pending at CEQ, 1 pending at OST, and 7 pending at OMB. Six (6) of these pending EOP requests were filed in 2007. Five (5) of those were filed after the date this lawsuit was filed. Each of the 90+

FOIA requests currently pending at the EOP and its components include requests for e-mails. We have previously filed FOIA requests with OA, but OA has responded to recent administrative appeals and FOIA requests with the claim that it is no longer an "agency" under the FOIA and, in one case, it stated that it was processing the appeal as a matter of administrative discretion.

28.    The Archive's publications described in this Declaration include more than 1000 records originating from the EOP and/or its components.

29.    The Archive also was a plaintiff in a series of cases brought against the Reagan, Bush and Clinton administrations concerning preservation of White House and EOP e-mails. The first suit was filed when, on the last day of the Reagan presidency, staff of the National Security Archive became aware that the outgoing administration officials planned to destroy all electronic communications records and back-up tapes before they left the White House. Only 30 hours before the destruction was to take place, lawyers for the Archive and the Center for National Security Studies (CNSS) filed a series of FOIA requests together with a lawsuit seeking an immediate temporary restraining order (TRO), to prevent the imminent erasure of the e-mail materials. This lawsuit, which began the *Armstrong* line of cases, led the D.C. Circuit to order the promulgation of adequate recordkeeping policies and guidelines in the Executive Office of the President. *Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993). As a result of this litigation, the Executive Office of the President established the first archiving system for the preservation of its e-mails. It is the Archive's understanding that this resulted in the retention of 30 million e-mail records.

30.    The Archive's existence is based on accessibility to government records. The destruction of EOP e-mails that would otherwise be available under FOIA or through other

means has injured the Archive because it cannot access and use those records.  Even though the

Archive has made FOIA requests that may cover some or all of the deleted e-mails, it has been

denied access to them because they have not been preserved and segregated with the other

federal records maintained by the EOP and its components, including the OA.  This denial of

access to these records has also injured the Archive because it has been denied the use of these

records for the various ongoing projects to which they may relate, including those described

above.

31.     Because current EOP policies and practices failed to prevent the deletion of these

e-mails, estimated to number over five million, it is my belief that more e-mails will be deleted

and destroyed in the future.  If more e-mails are destroyed, the Archive will suffer further injury

to its activities.  If these parts of the historical record are lost, the Archive will be impaired in its

ability as a historian to document, analyze, and report on historical events, which are underway

today.  The Archive will also suffer injury in its role as an archivist and depository of records,

because it will not be able to provide access to the complete historical record for its own

researchers and for the many other researchers who make use of the Archive.

32.     Based on our research priorities and our experience, I believe it is highly likely

that among the millions of e-mails that have been lost, there are records of historical significance

related to issues that are of public importance.  The deleted e-mails are included in requests for

records that the Archive has, is, or will continue to request for use in reporting, publishing,

compiling records collections, and otherwise conducting its many scholarly and journalistic

activities.  Given the time frame of the deleted records, the issues represented in those deleted

records include operations of the intelligence community in the wake of 9/11; operations in the

intelligence community in the lead-up to the war in Iraq and in the conduct thereof; drug policy

towards Latin America; trade policy towards Asia; and prior intelligence gathering related to nuclear proliferation in Iran, Syria, and North Korea. These and many other topics are areas of interest in which the Archive is currently conducting research. Thus, the deletion of the records has already caused the Archive harm. If more e-mails are lost, the Archive will continue to suffer injury in conducting its activities.

33.    As is apparent, many of these topics are not simply matters of past history, but are developing, and it is to be expected that federal agencies will continue to create records related to them. As the director of an organization committed to the research and preservation of history, I also realize that the purpose of preserving the entire historical record is so that researchers can have access to records on issues that may gain increased importance and relevance in the future. For this reason, I cannot foresee each and every additional topic for which the Archive might request and use federal records from EOP and OA in the future, or the other ways in which the Archive may be injured if it is denied access to records because they have been destroyed.

34.    As the director of the Archive, I believe that these injuries can be remedied if the Archivist of the United States and the relevant agency heads initiate steps to restore and preserve these records, including from the backup tapes. This is the process that worked in the *Armstrong* series of cases. I also believe that the threat of further records being destroyed can be prevented if the Archivist and agency heads work together to develop an adequate recordkeeping system and guidelines that ensure the preservation of historical records, just as when the prior administration installed an e-mail archiving system.

35.    I swear under the penalty of perjury that the foregoing is true and correct.


_13 December 2007_
DATE

THOMAS S. BLANTON
Executive Director
The National Security Archive
The Gelman Library
2130 H Street, N.W., Suite 701
Washington, DC, 20037
Tel. 202-994-7000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

NATIONAL SECURITY ARCHIVE,            )
                                      )
            Plaintiff,                )
                                      )
      v.                              )          Civil Action No. 07-1577 (HKK)
                                      )
EXECUTIVE OFFICE OF THE               )          (Consolidated with
PRESIDENT, *et al.*,                  )          Civil Action No. 07-1707 (HKK))
                                      )
            Defendants.               )
_____)

### [PROPOSED] ORDER

The Court having considered Defendants' motion to dismiss, Plaintiffs' oppositions

thereto and the entire record, it is hereby ORDERED that Defendants' motion to dismiss is

DENIED.

Dated: _____          _____
                                  HENRY H. KENNEDY, JR.
                                  United States District Judge